UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

David Bradberry                            )
individually and on                        )
behalf of all others similarly             )        **CLASS ACTION COMPLAINT**
situated,                                  )
                                           )
        Plaintiff,                         )        JURY TRIAL DEMANDED
                                           )
                                           )
v.                                         )        Case No.: **1:23-cv-09440 (JHR-OTW)**
                                           )
Abercrombie & Fitch Co.,                   )
Michael S. Jeffries,                       )
Matthew Smith, and                         )
The Jeffries Family Office, LLC,           )
                                           )
        Defendants.                        )
_____/

## <u>INDIVIDUAL AND CLASS ACTION FIRST AMENDED COMPLAINT</u>

Plaintiff, David Bradberry, files this first amended individual and civil class

action complaint for damages and other relief under (among other provisions of law)

the United States federal anti-sex trafficking statute, 18 U.S.C. § 1591, *et seq.*—the

Trafficking Victim Protection Act ("TVPA"), New York's Services for Victims of

Human Trafficking, N.Y. Soc. Serv. § 483-bb, negligent and intentional acts related

to sexual offenses as defined in article one hundred thirty of the penal law, pursuant

to the New York Adult Survivors Act, N.Y. CPLR §214-j, the Victims of Gender-

Motivated Violence Protection Law pursuant to N.Y.C. Admin. Code §§ 10-1101-

1107, and intentional infliction of emotional distress. The suit arises from Defendant

Abercrombie & Fitch Co.'s (hereinafter "Abercrombie") participation and intentional involvement in a widespread sex-trafficking operation led by its CEO, Defendant Michael Jeffries ("Jeffries"), as well as the direct, substantial financial benefits it received therefrom.

## I.  INTRODUCTION

1.      Jeffries has been described as a man who, "just never stopped working for the brand, thinking for the brand." He has even been referred to as the heart and soul of Abercrombie. Abercrombie was an alter ego of Michael Jeffries. As detailed further herein, Jeffries was indistinguishable from Abercrombie, and Abercrombie indistinguishable from Jeffries. That was the case from the time that he conceptualized the oversexualization of young men to catapult the Abercrombie brand into success, and it remained the case when he used his role as CEO of Abercrombie to prey upon attractive young men who believed that Jeffries was going to hire them as an Abercrombie model—the pinnacle of the modeling industry for men during the relevant time period. Abercrombie knew that it was providing the financial lifeblood for a sex-trafficking organization led by its CEO from at least 1992 through 2014, that allowed for him to commit sexual crimes against young men. Jeffries was so important to the profitability of the brand that he was given complete autonomy to perform his role as CEO however he saw fit, including through the use of blatant international sex-trafficking and sexual abuse of young

men, any one of which could have also been a prospective Abercrombie models.

2.     In exchange for providing the position of power and unfettered access to corporate funds necessary for Jeffries to sexually terrorize aspiring male models, Abercrombie knowingly and intentionally benefited and received things of value from Jeffries and his sex-trafficking operation, including the value Jeffries himself brought to the brand. Abercrombie willfully turned a blind eye to his blatant misconduct so that the company would remain profitable during the most prominent years of Jeffries's abuse, through the sex-charged and exploitive campaign that Jeffries instituted at Abercrombie.

3.     As the CEO of Abercrombie, Jeffries had modeling scouts scouring the internet and various other resources to identify attractive young men, many of whom who were models hoping to be the next face of Abercrombie. The modeling scout would typically require the hopeful young model to meet with him first during an initial casting. If the modeling scout saw "potential" in the young model, he would be invited to attend a casting at the palatial home of Michael Jeffries, the well-known CEO of the Abercrombie brand, with his partner, Matthew Smith. Often these prospective models, turned sexual abuse and trafficking victims, were later sent to other places, including other areas of New York, Morocco, England, and France, to be sexually abused by Jeffries and other men often under the guise of becoming the next Abercrombie model.

4.      Abercrombie was central to all of Jeffries's and Smith's sexual abuse of young men in this class, and Abercrombie knew about, endorsed, and ratified Jeffries's and Smith's use of the Abercrombie brand to sexually abuse young men. Prior to his arrival at the Jeffries casting, the model was often provided with Abercrombie brand clothing that he was required to wear to the event. Often, an Abercrombie gift card would be left at an Abercrombie store for the model to pick up and purchase the required clothing.

5.      Consistent with other modeling interviews in the industry, the prospective model was also provided with a detailed call sheet inclusive of pre-paid travel arrangements that had been made for him from his location usually to the home of the Abercrombie CEO at his Hamptons Estate in New York.

6.      To make clear to each of the prospective Abercrombie models in attendance that these were authentic Abercrombie endorsed interviews, all the men in attendance at Jeffries's home were dressed in Abercrombie attire including the other models, the apparent security staff, as well as Jeffries and his long-time partner, Matthew Smith.

7.      Each model was initially led into Jeffries's home and taken to interview with Jeffries personally, after which, each of the prospective models was forced to strip down so that Jeffries could view his body, which was not uncommon in model interviews with Abercrombie or other major brands. After this portion of the

interview and casting, the models were forced by employees of the Jeffries Family Office—who were present at these events and working in concert with Jeffries to perpetrate his crimes—to sign documents described to them as nondisclosure agreements, before suddenly being taken into rooms where men were engaging in sex with one another.

8.     At the events, the models were then pressured, if not forced, to take drugs, were surrounded by security, and were required to participate in sex acts with Jeffries and others, including Smith, all at Jeffries's direction. The models were led to believe that being sexually abused by the CEO of Abercrombie or his partner at a remote private location, reasonably believed to be arranged by the company, was the price that was paid to obtain one of the most coveted roles in the industry—an Abercrombie model. This fact was reiterated to them several times by several different people who were known to have knowledge of the inner workings of the industry.

9.     These individuals that informed the prospective models of the "normalcy" of engaging in sex with Jeffries and others to obtain the coveted Abercrombie model position included not only Jeffries and Smith, but well-known Abercrombie photographers such as Bruce Weber (another crucial witness and confidant of Jeffries). Abercrombie's crucial support and/or blatant disregard of Jeffries allowed him to successfully rape, sexually assault, and coercively sex traffic

David Bradberry, Barret Pall, and the numerous other members of the Class proposed below (the "Class").

10.    Abercrombie further knew or should have known that Jeffries was regularly committing violations of New York Penal Law Art. 130, including, but not limited to, New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66, and acted to enable, and facilitated Jeffries's commission of such offenses against countless young men, including David Bradberry and other Class Members. Further, these crimes of sexual violence were committed because of the victims' gender or on the basis of their gender, and due at least in part, to an animus based on their gender.  Abercrombie also knew that Jeffries, while acting in the course and scope of his employment and on behalf of the company, used means of force, threats of force, threats to cause serious harm, fraud, abuse of legal process, exploitation of power disparity, and a variety of other forms of fraud and coercion to cause young men to engage in commercial sex acts.

11.    Additionally, Jeffries openly flaunted and used his status and power at the company to create the perfect scheme to recruit prospective victims, and ultimately subject them to his and Smith's abuse. Knowing that it would earn, and was earning, millions of dollars in exchange for facilitating Jeffries's sex abuse and trafficking, and/or recklessly turning a blind eye to his conduct, Abercrombie chose profits over following the law.

12.    Specifically, Abercrombie chose participating in, facilitating the sex-trafficking conspiracy, and allowing the horrid conduct of Jeffries to continue for many years to keep its sexually abusive CEO at the helm and to churn profits.

13.    A review and comparison of the Abercrombie financials before and during Jeffries tenure as CEO will reveal conclusively why Abercrombie enabled and participated in this sex-trafficking and sexual abuse scheme of young men – this philosophy of sexually exploiting and abusing young men made Abercrombie exorbitant profits. David Bradberry makes the following allegations on information and belief and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## II. JURISDICTION, VENUE, AND TIMELINESS

14.    This action is brought pursuant to various federal and state statutes, including the federal TVPA, 18 U.S.C. § 1591 through § 1595. This Court has diversity jurisdiction as well as federal question subject-matter jurisdiction pursuant to 28 U.S.C. §1331, because David Bradberry—individually and on behalf of the other Class members—is proceeding under the federal TVPA statute.

15.    This Court also has supplemental jurisdiction over the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

16.    This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. § 1595, in which to bring this action. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Jeffries, his co-conspirators, Smith, Abercrombie, and the Jeffries Family Office all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in the illegal venture and conduct through actions that originated in this District. In addition, Jeffries and Smith sexually abused and trafficked David Bradberry and members of the Class in this District.

17.    Often these acts of sexual abuse and commercial sex acts, committed by Jeffries, Smith, and certain select individuals, took place in Jeffries's New York City mansion, New York City Hotels, his home in the Hamptons, as well as in London, England, Marrakesh, Morocco, Nice, France, and elsewhere abroad. Jeffries also used his New York City and Hampton's mansions to harbor his victims and as a base from which to transport them to other locations outside of New York and from which he operated, with Abercrombie and the Jeffries Family Office's cooperation and participation, a massive sex trafficking and criminal operation.

18.    A substantial number of the acts, events, and omissions giving rise to this cause of action occurred in this District.

19.    This action has been timely filed pursuant to the applicable law governing each individual cause of action, because the conspiracy continued until

recently, and under New York's Adult Survivor's Act, N.Y. CPLR § 214-j.

## III.   PARTIES

20.     David Bradberry is a U.S. citizen and was at all relevant times a resident of and domiciled in the State of Pennsylvania.

21.     As discussed below, many other men, believed to exceed one hundred victims, are similarly situated to David Bradberry.  Some or all of those men may wish to use a pseudonym to protect their identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

22.     Defendant Abercrombie is a specialty retailer that sells clothing. It is a Delaware corporation with its principal executive offices located at 6301 Fitch Path, New Albany, Ohio 43054. Abercrombie's common stock is listed and traded on the New York Stock Exchange under the symbol "ANF."

23.     Defendant Abercrombie operates in the State of New York, currently conducts substantial business in this District, and conducted substantial business at the time of events covered in this complaint.

24.     Abercrombie's activities, including the events alleged herein, were in and affecting interstate and foreign commerce.  In connection with the acts alleged in this complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, email, and interstate telephone communications.

25.    Abercrombie is responsible, under United States law and otherwise, for the acts of its officers, directors, employees, and agents, including the acts described in this Complaint.

26.    The acts alleged were committed by Abercrombie's officers, directors, employees, and agents and were committed within the actual and apparent scope of their employment and with the intention to benefit Abercrombie.

27.    Additionally, Jeffries, Smith, and others were aided in accomplishing their heinous sexual crimes and tortious conduct by the existence of their relationship with Abercrombie.

28.    But for Jeffries position as CEO, and Smith's pseudo-officer role within Abercrombie, the two would not have been afforded the opportunity to recruit, solicit, entice, coerce, harbor, transport, or obtain David Bradberry and other Class Members for commercial sex acts, criminal sex acts, and other tortious conduct.

29.    Defendant, Michael Jeffries, served as CEO of Abercrombie from February 1992 through 2014. Upon information and belief, Jeffries is a citizen of Ohio.

30.    Defendant, Matthew Smith, was Defendant Jeffries's long-time partner and someone with apparent authority who Abercrombie allowed to work extensively for the brand despite not holding an official position within the company. Upon information and belief, Smith is a citizen of Ohio.

31.    Defendant, Jeffries Family Office, LLC ("Jeffries Family Office") is a limited liability corporation based in Ohio with its principal place of business located at 2 Easton Oval, Columbus, Ohio 43219.  According to the sworn testimony of Matthew Smith, the Jeffries Family Office has been in existence since 1998, with Matthew Smith as the head of the Jeffries Family Office since its 1998 inception.

32.    Defendant, Jeffries Family Office, operates in the State of New York, currently conducts substantial business in this District, and conducted substantial business at the time of events covered in this Complaint.

33.    Jeffries Family Office's activities, including participation in the events alleged herein, were in and affecting interstate and foreign commerce, and were instrumental in the facilitation and commission of Jeffries's sex crimes and sex trafficking venture. In connection with the acts alleged in this complaint, Defendant, Jeffries Family Office, directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, email, and interstate telephone communications.

34.    Jeffries Family Office is responsible, under United States law and otherwise, for the acts of its officers, directors, employees, and agents, including the acts described in this Complaint.

35.    The acts alleged were committed by Jeffries Family Office's officers, directors, employees, and agents and were committed within the actual and apparent

scope of their employment and with the intention to benefit the Jeffries Family Office.

## IV.  FACTUAL BACKGROUND

36.    The Abercrombie sex-trafficking venture, carried out by Jeffries as Abercrombie CEO, with the assistance, cooperation, and participation of the co-defendants, operated as a sex-themed enterprise designed to sexually exploit and abuse vulnerable young men and falsely cause them to believe that they could become brand ambassadors or professional models for one of the world's most popular and successful clothing brands if they succumbed to the sexual abuse of Michael Jeffries, the CEO of the company.

37.    Jeffries and his co-conspirators preached the importance of the all-powerful Jeffries to cause young male models to succumb to sexual abuse and believe it was a "normal" and "necessary" step to becoming an Abercrombie model.

38.    Once in Jeffries's clutches, each victim knew that he must be completely compliant with every demand Jeffries had for him; otherwise, he would suffer serious reputational, financial, and/or psychological harm.  By using these and other means of force, threats of force, fraud, threats of abuse of the legal process and coercion, Jeffries in his role as CEO of Abercrombie and his co-conspirators sexually trafficked and sexually abused David Bradberry and the other members of the Class.

12

**A. Mike Jeffries**

39.    Abercrombie was founded in 1892 by David T. Abercrombie. In 1900, Ezra Fitch bought a significant interest in the business and by 1904, the company was renamed Abercrombie & Fitch Co.

40.    In 1976, Abercrombie filed for Chapter 11 bankruptcy and closed its flagship store in New York City in 1977. In 1978, Oshman's Sporting Goods bought the company for $1.5 million.

41.    In 1988, Leslie Wexner, the founder of The Limited, bought Abercrombie from Oshman's for $47 million in an effort to take the failing brand and turn it around.

42.    In 1992, Leslie Wexner hired Jeffries to act as the CEO of Abercrombie. Wexner put full faith into Jeffries to aid him in transforming the clothing brand into a brand aimed at teens with extreme sexual appeal featuring half naked models. It was then that the Abercrombie sex-trafficking venture originated and was refined over the years under the watch of CEO Jeffries, a known and prolific sexual abuser.

43.    Prior to working for Abercrombie, Jeffries was the President of Alcott & Andrews, a women's retail chain that filed for bankruptcy in 1989.

44.    In 1996, Abercrombie became a publicly traded company.

45.    From 1996 until mid-2008, Abercrombie performed exceedingly well

with steady growth in earnings and share price.

46.    As part of his oversexualization of the company, Jeffries brought famed photographer, and fellow sexual abuser, Bruce Weber, into the fold. Weber has been accused of sexually assaulting more than 20 current and former models who claimed that he engaged in unnecessary nudity and coercive sexual behavior during professional modeling shoots.

47.    By 2003, under the direction of Wexner and Jeffries, the oversexualization of the brand was speaking for itself.



48.    Jeffries was hired by Wexner to invigorate Abercrombie and is considered to have been the main creator of the new look for the company saying that he wanted Abercrombie to "sizzle with sex."

49.    While Jeffries was the CEO and in charge of Abercrombie's methods for recruiting models and expanding the brand, Wexner was always his glorified

boss and mentor, and the Abercrombie Ohio office maintained somewhat of a shrine to Wexner.

50.     While working on behalf of Abercrombie, Jeffries while at the helm of Abercrombie, hosted and supported Abercrombie events where young male models were sexually abused. Jeffries had a refined system of recruitment wherein he hired a middleman to recruit victims with the prospect of becoming a model for the company.

51.     Abercrombie financially rewarded Jeffries for his methods of recruiting new models, thereby encouraging his sexually abusive ways so long as Jeffries's methods continued to financially benefit Abercrombie.

52.     That Abercrombie was constantly ramping up the sexualization of its brand was not hidden secret, as Jeffries made it clear that was what set Abercrombie apart and he was constantly looking to push the sexual envelope to keep company's edge over competition.

53.     For his sexually charged ideas, which included serial sex trafficking and abuse of young male models, Jeffries was handsomely rewarded.

54.     In 2004, Jeffries made approximately $25 million with a "stay bonus" of $6 million.

55.     In 2006, Jeffries gave an interview to Salon admitting that the Abercrombie image was built around sex appeal. He stated, "we hire good-looking

people in our stores. Because good-looking people attract other good-looking people, and we want to market to cool, good-looking people. We don't market to anyone other than that."

56.    As news within Abercrombie openly spread of Jeffries and his partner Smith, abusing young models sexually, Abercrombie continued to encourage and financially reward the conduct.

57.    At one point, a video circulated within the Abercrombie office, which depicted Mike Jeffries sniffing what was believed to be cocaine off a man's penis, and while Abercrombie tried to prevent the video from being more widely disseminated, the company did nothing to discourage the behavior captured in the video and in fact continued to financially reward Jeffries for his methods of recruiting young models, even though those methods were known to include rampant sexual abuse of young men.

58.    In 2008, Jeffries received a compensation package valued at approximately $71.8 million.

59.    On December 31, 2008, Jeffries's employment agreement was set to expire. Just days before, it was renewed and extended until February 22, 2014.

60.    Abercrombie also systematically incurred massive travel-related costs for Jeffries, which included extensive costs for the sex parties described herein.

61.    From at least 1992 through 2014, Jeffries—as the CEO of

Abercrombie—and Smith hosted parties for prospective Abercrombie models around the world, including at Jeffries's home in New York City.

62.    A middleman holding himself out to be a representative of Abercrombie was primarily responsible for the recruitment of and initial interaction with prospective male Abercrombie models, each of whom was paid thousands of dollars in cash after the sexual assault occurred. The "modeling scout" made it clear to the victims that the future of their modeling career with Abercrombie required an initial meeting with the scout, after which they would be recommended to meet Jeffries if they passed the first interview process with the scout.

63.    At the initial scout level meeting, the male models were often required to engage in sex with the scout, who made clear that the model's chances with Abercrombie were absolutely dependent on their engaging in those sexual acts, before a recommendation for a meeting with Jeffries was made.

64.    Each model was paid by the scout for his coerced participation and the scout was compensated by Defendant Jeffries Family Office.

65.    Once the victim engaged in commercial sex against his will with the scout, only then would he be invited to Jeffries's homes in New York City, the Hamptons, and other locations where he was typically forced to consume drugs such as "poppers" and Viagra before being forced or coerced into engaging in commercial sex and/or subjected to sexual abuse by Jeffries, Smith or other men at Jeffries's

direction.

66.     On multiple occasions, more extreme measures were forced upon the young men including the insertion of a needle and substance directly into the victim's penis in order to force a long-lasting erection and cause the victim to be involuntarily able to perform the forced sexual acts with Jeffries and/or Smith.

67.     Each of these events that resulted in the sexual abuse of young men was an Abercrombie-themed model event, where each of the models were provided with Abercrombie attire that he had to wear, and each of the other individuals in attendance was also made to dress head to toe in Abercrombie clothing.

**B. Matthew Smith**

68.     Since at least December 2007, and likely well before then, it was known to Abercrombie that Jeffries and other Abercrombie employees provided his partner, Matthew Smith, with Abercrombie managerial authority and access to nonpublic Abercrombie documents on a regular basis. Smith was known to have participated in meetings discussing Abercrombie business, he reviewed proprietary sales reports, and he visited Abercrombie stores to evaluate and generate reports for Abercrombie.

69.     Dating back to 1998, Smith considered himself to be the principal of the Jeffries Family Office. The Jeffries Family Office was designed to advise Jeffries on strategies relating to his stock in Abercrombie and to work hand in hand through Jeffries to operate and enhance the Abercrombie brand. Abercrombie could not have

achieved its level of success without Jeffries, the Jeffries Family Office, or the subject sex trafficking operation.

70.    Abercrombie even allowed Matthew Smith to play an integral role in the de facto partnership between Abercrombie and the Jeffries Family Office.

71.    Smith was without a doubt working for and at the direction of Abercrombie at the highest levels; he even attended private Abercrombie Board meetings wherein expansion opportunities and financial plans were discussed.

72.    On August 4, 2010, Smith executed a Non-Disclosure Agreement with Abercrombie allowing him to access proprietary Abercrombie documents and facilities without limitation for any purpose indefinitely.

73.    Between August 2011 and November 2013, Matthew Smith made 170 unannounced visits to stores in furtherance of the direct role that he had in company operations. While he never held an official position within Abercrombie, his influence over the company and involvement in the sex-trafficking venture and abuse of young men was well known to Abercrombie.

74.    It has been reported that Smith has been described by former Abercrombie executives as dangerous due to the fact that he was organizationally unaccountable if something were to go wrong with regard to a decision he made—a fact known by Abercrombie for the duration of Smith's relationship with Jeffries.

75.    In 2012, through the Jeffries Family Office, Smith created the

Abercrombie Aircraft Standards Manual to address standards for the maintenance, operation, and staffing of the Abercrombie airplane, which was integrally used in the underlying sex trafficking operation and the sexual abuse of young men by both Jeffries and Smith. *See* Abercrombie Aircraft Standards Manual (hereinafter "manual") attached as **Exhibit A**.

76.     Abercrombie staffed its plane and paid the salary and travel expenses of four cabin attendants provided by Cosmopolitan Management LLC, a company known for hiring out actors and models for events. Cosmopolitan Management LLC is the same company that the Jeffries Family Office paid to provide house staff for Jeffries and Smith.

77.     The Aircraft Standards manual created by Smith for the Abercrombie Gulfstream required the cabin attendants to wear a uniform of Abercrombie polo shirts, boxer briefs, flip-flops, and required that the male staff "spritz their uniforms with Abercrombie & Fitch 41 cologne." Notably, Jeffries required each of his victims to dress in the same Abercrombie attire that he required be worn on the Abercrombie plane.

78.     The Gulfstream G550 jet was owned by Abercrombie.

79.     The Aircraft Standards manual highlights the inextricably intertwined nature of the relationships between Abercrombie, the Jeffries Family Office, Michael Jeffries, and Matthew Smith.

80.    Having no official employment relationship with Abercrombie, and only acting as the significant other of Jeffries, Abercrombie permitted Matthew Smith to create the manual.

81.    The manual required staff to dress as ambassadors of the Abercrombie brand and required staff to provide both Jeffries and Smith with daily printed copies of confidential Abercrombie corporate documents during each flight that they took on the Abercrombie plane in furtherance of Abercrombie business.

82.    The manual directed the airplane staff to access the confidential corporate Abercrombie reports from http://www.thejeffriesfamilyoffice.com. Specific instructions were then provided on how to use the Jeffries Family Office website to access numerous corporate Abercrombie documents, including but not limited to: (1) Abercrombie & Fitch Flash Sales by Month Calendar Month Comparison; (2) Abercrombie & Fitch Flash Sales by Store Calendar Month Comparison,; (3) Abercrombie & Fitch Direct to Consumer Flash Order $ by Department Week to Date Orders Reported; and (4) the Daily Sales Abercrombie & Fitch Total Company.

83.    The manual addresses all guests on the Abercrombie plane as guests of either Jeffries or Smith and provides specific instructions for the flight plans of the couple's personal pets. It is apparent that Abercrombie purchased the plane for Jeffries and Smith to use together in any way they saw fit in promotion of the

Abercrombie brand, including in the use of the subject sex trafficking operation that Abercrombie, and all Defendants, benefitted from.

84.    Mike Jeffries was always on the clock working for Abercrombie. He utilized the Abercrombie plane to conduct Abercrombie business while traveling to hotel rooms that were decorated like Abercrombie store fronts where he lured young men who were instructed to dress in Abercrombie clothes.

85.    The Abercrombie plane was paid for by Abercrombie, the hotel rooms were paid for by Abercrombie, and the corresponding expenses were put on the Abercrombie company tab.

86.    As the significant other of the CEO of Abercrombie, Smith created standards for the operation of various aspects of Abercrombie, he was regularly provided with confidential documents for review that were accessible through the Jeffries Family Office, he was given unfettered access to the Abercrombie campus, and he worked together with Abercrombie employees to make decisions for the company.

87.    Abercrombie, through its employees and executives other than Jeffries, required Matthew Smith and at times other employees of the Jeffries Family Office including Janine Beaudette, to interview and approve pilots for the Abercrombie jet, further demonstrating the synergistic relationship between the four named Defendants.

**C. The Jeffries Family Office**

88.    The Jeffries Family Office and Abercrombie worked symbiotically with one another. The two corporations even shared employees who were paid by both Abercrombie and the Jeffries Family Office at the same time.

89.    In fact, Abercrombie, the Jeffries Family Office, Jeffries, and Smith worked in concert to create and endorse the Abercrombie brand, which meant to facilitate and endorse the sexual abuse and trafficking of young men. It was also well known to Abercrombie that sales reports and other highly confidential Abercrombie data were hosted by the Jeffries Family Office's computer network rather than by Abercrombie.

90.    Abercrombie was aware of the fact that the Jeffries Family Office, in essence, operated as a functioning subset of Abercrombie and was under the control of Jeffries and Smith.

91.    In fact, without the Jeffries Family Office, the continued sexual trafficking and abuse of the Class Members could not have continued.

92.    The Jeffries Family Office was responsible for staffing individuals to ensure that Jeffries, Smith, and others were able to sexually traffic, abuse, and exploit Class Members.

93.    More specifically, the Jeffries Family Office, through its agents, employees, and/or representatives, was responsible for facilitating key aspects of the

operation including by finding and paying recruiters who were responsible for locating, abusing, and bringing the prospective models to the purported casting event.

94.     Moreover, the Jeffries Family Office, through its agents, employees, and/or representatives presented themselves as the apparent Abercrombie security staff who were responsible for ensuring that Class Members were not able to leave the purported casting events and were responsible for forcing the Class Members to sign nondisclosure agreements prior to, or after being sexually trafficked and abused by Jeffries, Smith, and others. The Jeffries Family Office was also responsible for organizing all Class Members travel and lodging for the purported casting events and ensuring that the events ran smoothly and in a way that satiated Jeffries's sexual misconduct. Prior to attending an Abercrombie event with Jeffries, each Class Member was made to sign an overtly threatening nondisclosure agreement to prevent him from reporting the impending sexual abuse to anyone and preventing him from bringing civil or criminal justice against the Defendants. The men were not permitted to read or review the document prior to being made to sign, and they were not permitted to retain a copy of the document after they signed.

95.     The nondisclosure agreements that Class Members were forced to sign were complex legal documents that were used to explicitly and implicitly threaten Class Members should they ever speak about the abuse or trafficking they endured

at the hands of Jeffries, including by way of filing a lawsuit.

96. Specifically, the nondisclosure agreement was executed between a Class Member and the Jeffries Family Office and its "Related Parties."

97. "Related Parties" per the nondisclosure agreement included "[the Jeffries Family Office], Michael Jeffries, and his family members, business associates, and their affiliated entities, and all of their officers, directions, agents, employees, executives, representatives, predecessors, successors, subsidiaries, assigns, principals, partners, members, shareholders, managers, trustees, accountants, executors, and administrators."

98. Given that Michael Jeffries was the CEO of Abercrombie at the time the nondisclosure agreements were executed, it created even further reliance on the part of the Class Members that this was an Abercrombie-sanctioned event, as it was clear the nondisclosure agreement was intended to include Abercrombie as a Related Party. Specifically, the nondisclosure agreement defined Related Parties as any entity affiliated with Michael Jeffries, Abercrombie's CEO.

99. The nondisclosure agreement precluded Class Members from disclosing what it defined as "confidential information" to any person or entity whatsoever.

100. The nondisclosure agreement prevented Class Members from bringing contraband or controlled substances to the purported casting events as well, yet

Jeffries and his coconspirators neglected to abide by their own terms, as they frequently forced the Class Members to engage in illegal drugs or other controlled substances at the purported casting events.

101.  Furthermore, the nondisclosure agreement included explicit and significant threats to Class Members designed to intimidate, threaten, and deter them from ever speaking about the abuse and trafficking they endured. Specifically, the nondisclosure agreement provided for a $50,000 liquidated damages clause for any actual or threatened breach of the nondisclosure agreement, as well as other remedies available to the Jeffries Family Office.

102.  In addition to the explicit threats found within the nondisclosure agreement, the presentation and forced signing of the agreement contained implicit threats as well, including threats to the safety and wellbeing of Class Members as evidenced by the Jeffries Family Office agents, employees, and/or representatives carrying firearms reasonably preventing Class Members from leaving the purported casting events.

103.  Other implicit threats found in the nondisclosure agreement included the threat to the Class Members careers, and consequently, their financial livelihood. Because the nondisclosure agreement included Abercrombie as a Related Party to the agreement—as it was clearly an entity associated with its CEO, Michael Jeffries—the Class Members feared that disclosure of the abuse and trafficking

would serve as a serious detriment to their careers in the modeling industry, as at the time, Abercrombie was the most coveted job in the male modeling industry. Any actual or threatened breach of the agreement reasonably led Class Members to believe that they would be blacklisted from the modeling industry.

104.    As a result, Class Members, including David Bradberry, were actively prevented from ever coming forward or disclosing the trafficking or abuse without the real risk of suffering serious harm.

105.    The Defendants were in a position of extraordinary power, and the victims were without any power, at the time the non-disclosure agreements were presented and the victims forced to sign. Immediately after signing, each victim was forced into abusive sexual acts with Jeffries, Smith and others, and each was expressly told that if he ever revealed anything that occurred at these events, he would be made to suffer financially and otherwise.

106.    The significant cause of delay in Class Members, including David Bradberry, coming forward in their claims were beyond their control and unavoidable even with diligence.

107.    Specifically, the Class Members were faced with explicit and implicit threats from all Defendants that if they were to ever disclose the abuse and trafficking they were forced to endure, they would suffer harm.

108.    The Class Members were made to reasonably believe that the document

prohibited them from ever discussing the abusive nature of the events, which was the intended effect of the document.

109.   It was only many years later that a select few individuals, including David Bradberry and Barrett Pall, could not live with the abuse they suffered and bravely exposed the Abercrombie sex-trafficking scheme.

110.   In addition to the threats of the Class Members' modeling careers, the Class Members were actively prevented from coming forward with their claims as there still existed the threat of a liquidated damages clause of $50,000 if they chose to disclose the abuse of trafficking carried out against them.

111.   To this very day, putative Class Members and former employees of Jeffries Family Office have been unwilling and/or hesitant to share information as a result of the implicit and explicit threats associated with the nondisclosure agreements they had to sign.

112.   The Jeffries Family Office, through its agents, employees, and/or representatives, was also the entity responsible for working with Abercrombie to ensure that all Class Members would have Abercrombie clothes when they arrived to the purported casting events and that the locations of the purported casting events were designed to mirror the image of an Abercrombie storefront.

113.   Finally, the funds used to pay the Class Members after being sexually trafficked and abused were derived from the Jeffries Family Office.

114.   Through Jeffries reign as a CEO of Abercrombie, there were frequent communications between members of Jeffries Family Office—primarily Jeffries and Smith—and employees at Abercrombie directly related to the procurement of prospective models, and the sexual abuse and trafficking thereof.

115.   When Abercrombie accounts and finances were not used to fund the casting events, it was the Jeffries Family Office that paid to facilitate the sex-trafficking venture.

116.   As a result, the Jeffries Family Office and Abercrombie were the two legal entities, directed and controlled by Jeffries, that were at the forefront and both directly and indirectly participated in the sex-trafficking venture and the sexual abuse of Class Members.

117.   The Jeffries Family Office was a known ambassador for Abercrombie, functioning solely to carry out tasks in furtherance of the Abercrombie brand. Jeffries and Smith always held themselves out as agents of Abercrombie. Operation manuals were written by Smith on behalf of the Family Office in furtherance of the operations of Abercrombie requiring that the same music—selected by Jeffries and Smith—be played in Abercrombie stores, on the Abercrombie airplane, on location during Jeffries's travel, and inside of Jeffries's personal homes. The plane staff were required to wear Abercrombie clothing because it was an Abercrombie plane. Likewise, the victims of Jeffries and Smith were required to wear Abercrombie

clothing to the events wherein the sexual abuse occurred because they were Abercrombie events.

**D. Abercrombie**

118.   From its inception until Jeffries left the company in 2014, the sex-trafficking venture operated primarily for the purpose of luring young men into a position where Jeffries and his co-conspirators could coerce them to engage in commercial sex acts and commit sexual offenses against them.  The Abercrombie sex-trafficking venture also operated to conceal its sex trafficking from law enforcement organizations at least through 2014, when Abercrombie officially separated from Jeffries due to his conduct. Additionally, the venture provided financial and other benefits to those who assisted and enabled the venture.

119.   The Abercrombie sex-trafficking venture was well-structured from the beginning and grew increasingly more complex and powerful as it victimized more young men.

120.   While Jeffries was at the very top of Abercrombie and was personally sexually abusing dozens and likely over a hundred young models, Jeffries could not and did not act alone.  He created and maintained this sex-trafficking venture with the assistance of other influential individuals and entities who knew he was sexually abusing and sexually trafficking young men and provided support to facilitate his sexual abuse and sex trafficking operation.

121.    Abercrombie's sex-trafficking venture was not possible without the assistance and complicity of the company itself, which provided special treatment to Jeffries and the sex-trafficking venture by ensuring its continued operation and sexual abuse and sex-trafficking of young men. Without Abercrombie's knowing participation, the sex trafficking scheme could not have existed and flourished.

122.    At all times material hereto, Jeffries was using the Abercrombie name, holding himself out to be working on behalf of Abercrombie, his power within the company, its clothing, its photographers, and its marketing materials in order to ensnare the young male victims into the sex-trafficking venture and to sexually abuse them.

123.    Jeffries's victims were young men, who suffered severe abuse as sex-trafficking victims and who believed they had to remain loyal to him and the venture at all costs to survive; otherwise they were led to believe they would suffer serious physical, financial, and reputational harm to the point that their careers would be completely destroyed if ever they disclosed the Abercrombie/Jeffries/Smith method of recruiting and sexually abusing.

124.    Jeffries victimized dozens and likely over a hundred young men with the assistance of a wide network of co-conspirators, including Abercrombie.

125.    Jeffries's sexual abuse and the sex trafficking scheme was supported by virtually unlimited wealth, derived from Abercrombie, which acted as the financial

engine behind the sex-trafficking operation, in exchange for financial benefits.

126.    Specifically, Abercrombie financially benefited by retaining Jeffries as its cash cow CEO, who required as part of his employment, complete autonomy to utilize any methods of brand building he wanted, including the blatant use of a sex-trafficking and sexual abuse scheme.

127.    Abercrombie further benefitted in that as a by-product of the sex-trafficking venture, Abercrombie had at its disposal, a group of male victims to employ and further promote its brand image.

128.    Abercrombie's massive profitability was reliant upon the outside-the-box sexual philosophy and sexualized marketing methods of its CEO, which primarily relied upon the sexual abuse and exploitation of young men.

129.    During the period of time of the alleged abuse, Abercrombie's corporate public image was that of sex-appeal. This image was achieved primarily through the advertising of male models. Jeffries and Abercrombie built the brand into one of the most popular and profitable in the world by sexualizing the brand, notoriously and openly seeking out models. As the financials will show, Jeffries's over-sexualization and exploitation of young men catapulted Abercrombie financially and is one of the primary reasons that Abercrombie allowed for Jeffries's abusive conduct to occur and continue.

130.    Jeffries and those at the top of Abercrombie believed that for the

brand's public sex appeal image to be authentic, the prospective models had to exhibit an outward, open sexual image, which included Jeffries, Smith and others required participation in sex at Jeffries direction.

131.   The promotion of these models and the "Abercrombie image" was a direct force in driving consumers into retail stores around the country and increasing company revenue.

132.   Jeffries's abuse, at its core, epitomized the brand at the time, and through the sex-trafficking scheme, trapped these men into the Abercrombie brand.

133.   Once sexually abused, David Bradberry and other Class Members knew to stay quiet, each who had been made to sign threatening non-disclosure agreements that inured to the benefit of Abercrombie, knew not to blow the whistle on the brand, and knew not to jump to a competitor, thereby benefiting Abercrombie.

134.   Abercrombie also knowingly benefited from the sex-trafficking in that by facilitating Jeffries's conduct, they were able to keep him happy and productive, which allowed him to rebrand the company's image and transform it into a billion-dollar industry leader.

135.   Jeffries masterfully assessed the specific needs and vulnerability of each of his targeted victims. Jeffries groomed the young men, indoctrinating them to believe that engaging in sex against their will and without any choice in the decision, was the price they would be required to pay for success in the modeling

industry.

136.    The Abercrombie sex-trafficking venture's purpose included enticing, obtaining, harboring, and transporting the young victims without drawing unwanted attention from law enforcement. The venture had everything a sex-trafficking organization needed—funding, infrastructure, the appearance of legitimacy, and a complicit corporate institution.

137.    The Abercrombie sex-trafficking venture knowingly used means of force, threats of force, fraud, coercion (including threats of serious harm or physical restraint), and abuse of law and the legal process, to cause David Bradberry and many dozens of other similarly situated men to engage in commercial sex acts.

138.    The Abercrombie sex-trafficking venture, through Jeffries and other agents, made several false statements regarding material facts, most notably that all Class Members were told of their chances to become an Abercrombie model once they were selected to meet the CEO Jeffries at one of his homes and follow Jeffries's directions and requirements once there.

139.    While the majority of the Class Members have either not yet come forward or have come forward but wish to remain anonymous, a select few, including David Bradberry and Barrett Pall, have already spoken publicly about their abuse without the use of a pseudonym.

140.    Class Member Barrett Pall had made it to the final stages of the

Abercrombie casting process prior to being given the opportunity to attend the casting with Abercrombie's CEO, Jeffries, at which time he had legitimate reason to believe that he was going to be cast as a model for Abercrombie.

141.   David Bradberry and other Class Members were promised the opportunity to model for Abercrombie so long as they engaged in commercial sex and succumbed to the sexually abusive acts without their consent by Jeffries, Smith, and their associates.

142.   Abercrombie and Jeffries had knowledge that this information was false.

143.   Because of the representations made by Abercrombie—through Jeffries and their agents in the course and scope of their employment—David Bradberry and other class members, like Barrett Pall, relied on those statements.

144.   Abercrombie and Jeffries knew that these fraudulent representations would induce David Bradberry and other Class Members to engage in commercial sex acts and/or would cause for them to be sexually abused.

145.   In fact, Abercrombie and Jeffries utilized well-known and reputable third-party sites—such as Model Mayhem, LA Casting, and more—specifically designed for prospective modeling and casting opportunities to locate and find individuals to abuse,

146.   Had David Bradberry and other Class Members known these

representations were in fact false, they would have never attended the casting calls that, in reality, were sex-trafficking events.

147.    The aforementioned misrepresentation was material, because had the truth been disclosed, the abuse would never have happened.

148.    Jeffries, and Abercrombie through Jeffries, had the intention to induce David Bradberry and other Class Members to engage in commercial sex acts and to sexually abuse them.

149.    The Abercrombie sex-trafficking venture operated in and affected interstate and foreign commerce.  Jeffries, in his capacity at Abercrombie, recruited, solicited, coerced, harbored, transported, and enticed his victims, including David Bradberry and others similarly situated, to engage in commercial sex acts in, among other places, New York (including the Southern District of New York) and abroad.

150.    The Abercrombie sex-trafficking venture operated throughout the world from at least 1992 to 2014, when Jeffries left Abercrombie and lost the legitimate infrastructure for the criminal enterprise.  Thereafter, through at least the date of this complaint, members of the sex-trafficking venture, including Abercrombie, continued to further the venture by concealing the sex-trafficking and activities and extent of the venture.

151.    One primary reason why Abercrombie's sex-trafficking venture and conspiracy accumulated new victims at an alarming rate was Jeffries's access to

Abercrombie's resources, which included a jet, transportation, and unlimited amounts of cash.

152. Jeffries's knowledge that he had a complicit corporation—Abercrombie—through which he could operate an illegal sexual abuse organization without fear of being reported to law enforcement was necessary for his extensive sexual abuse of male models.

153. To put it plainly, Jeffries needed a corporation that knew he was engaging in illegal activity and did not care, which Jeffries had in Abercrombie.

154. As further detailed below, Abercrombie worked closely with Jeffries through every step of the sex trafficking operation's expansion and growth in some of its most prolific of years—between around 2009 through 2014.

155. In 2014, Jeffries and Abercrombie were sued in a verified stockholder derivative complaint that alleged Abercrombie continued to pay Jeffries massive sums of money despite the company's declining performance towards the backend of Jeffries's reign as CEO, all the while, delegating managerial-like authority to his life partner, Matthew Smith.

156. The derivative suit further alleged that the Abercrombie board tolerated the creation of a corporate culture that resulted in completely avoidable lawsuits that tarnished the company as a result of Jeffries's conduct.

157. In fact, it was known to Abercrombie that Jeffries was using company

funds to pay for excessive travel costs and expenses that included massive, multiple hotel rooms on business trips that Jeffries described as "necessary to hold meetings."

158.    Consequently, the use of those hotel rooms, paid for by Abercrombie, are consistent with the allegations of Class Members being sexually abused and trafficked within those rooms as described further herein.

159.    On December 9, 2014, Jeffries stepped down as the CEO of Abercrombie, bringing with him a $25 million retirement package.

160.    Through information and belief, Abercrombie paid settlements to various individuals related to improper acts of Jeffries or Smith, some of which were related to sexual harassment or abuse.

161.    Still, Abercrombie allowed Jeffries to use Abercrombie financial resources with little-to-no meaningful oversight, for he was encouraged to engage in any activities necessary to increase profits for the company. Jeffries was even permitted to pay hush money to victims and others using Abercrombie funds for a number of years before his departure from Abercrombie.

162.    In 2018, Jeffries sold the Manhattan townhouse where he assaulted many of his victims, for $12.9 million.

163.    In 2023, after an extensive investigation identifying nearly a dozen victims, the BBC found that Jeffries and Smith sexually exploited what is believed to be over 100 men during Abercrombie events they hosted around the world.

164.   To be clear, each of the events where the Class Members were abused were Abercrombie events and the victims were invited there as Abercrombie models. Each victim was provided and made to wear Abercrombie attire, head to toe, for each event, including those events abroad that lasted several days. Each other individual working or otherwise participating in these Abercrombie sexual abuse events was also dressed entirely in Abercrombie clothing, and the decorations, including in rented hotels, was professionally organized to appear as an Abercrombie store, leaving no doubt in the minds of anyone that these events where men were routinely sexually abused at the direction of Jeffries and Matthews were ratified, endorsed and approved by Abercrombie.

## V. THE TRAFFICKING VICTIMS PROTECTION ACT

165.   The Trafficking Victims Protection Act (TVPA) outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States.  It is to be construed broadly because it serves a remedial purpose and uses intentionally broad language.

166.   The TVPA forbids, among other things, the following sex-trafficking conduct:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or

> solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a).

167.    The TVPA also forbids (among other things) conspiring to violate 18 U.S.C. § 1591.  18 U.S.C. § 1594(c).

168.    The TVPA contains an explicit "civil remedy" provision which allows an individual who is a victim of a violation of Chapter 77 of Title 18 (*e.g.*, violation of 18 U.S.C. §§ 1591–94) to bring a civil action against the perpetrator and any person or entity who knowingly benefits, financially or by receiving anything of value from participation in an illegal sex-trafficking venture.  18 U.S.C. § 1595(a).

169.    Unlike the criminal penalties provisions in the TVPA, the civil remedies provision contains a "constructive knowledge" provision.  This provision allows a civil action to be brought not only against a person or entity who participated in a venture known to have engaged in illegal sex trafficking, but also against a person or entity who participated in a venture that the person or entity

should have known had engaged in illegal sex trafficking. 18 U.S.C. § 1595(a). This expansive provision is known as the "constructive knowledge" provision, which provides an alternative to proving actual knowledge as part of a civil damages claim.

170.    In the paragraphs that follow, whenever David Bradberry alleges that Defendants acted with actual knowledge, or in reckless disregard of the fact, that the Abercrombie sex-trafficking venture used means of force, threats of force, fraud, coercion, abuse of process, or some combination thereof to cause a person to engage in commercial sex acts, the Plaintiff also alleges that, at a bare minimum, Defendant should have known that the sex-trafficking venture had used such means to engage in illegal sex trafficking in violation of 18 U.S.C. §§ 1591–94—*i.e.*, that they had constructive knowledge of Jeffries's sex trafficking.

171.    In this complaint, David Bradberry and other members of the Class also alternatively allege that Abercrombie was willfully blind to the fact that it was facilitating and participating in a sex-trafficking venture carried out by the most powerful person at the company.

## VI.    THE ADULT SURVIVOR'S ACT

172.    The Adult Survivor's Act (ASA) revived every civil claim or cause of action, for both intentional and negligent conduct, as a result of a sexual offense that had previously expired between November 24, 2022 through November 23, 2024.

173.    Specifically, the ASA reads as follows:

> Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older, or incest as defined in section 255.26 or 255.27 of the penal law committed against such person who was eighteen years of age or older, which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section. In any such claim or action, dismissal of a previous action, ordered before the effective date of this section, on grounds that such previous action was time barred, and/or for failure of a party to file a notice of claim or a notice of intention to file a claim, shall not be grounds for dismissal of a revival action pursuant to this section.

N.Y. CPLR 214-j.

174.   The ASA makes explicitly clear that an individual may bring a civil claim or cause of action against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older… N.Y. CPLR 214-j.

175.   In the paragraphs that follow, whenever David Bradberry alleges that Defendants acted with actual knowledge, or in reckless disregard of the fact, that

Jeffries, Smith, and their co-conspirators were sexually abusing Class Members, the Plaintiff also alleges that, at a bare minimum, the other codefendants should have known that Jeffries was sexually abusing the Class Members—*i.e.*, that they had constructive knowledge of Jeffries's violations of sexual offenses as defined in section one hundred thirty of the penal law.

176.   In the paragraphs that follow, whenever David Bradberry alleges that Defendants engaged in sex-trafficking, ran a sex-trafficking operation, or caused David Bradberry and Class Members to engage in commercial sex acts, the Plaintiff also alleges that the above-described offenses constitute sexual crimes pursuant to Article 130 of the New York Penal Code.

177.   In this complaint, David Bradberry and other members of the Class also alternatively allege that Abercrombie was willfully blind to the fact that it was aiding and abetting a sexual abuse operation carried out by the most powerful person at the company.

## VII.   FACTUAL ALLEGATIONS PERTAINING TO DAVID BRADBERRY

### A.    The Abercrombie Sex-Trafficking Venture and Conspiracy

178.   During all times relevant to this complaint, Jeffries was an extraordinarily wealthy man with multiple residences in the United States

179.   Beginning in at least 1992 and continuing through 2014, Jeffries

knowingly established and ran a sex-trafficking venture and conspiracy in violation of 18 U.S.C. §§ 1591–95 wherein he, and others, engaged in violations of Chapter 130 of the New York Penal Code against Class Members, including David Bradberry. As part of the venture, Jeffries, in his role as CEO of Abercrombie and for the benefit of Abercrombie, used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young men from all over the world to engage in commercial sex acts and to sexually abuse them. Jeffries and others also conspired to violate 18 U.S.C. § 1591.

180.  In creating and maintaining this network of victims in multiple states and in other countries to sexually abuse and exploit, Jeffries worked and conspired with others, including Abercrombie and Jeffries Family Office employees, associates, agents, and/or representatives who facilitated his conduct by, among other things, recruiting victims, communicating with victims, providing gifts, transportation, hotels and clothing to victims, coercing victims, and scheduling their sexual abuse by Jeffries at his New York City mansion, his Hampton's mansion, and abroad.

181.  Jeffries and his co-conspirators used Abercrombie's corporate wealth, his position as CEO, and the wealth that Jeffries had amassed as a result of his employment with Abercrombie, to lure and transport victims to his homes and hotels abroad for purported modeling castings.

182.    Jeffries used Abercrombie corporate money, travel benefits, cash, and the company's name and prominence to facilitate and effectuate the sex trafficking venture and sexual abuse against Class Members.

183.    Jeffries used money and resources from the Jeffries Family Office to staff the purported casting events with security and other essential personnel, as well as to pay the victims cash to facilitate and effectuate the sexual trafficking and abuse operation against this Class.

184.    Jeffries and his co-conspirators had perfected a scheme for the manipulation and abuse of young men under the guise of providing them with the modeling opportunity of their dreams—becoming an Abercrombie model.  As part of the scheme, a male recruiter would approach the men selling this opportunity but would then require them to engage in commercial sex and be sexually abused by him in order to obtain the opportunity to move higher up the chain to Jeffries, the man who would make them an Abercrombie model. The recruiter would then inform the young man that he was approved to the next level of the interviewing and casting process of Abercrombie, where travel was then arranged for the prospective model to travel to one of Jeffries's residences to meet with Jeffries himself, getting one step closer to achieving the pinnacle of a young model's dream.

185.    Once at Jeffries residence, and before the interview with Jeffries, the men were required to sign a document that they were not permitted to read that

purportedly bound them to silence. Jeffries Family Office, through its employees, agents, and/or representatives was the entity responsible for forcing the men to sign this agreement. They were informed that if they were to ever speak about what occurred in the home, significant legal action would be initiated against them.

186.   Once at Jeffries's home and trapped in a room with Jeffries, he sexually assaulted his victims, with the assistance of Smith.

187.   Often, as part of this process that Jeffries portrayed as essential for obtaining an Abercrombie model job, the male model was required to strip naked and to visit the groomer before arriving, who would quite literally shave the model head to toe including and especially the intimate private parts of the model.

188.   Upon information and belief, this groomer was also paid by the Jeffries Family Office to perform the above-described services.

189.   After Jeffries and Smith were finished sexually abusing the prospective model, Jeffries and his associates would pay his victims thousands of dollars in cash before leaving.

190.   In this District and elsewhere, Jeffries on behalf of Abercrombie, perpetuated this pattern of abuse in similar ways, dozens and likely over a hundred times.

191.   Jeffries was skilled at ascertaining his victim's greatest aspirations and targeted those fears and aspirations to coerce and trap his victims into performing

46

commercial sex acts and to be subjected to sexual abuse.

192.   Among other things, Jeffries sexually abused his many victims and caused his victims to engage in commercial sex acts, specifically sex acts for which his victims received things of value, including money, promises of career advancement, and promises that Jeffries would hire them to work as Abercrombie models.  These promises were a quid pro quo for the sex acts that occurred. The promises were not the only tactic employed by Jeffries, however. Jeffries also employed forcible compulsion to commit his sexual crimes against the Class Members; specifically, through physical harm or the threat of physical harm, as Jeffries, by way of the Jeffries Family Office, had stationed guards carrying weapons outside the purported casting events to ensure that Class Members felt like they could not leave without being subjected to further and potentially more serious physical harm.

193.   Because Jeffries was the CEO of Abercrombie, and he and his co-conspirators were giving his victims access to Abercrombie clothing and promises to meet with Abercrombie's official photographer, the Abercrombie sex-trafficking scheme gave off the legitimate appearance for male victims that the potential for them to become Abercrombie models truly existed.

194.   Jeffries provided things of value to his victims in order to coerce them to engage in sex acts with him and others.

195.   As one means of coercing victims to engage in commercial sex acts, Jeffries and his co-conspirators would give his victims money to stay quiet about the assaults.

196.   In addition to coercing commercial sex acts from his victims, Jeffries's coercive tactics also constituted sexual offenses against the Class Members as defined in New York Penal Law § 130, as described in greater detail below.

197.   Throughout around 1992 through about 2014, the Abercrombie sex-trafficking venture recruited, solicited, enticed, harbored, obtained, provided, and transported dozens and likely over a hundred victims to cause them to engage in commercial sex acts with Jeffries and others.

198.   Jeffries recruited, solicited, enticed, harbored, obtained, provided, and transported his victims to cause them to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including using means of interstate communications (such as cell phones) and means of interstate and foreign travel.

199.   Jeffries transported his victims in interstate and foreign commerce, including transportation to and from his mansion in this District.

200.   The Abercrombie sex-trafficking venture transported victims across state boundaries, and in foreign commerce between the United States and other countries.

**B.    Consistent With Jeffries's Uniform Pattern and Practice, David Bradberry Was Subjected to Sexual Crimes and Forced to Engage in Commercial Sex Acts with Jeffries by Means of Force, Fraud, and Coercion.**

201.    In 2010, David Bradberry was contacted on www.ModelMayhem.com (a credible website for professional models and photographers) by a man named Gilbert Bell who presented himself as a manager and agent for young stars.

202.    Bell informed David Bradberry that he wanted to introduce Bradberry to someone powerful in the fashion industry to help advance his modeling career. Bell further informed Bradberry that if things went well during the meeting, Bradberry would be introduced to the owner of Abercrombie.

203.    Bell caused David Bradberry to believe that he had the potential to be an Abercrombie model and that he was being scouted for a legitimate casting.

204.    Instead, David Bradberry was informed that prior to meeting the owner of Abercrombie, he would need to do an initial meeting with a man who was an independent model scout for Abercrombie who would evaluate whether he was a fit and who reported directly to the top executives at Abercrombie.

205.    This individual held himself out to be working on behalf of Abercrombie as a model scout and was in constant communication with Abercrombie CEO Jeffries.

206.    In reality, and unbeknownst to David Bradberry, the purported scout was an agent, employee, and/or representative of the Jeffries Family Office, given

direct instruction by Jeffries, the CEO of Abercrombie, to hold himself out to be working on behalf of Abercrombie.

207.    During the initial meeting, the scout told David Bradberry that he would need to get casting photos taken with famed Abercrombie photographer, Bruce Weber, who has since been exposed as a sexual predator himself.

208.    The scout reiterated what Bell had led David Bradberry to believe; that this was his big opportunity to get a real start in the modeling industry with one of the most popular brands in the world. He remembers thinking that it was like this person was selling fame and the price was David Bradberry's compliance.

209.    As the scout began to touch David Bradberry inappropriately, he told Bradberry that he wasn't supposed to do this, but he just couldn't help it.

210.    He then made it clear to David Bradberry that he held the key to the next level in the Abercrombie process and that unless he let the scout perform oral sex on him, Bradberry would not be meeting with Abercrombie or its CEO, Michael Jeffries.

211.    David Bradberry perceived this individual to be a gatekeeper who made it clear that he was holding the keys to the Abercrombie kingdom, and that his approval was necessary to make it to the next stage in the casting process, an interview with Jeffries.

212.    After sexually assaulting David Bradberry, the scout gave him cash as

compensation for his time.

213.   He then told Bradberry that he was what Jeffries was looking for and extended an invitation to David Bradberry to attend several casting events where Bradberry believed that Jeffries would be selecting models for Abercrombie.

214.   Upon information and belief, in or around Spring 2010, Bradberry was transported to Washington D.C. and London where he was forced to engage in commercial sex acts with Jeffries and his associates.

215.   Throughout the first two events, David Bradberry was led to believe that so long as he complied with the demands to engage in commercial sex acts, he would have a legitimate chance to be cast as an Abercrombie model; the promise that got him there in the first place.

216.   These Abercrombie themed events were organized by the Jeffries Family Office, whose employees, agents, and/or representatives arranged Bradberry's transportation, forced him to sign the nondisclosure agreement, and ensured that the events for which David Bradberry and other Class Members attended gave off the legitimate appearance of a casting event.

217.   In or around May 2010, David Bradberry believed that he finally had that opportunity when the original modeling scout told him that he was selected to attend a casting event in Jeffries private palatial estate in the Hamptons where Jeffries would be selecting a model for Abercrombie.

218.   David Bradberry was convinced that this was his opportunity to make his dreams come true.

219.   In order to prepare for the casting, David Bradberry was told to go to the flagship Abercrombie store in New York City. He was provided with Abercrombie gift cards to purchase the clothes, which had been pre-selected for him and were set aside in Bradberry's correct sizes ready for him to pick up upon his arrival at the store. This is absolute proof that everything Jeffries was doing with these prospective models, especially the casting events at his private homes in the Hamptons and Manhattan was done in concert with Abercrombie, condoned, ratified, financed and for the benefit of Abercrombie and with their direct knowledge.

220.   As instructed, David Bradberry, went to the Abercrombie flagship store in Manhattan to get the required clothes for the casting event.

221.   The modeling scout then provided David Bradberry with a detailed call sheet document delineating travel instructions for the casting event that Bradberry would be attending in the Hamptons, New York.

222.   The call sheet thanked David for joining Matthew and Michael for their "gathering." It also instructed him to contact another individual who would be attending the event with him.

223.   Further   indicators   that   this   was   a   professionally   conducted

Abercrombie event, the call sheet further instructed David to contact a groomer to make an appointment, and that his hotel room at the Night Hotel was already paid for. It provided details on transportation to and from the Hamptons, which was also a covered expense.

224.   The groomer, the hotel room, and the transportation to the Hamptons was all paid for and organized by the Jeffries Family Office.

225.   Prior to the event, David Bradberry was required to undress and be evaluated by the groomer who told him that he did not need to be shaved prior to the casting.

226.   David Bradberry was then told that he would need to sign a Non-Disclosure Agreement. When he attempted to read the document, another present individual, Ty Green, appearing to be an Abercrombie employee, but instead no longer a direct employee of Abercrombie but a then-employee of the Jeffries Family Office, told him that he did not need to read the document. Green then required Bradberry to sign the document, which was taken away immediately upon execution. Bradberry was not provided a copy of the document, was never permitted to read the document, and still today does not know what the document said. Bradberry was told and believed that if he ever disclosed what happened to him, he would be sued by Abercrombie or otherwise suffer serious harm.

227.   The casting event occurred at Jeffries's house in the Hamptons.

Through information and belief, Jeffries's personal house staff was dismissed every Saturday from 10am to 6pm during the time of the castings, which the staff found to be odd and concerning.

228.    Consequently, once the house staff was dismissed, Jeffries would bring in employees, agents, and/or representatives of the Jeffries Family Office who were hired to run the purported casting event that day.

229.    By all accounts, the casting event run by Abercrombie's CEO, Jeffries, appeared to be a legitimate Abercrombie-sponsored function, as they were to meet with the CEO of the company, while forced to wear Abercrombie clothing.

230.    During the casting attended by David Bradberry, approximately six prospective models were also present. Each was wearing an Abercrombie polo shirt, Abercrombie pants, and Abercrombie flip flops.

231.    Once inside the house, David Bradberry was told to undress down to his underwear, provided with a glass of wine, and told that he would be going into the casting conversation with Abercrombie's CEO Jeffries shortly.

232.    When David Bradberry entered the room, Jeffries and Smith were both present wearing Abercrombie clothing. Jeffries began asking David Bradberry about his aspirations in the modeling industry. David Bradberry told Jeffries and Smith that he wanted to be an actor and model, and that he would like to be in the Abercrombie catalogue.

233.    After having been provided with a few glasses of wine, Jeffries and Smith began to make David Bradberry feel uncomfortable.

234.    Jeffries and Smith took David Bradberry into a room where two other men were naked and having sex. Jeffries and Smith both began to slowly undress. Jeffries then came up behind Bradberry, placed his hand on his shoulder, and asked him if he thought that the sex they were watching was hot.

235.    Jeffries then asked David Bradberry if he liked poppers. Bradberry had never heard of poppers before. Jeffries immediately told Bradberry that he would like poppers while he held David Bradberry's head and put the popper bottle under his nose until Bradberry felt light-headed and confused.

236.    Amidst the confusion caused by the poppers, David Bradberry began to focus on the four older, larger, physically fit men who appeared to be security guards observing the activity in the room. These imposing men, dressed in Abercrombie clothing, caused Bradberry, by way of forcible compulsion, to feel like there was no way that he could leave the room safely or resist what Jeffries was demanding.

237.    The apparent security guards were agents, employees, and/or representatives of the Jeffries Family Office.

238.    Jeffries then asked David Bradberry if he wanted to have sex. Bradberry declined. When Jeffries attempted to engage in anal sex with Bradberry, Smith made Jeffries put on a condom, at which point, Jeffries anally raped Bradberry as Jeffries

held his hand on the back of Bradberry's neck to keep him still. While he was being

anally raped, David Bradberry said, "ow, stop," and "no." Jeffries did not stop.

239.   Jeffries then physically pushed and maneuvered David Bradberry with

his hands, forcing Bradberry to engage in sexual conduct with other men for

Jeffries's sexual gratification.

240.   David Bradberry was paid $2,500 after being sexually abused by

Jeffries, Smith, and others at Jeffries's direction.

241.   Following the horrific event, Bradberry was led to believe that he would

be offered a job or a contract from Abercrombie.

242.   David Bradberry was then flown to Nice, France at the direction of

Jeffries where he was again forced to perform sex acts on Jeffries.

243.   Finally, after having endured severe sexual abuse in numerous

locations, Bradberry was sent to Jeffries's townhouse in Manhattan, New York,

where he held out hope that this was the time he had finally done all that Jeffries

wanted and that Jeffries and others had indicated was essential to become an

Abercrombie model.

244.   However, this final encounter was strikingly similar to the past, where

Jeffries gave the impression it was a stepping stone into the Abercrombie catalogue,

but it was only a more serious sexually abusive event with no Abercrombie contract

at the end.

245.   Jeffries abused David Bradberry for a fifth time at his townhouse in Manhattan, New York.  During the horrific instance of abuse in New York City, Jeffries inserted a suppository into David Bradberry before raping him and causing him to be sexually violated by other men that were present in the home.

246.   Shortly thereafter, David Bradberry began to believe that he had been lied to all this time while he was subjected to Jeffries's sexual abuse. However, the modeling scout informed Bradberry that Jeffries liked him for Abercrombie and felt that he had a great personality but informed him that Bradberry was not "catalogue ready" and needed to attend another casting. Bradberry was then coerced to attend another casting in London to continue the interview process.

247.   When David Bradberry arrived in London, his passport was taken from him for the duration of the casting.

248.   Once again, David Bradberry was sexually assaulted by Jeffries and others on two separate occasions during the casting event in London.

249.   Jeffries and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable men like David Bradberry, all under the guise of this being the official interview and casting process for Abercrombie models.

250.   Jeffries and his co-conspirators constantly reminded David Bradberry how powerful and important Jeffries was, including that whether or not he achieved

his dreams of becoming an Abercrombie model was dependent on his compliance with Jeffries's demands.

251.   In 2010, Jeffries sexually abused David Bradberry and other Class Members in New York City and in the Hamptons in direct violation of Article 130 of New York's Penal Law, including but not limited to the following:

a.   Sexual misconduct as defined in §130.20, inasmuch as Jeffries engaged in sexual intercourse with Plaintiff without the Plaintiff's consent;

b.   Rape in the first degree as defined in §130.35, inasmuch as Jeffries engaged in sexual intercourse with the Plaintiff by forcible compulsion;

c.   Criminal sexual act in the first degree as defined in §130.50, inasmuch as Jeffries engaged in oral sexual conduct with the Plaintiff by forcible compulsion;

d.   Forcible touching as defined in §130.52, inasmuch as Jeffries, intentionally and for no legitimate purpose, engaged in the forcible sexual touching of the Plaintiff for the purpose of degrading or abusing him or for the purpose of gratifying his own sexual desire; and

e.   Sexual abuse in the third degree as defined in §130.66, inasmuch as Jeffries inserted a foreign object in the anus of the Plaintiff by forcible compulsion.

252.   These acts of violence were committed because of David Bradberry's and other Class Members' gender or on the basis of their gender, and due at least in part to an animus based on their gender.

253.   Jeffries used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to cause David Bradberry and other Class Members to engage in commercial sex acts.

254.   Jeffries committed sexual offenses by way of forcible compulsion and/or caused David Bradberry and other Class Members to be unable to consent by some way other than incapacity.

255.   Jeffries recruited David Bradberry and other Class Members to cause and force him to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cell phones and means of interstate transportation.

256.   Jeffries transported David Bradberry and other Class Members to New York and other places to cause them to engage in commercial sex acts.

257.   David Bradberry wanted to escape from the Abercrombie sex-trafficking venture, yet Jeffries and his supporting team of co-conspirators increased the tactics of fraud, force, or coercion to cause him to remain compliant in fulfilling Jeffries's sexual demands.

258.   As alleged more fully below, Abercrombie knew that the company was at the forefront of the sex-trafficking venture based on a number of facts.

259.   Jeffries used promises in his official capacity at Abercrombie and made on behalf of Abercrombie to secure David Bradberry's and other Class Members' compliance with his demands, including demands that he engage in commercial sex acts with him and others.

260.   Jeffries and his co-conspirators continued to coerce David Bradberry

and other Class Members to engage in commercial sex with Jeffries, Smith, and others through the use of Jeffries's force, fraud (such as false promises of becoming an Abercrombie model) and coercion (making it clear that if he did not abide then his dream would never come true).

### C. Abercrombie Directly Participated in The Sex-Trafficking Venture and Recklessly Disregarded Jeffries's Conduct

261. Along with Jeffries, Abercrombie knowingly and intentionally participated in the sex-trafficking venture by (among other things) using the promise of a lucrative modeling career as an Abercrombie model to recruit, lure, coerce, and entice young men to cause them to engage in commercial sex acts and other degradations, including subjecting them to sexual abuse.

262. In or about 1992, Jeffries realized that his new role as CEO of Abercrombie provided him the necessary legitimate appearance to access countless young men to exploit and abuse.

263. From at least 1992 through 2014, Abercrombie knowingly and intentionally participated in a sex-trafficking venture by (among other things) providing the essential financial underpinnings for the venture. It also financially benefited from that participation. There can be no doubt that Abercrombie's conduct, as described below, was outrageous and intentional.

264. Abercrombie had knowledge of and permitted Jeffries to accumulate massive travel related expenses.

265. Despite having knowledge of Jeffries's use of Abercrombie resources, it turned a blind eye to the propriety of his conduct and the use of Abercrombie funds to further his sex-trafficking operation and sexually abusive crimes.

266. Abercrombie provided the financial infrastructure for its sex-trafficking operation inclusive of: (1) clothing for Class Members and others in attendance at the various purported casting events; (2) Jeffries's travel to and from the events; (3) procurement of hotel rooms wherein Jeffries, Smith, and others would participate in the sex trafficking and sexual abuse of Class Members; (4) exorbitant amounts of money paid to Jeffries despite the clear and obvious risk he presented; and (5) a direct lack of supervision of Jeffries and his use of company funds and resources . Specifically, money was paid from Abercrombie affiliated accounts to cover portions of the aforementioned expenses, including Jeffries's travel.

267. Abercrombie also deliberately failed to review the expenditures of Jeffries as its CEO to ensure that corporate funds were being used appropriately and not for illegal means such as to engage in or facilitate sex-trafficking and sexual abuse.

268. With Abercrombie's complicity, Jeffries was free to sexually abuse dozens of men, paying a tremendous amount of cash in hush money, without the fear of detection by law enforcement. Jeffries used the support of his co-conspirator, a reputable fashion institution, to help cover up his sex-trafficking venture and sexual

abuse.

269.   Abercrombie cared about profiting and showed absolute loyalty to Jeffries, including a willingness to spend copious amounts of money on extravagant drug and sex parties, ignoring multiple red flags of criminality in Jeffries's corporate account activity, knowing of sexually exploitive videos depicting Jeffries and other evidence such as Jeffries's requirement that Abercrombie employees properly pack his sex toy bag for his business trips, that Jeffries was using sex trafficking and abuse as a method of recruitment, and allowing for the use of the company name to enable Jeffries to fulfill his abusive sexual appetite at the expense of countless vulnerable young men.

270.   Specifically, Abercrombie financially benefited in that as a by-product of the sex-trafficking venture, Abercrombie was able to employ male models to further promote their brand image, while simultaneously keeping Jeffries happy and productive, allowing him to rebrand the company's image and transform it into a billion-dollar industry leader.

271.   But for Jeffries position at Abercrombie, he would have never been able to commit the horrid crimes alleged herein. It was only because of his ability to act on behalf of Abercrombie as its CEO, that Jeffries was able to lure men to his home for purported casting events. Jeffries, at all times, was operating in the course and scope of his employment when organizing and arranging the purported casting

events.

272.   Over many years, many Abercrombie employees were aware of Jeffries's sexually exploitative and abusive behavior.  Abercrombie's leadership ignored this knowledge and ultimately decided to keep Jeffries at the helm as the CEO of the corporation.  Abercrombie decided that, because it was receiving such large monetary benefits from Jeffries during his tenure as CEO, it would continue participating in the sex-trafficking venture by providing its financial infrastructure and turn a blind eye to his conduct.

273.   Ultimately, Abercrombie chose to benefit financially by earning millions of dollars while the company was under the direction of Jeffries instead of acting reasonably to ensure Class Members would not be harmed by Jeffries.

274.   Over the many years of the venture between Abercrombie and Jeffries, numerous Abercrombie executives turned a blind eye to Jeffries's conduct because of the profit that was being generated during his reign as CEO.

275.   Given all the surrounding circumstances, Abercrombie's decision to support Jeffries was made with knowledge that it was participating in a sex-trafficking venture and conspiracy and aiding and abetting Jeffries's continued sexual abuse of Class Members.

276.   With Jeffries at the helm, Abercrombie, as a corporation, required aspiring male models to be sexually assaulted by the company's CEO, and others,

in order to be considered for a role as an Abercrombie model.

277.   While Abercrombie stopped employing Jeffries as its CEO in 2014, it did not make a clean break from the sex-trafficking venture; it continued to hide the venture and protect itself from law enforcement.

278.   Between 1992 and 2014, while Jeffries was CEO, Abercrombie was aware of Jeffries's, Smith's and their respective assistants' use of Abercrombie's email platform to coordinate with model scouts and otherwise make arrangements for sexual abuse and exploitation of young male models.

279.   After Jeffries left the company, Abercrombie was aware of and retained emails, electronically stored correspondence, and hard copy documents evidencing the years long sexual abuse and trafficking scheme that was operated through and for the benefit of Abercrombie, Jeffries, and Smith.

280.   Abercrombie caused Jeffries's victims to continue to live in fear for nearly another decade before his sex-trafficking operation was exposed.

281.   The money trail into Jeffries's corporate Abercrombie accounts and personal accounts was a dead giveaway that Jeffries was engaging in sexual crimes in furtherance of the company's mission to use sex to sell clothes.

282.   At all times material hereto, Abercrombie was aware of the foregoing information and more about Jeffries's sex trafficking activities. In fact, dozens of employees of Abercrombie learned of Jeffries's and Smith's sexual abuse of men in

their role as CEO and the partner to the CEO.

283.  As a result of Jeffries's direct and actual knowledge of his own sex-trafficking venture—created and carried out during the course and scope of his employment as the CEO of Abercrombie—the company had direct and actual knowledge of the sex-trafficking venture itself.

284.  Despite its knowledge, Abercrombie deliberately did little or nothing to inquire into the money that Jeffries was spending to sexually abuse young men. Abercrombie intentionally failed to conduct this basic inquiry, knowing that an inquiry would reveal the sex-trafficking and abuse of Class Members. Instead, it chose to continue to financially benefit from its relationship with Jeffries and his co-conspirators.

285.  Abercrombie's desire to maintain its profitability under the leadership of its CEO Jeffries led it to avoid taking steps that would have documented its involvement in the sex-trafficking venture.

286.  Abercrombie knowingly and intentionally benefited financially and in other ways from its participation in the sex-trafficking venture, with knowledge, or with reckless disregard of the fact, that Jeffries used means of force, threats of force, fraud, and coercion (and combinations thereof) to force young men into engaging in commercial sex acts.

287.  As recounted throughout this complaint, Abercrombie financially

benefited by earning millions of dollars from its participation in the sex-trafficking venture by allowing Jeffries to run a facially sexually exploitive corporation as a front for abusing young men.

288. As recounted throughout this complaint, Abercrombie recklessly disregarded Jeffries's conduct because it was earning millions of dollars from its participation in the sexual abuse operation by allowing Jeffries to run a facially sexually exploitive corporation as a front for abusing young men.

289. The benefits that Abercrombie received came directly from its participation in the sex-trafficking venture and because of its participation in that venture. In other words, there was a causal relationship between Abercrombie's conduct furthering the sex-trafficking venture and its receipt of the financial benefits with actual (and constructive) knowledge of that causal relationship.

290. By facilitating and financing Jeffries's commercial sex acts in interstate and foreign commerce, Abercrombie increased sales, attracted investors, and received other financial benefits directly from its connection with Jeffries and others acting in concert with Jeffries. Jeffries provided those financial benefits to Abercrombie precisely because it was facilitating his sex-trafficking venture—and Abercrombie knew that was the reason that Jeffries was providing them with those financial benefits.

291. Abercrombie benefited by receiving things of value from its

participation in the sex-trafficking venture. Among the various things of value that Abercrombie received were the use of models to generate immense corporate profits made by the company during the time that Jeffries acted as CEO. As such, Abercrombie knowingly and intentionally received these things of value as a direct result of its participation in the sex-trafficking venture and because it was furthering the sex-trafficking venture.

292. Abercrombie knowingly and intentionally financed the illegal sex-trafficking venture. Abercrombie knew that if it did not finance the illegal sex-trafficking venture, then it would lose Jeffries as CEO of the company at a time when he was generating great profit for the company and providing the company with enhanced financial gain. Faced with the choice between profiting from the sex-trafficking venture or following the law, Abercrombie chose to profit.

293. Among the young men whose sex trafficking and sex abuse Abercrombie participated in, benefited from, aided and abetted, and furthered were David Bradberry and the Class Members.

294. Abercrombie's sex-trafficking venture constituted a criminal conspiracy and a sex-trafficking venture that operated continuously from around 1992, through and including 2014. The conspiracy and venture undertook criminal actions in violation of the TVPA throughout those years, including 2014 and after.

## VIII. CLASS ACTION ALLEGATIONS

295.  David Bradberry brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of himself and the following Class:

> All men who were sexually abused or trafficked by Abercrombie, Michael Jeffries, Matthew Smith, or any of their associates during the time when Abercrombie employed Michael Jeffries as its Chief Executive Officer, which included 1992 through 2014, both dates inclusive (the "Class Period").

296.  David Bradberry reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

297.  <u>Numerosity</u>:  The Class consists of  approximately 100 men, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1).  The exact size of the Class and the identities of the individual Class members are ascertainable through records maintained by Jeffries, Smith, the Jeffries Family Office, and Abercrombie, including but not limited to Abercrombie's records for Jeffries-related corporate accounts. Namely, each of the young men who were abused through the Defendants' sexual abuse and sex-trafficking scheme was forced to sign an NDA (a coercive document designed to instill fear in each to prevent reporting the crimes). Once the Defendants produce these critical documents, Plaintiff will be able to ascertain the exact class size and identities of each putative class member.

298.  <u>Typicality</u>:  David Bradberry's claims are typical of the claims of the other Class Members he seeks to represent.  The claims of David Bradberry and the

other Class Members are based on the same legal theories and arise from the same unlawful pattern and practice of Abercrombie's intentional and negligent acts, participation in, conspiring to join in, and funding of the Jeffries's sexual abuse and Abercrombie's sex-trafficking venture.

299.   <u>Commonality</u>:  There are many questions of law and fact common to the claims of David Bradberry and the other Class Members, and those questions predominate over any questions that may affect only individual Class Members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3).  Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

300.   Common questions of fact and law affecting Class members include, but are not limited to, the following:

   a.  Whether the Abercrombie sex-trafficking venture and conspiracy caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1);

   b.  Whether the Abercrombie sex-trafficking venture and conspiracy recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce;

   c.  Whether Jeffries and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means,

to sexually abuse the victims and to cause victims to engage in commercial sex acts;

d. Whether Jeffries committed, directed, enabled, participated in, or conspired in the commission of a crime of violence motivated by gender;

e. Whether Abercrombie committed, directed, enabled, participated in, or conspired in the commission of a crime of violence motivated by gender;

f. Whether Abercrombie knowingly and intentionally assisted, facilitated, and supported the sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

g. Whether Abercrombie benefited financially or by receiving things of value from its participation in a venture which has engaged in sex trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

h. Whether Abercrombie knew or should have known that the sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a);

i. Whether Abercrombie was part of conspiracy to violate 18 U.S.C. § 1591(a), in violation of 18 U.S.C. § 1594(c);

j. Whether Abercrombie committed intentional and negligent acts or

omissions that facilitated sexual abuse which would constitute a sexual offense as defined in article 130 of New York Penal Law committed against such persons who were eighteen years of age or older.

k.  Whether Jeffries committed intentional and/or negligent acts or omissions which would constitute a sexual offense as defined in article 130 of New York Penal Law committed against such persons who were eighteen years of age or older;

l.  Whether the Jeffries Family Office committed intentional and/or negligent acts or omissions that facilitated sexual abuse which would constitute a sexual offense as defined in article 130 of New York Penal Law committed against such persons who were eighteen years of age or older;

m. Whether Smith committed intentional and/or negligent acts or omissions that facilitated sexual abuse which would constitute a sexual offense as defined in article 130 of New York Penal Law committed against such persons who were eighteen years of age or older.

301.  Absent a class action, most of the Class Members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the

courts and the litigants and promotes consistency and efficiency of adjudication.

302.    Adequacy:  David Bradberry will fairly and adequately represent and protect the interests of the other Class Members he seeks to represent. David Bradberry has retained counsel with substantial experience in prosecuting complex litigation and class actions.  David Bradberry and his counsel are committed to vigorously prosecuting this action on behalf of the other Class Members and have the financial resources to do so.  Neither David Bradberry nor his counsel have any interests adverse to those of the other Class Members.

303.    This action has been brought and may properly be maintained as a class action against Abercrombie pursuant to Rule 23 of the Federal Rules of Civil Procedure because this is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from Abercrombie's records.

304.    Superiority:  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

     a.  Joinder of all Class Members is impracticable;

     b.  The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Abercrombie and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

     c.  Class action treatment will permit a large number of similarly situated

72

persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

d.  Absent a class action, Class Members will continue to suffer losses and be aggrieved and Abercrombie will escape liability for its conduct and be able to continue to violate New York and federal law without remedy;

e.  Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f.  David Bradberry, and his counsel are unaware of any class action brought against Abercrombie by victims for the violations alleged in this action;

g.  The forum is desirable because David Bradberry and other Class Members were sexually trafficked and abused in this District; and

h.  This action presents no difficulty that would impede its management by the Court as a class action.

## IX.  CAUSES OF ACTION

### COUNT I
### AIDING, ABETTING, AND FACILITATING BATTERY
### AGAINST ABERCROMBIE

305.   Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

306.   David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

307.   Between about 1992 and 2014, in this District in New York, Jeffries intentionally committed batteries and other intentional tortious conduct, including crimes in violation of New York Penal Law Chapter 130 such as New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66 (hereinafter "Chapter 130 crimes"), against David Bradberry and the Class Members. Jeffries committed intentional tortious conduct and crimes against David Bradberry and Class Members when they were 18 years of age or older.

308.   As described throughout this complaint, Jeffries intentionally and non-consensually touched David Bradberry and the Class Members in a harmful and offensive manner that resulted in substantial injuries, including damages from physical and psychological injury, extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy.

309.   The resulting injuries that David Bradberry and the Class Members suffered include injuries directly and proximately suffered as a result of sex offenses committed by Jeffries and other co-conspirators and criminalized under article 130 of the New York Penal Laws.   The offenses included sexual intercourse without

consent and oral sexual conduct without consent, forbidden by New York Penal Law § 130.20.  The offenses included forcible touching of sexual or other intimate parts without consent, forbidden by New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66.

310.   Regardless of when the tortious conduct (*e.g.*, battery) and Chapter 130 Crimes were committed by Jeffries, the conduct and crimes are now civilly actionable, regardless of any statute of limitations to the contrary, because they are covered by the one-year "look back" window in New York Adult Survivors Act. *See* N.Y. C.P.L.R. § 214-j.

311.   Between at least 1992 and 2014, Abercrombie knowingly and intentionally aided, abetted, and facilitated Jeffries's intentional tortious conduct (*e.g.*, battery), through Chapter 130 Crimes recounted in the preceding paragraphs of this Count.

312.   Because Abercrombie aided, abetted, and facilitated Jeffries's conduct and crimes in violation of Chapter 130, it is liable for damages caused by the conduct and crimes.

313.   Between at least 1992 and 2014, when it provided substantial assistance to Jeffries, Abercrombie was well aware of its important and substantial role as a part of Jeffries's intentionally tortious and illegal activity in committing Chapter 130 Crimes.

314.   As a direct and proximate result of Jeffries's tortious conduct and crimes, which Abercrombie knowingly and intentionally aided, abetted, and facilitated, David Bradberry and the Class Members have in the past suffered, and in the future will continue to suffer, substantial damages, including damages from physical and psychological injury, extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of his privacy.

315.   At the time of Jeffries's batteries, intentionally tortious conduct, and crimes against David Bradberry and the Class Members, Abercrombie was well aware of a sex-trafficking venture and Jeffries's sexual abuse and that its concrete steps in furtherance of the venture were aiding, abetting, and facilitating his batteries, tortious conduct, and crimes.

316.   At the time of Jeffries's crimes against David Bradberry and the Class Members, Abercrombie knowingly provided substantial assistance in Jeffries's tortious conduct and crimes.  That knowing substantial assistance went beyond mere knowledge and approval of Jeffries's wrongdoing.   For example, Jeffries used Abercrombie funds to commit the coercive sex offenses described in the preceding paragraphs in this Count.  Without that support, Jeffries could not have committed his tortious conduct and crimes—a fact that Abercrombie knew.

317.   Another example of Abercrombie's aiding and abetting the commission of batteries by Jeffries upon David Bradberry and the Class Members; Abercrombie

knowingly allowed Jeffries to use his title and authority as CEO of Abercrombie as "bait" for his tortious conduct and crimes.

318.   Abercrombie knowingly and intentionally committed both substantial acts in support of Jeffries and substantial deliberate omissions in support of Jeffries. For example, Abercrombie deliberately omitted to take important steps that would have prevented the crimes thereby substantially assisting Jeffries to commit his crimes against David Bradberry and Class Members in violation of New York Penal Law Chapter 130.

319.   Jeffries had actual first-hand knowledge of his and Smith's sex trafficking venture, knowledge of which is imputed to Abercrombie as his principal.

320.   In aiding, abetting, and facilitating Jeffries's intentional tortious conduct and crimes, Abercrombie could readily foresee direct and proximate injury to David Bradberry and the Class Members.   Abercrombie should have foreseen direct and proximate injury from its actions and inactions to David Bradberry and the Class Members.

321.   Indeed, Abercrombie did foresee injury to Jeffries's victims, including David Bradberry and Class Members.

322.   In aiding, abetting, and facilitating Jeffries's tortious conduct and crimes, Abercrombie committed intentional torts directed against David Bradberry and the Class Members.   Abercrombie's aiding, abetting, and facilitating Jeffries's

tortious conduct and crimes were its own wrongful acts and omissions.

323.    Abercrombie had a duty not to commit tortious conduct and crimes—specifically aiding, abetting, and facilitating New York sex crimes as described above— directed against David Bradberry and the Class Members.

324.    At all relevant times, Abercrombie acted with reckless disregard for the safety of the Plaintiff and others who were subjected to Jeffries's sexual abuse.

325.    As a result, Plaintiff alleges that one or more exemptions set forth in N.Y. CPLR § 1602 applies.

326.    As a result of the foregoing, Abercrombie is liable civilly for damages it directly, tortiously, and criminally caused to David Bradberry and the Class Members.

327.    David Bradberry and the Class Members accordingly are entitled to bring a cause of action for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of Abercrombie's aiding, abetting, and facilitating Jeffries's tortious conduct and crimes described above and for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of Jeffries's tortious conduct and crimes.

328.    By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Abercrombie is liable to David Bradberry and other

Members of the Class for punitive damages.

**COUNT II**
**NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE TO PREVENT PHYSICAL HARM**
**AGAINST ABERCROMBIE**

329.    Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

330.    David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

331.    Abercrombie owed a duty to David Bradberry and the Class Members to exercise reasonable care to avoid conduct that created a risk of physical harm to them.

332.    Abercrombie's duties included a duty to exercise reasonable care to avoid conduct that would combine with Jeffries's crimes, and permit Jeffries's crimes, in violation of Chapter 130.

333.    Abercrombie's own conduct in providing financial and other support for the sex trafficking venture and Jeffries's sexual abuse set forces in motion that directly and proximately injured and caused physical harm to David Bradberry and the Class Members.

334.    These forces that Abercrombie set in motion caused Jeffries's intentional tortious conduct and Chapter 130 Crimes against David Bradberry and the Class Members, causing physical harm and in themselves constituted physical

79

harm to David Bradberry and the Class Members.

335.   Abercrombie owed David Bradberry and the Class Members a duty not to set those forces in motion because they unreasonably created a risk of physical harm.

336.   Abercrombie reasonably could foresee, and did in fact foresee, that its negligent failure to prevent physical harm would result in physical harm to David Bradberry and the Class Members.  Abercrombie owed a duty to prevent that physical harm.

337.   Abercrombie failed to act objectively reasonably in failing to take precautions to prevent Jeffries's intentional tortious conduct and sex-trafficking and sex crimes in violation of Chapter 130, which were committed against David Bradberry and the Class Members.

338.   If Abercrombie had acted reasonably to prevent physical harm, it would not have supported and allowed Jeffries's tortious conduct and sex-trafficking and sex crimes to occur. Abercrombie owed David Bradberry and the Class Members a duty to act objectively reasonably.

339.   At the time of Abercrombie's own negligent conduct, Abercrombie both realized and should have realized the likelihood that it was creating an opportunity for Jeffries to commit intentional tortious conduct and Chapter 130 Crimes against David Bradberry and the Class Members.

340.    Indeed, Abercrombie knew that its own conduct was necessary to create Jeffries's opportunities to engage in that conduct and commit those crimes. Abercrombie owed David Bradberry and the Class Members a duty not to create those opportunities for Jeffries.

341.    Abercrombie's breaches of its legal duties were the direct—*i.e.*, the but-for—cause of physical and psychological injuries to David Bradberry and the Class Members.  Without Abercrombie's breaches of legal duties, those injuries would not have occurred.  The injuries that occurred were readily foreseeable to Abercrombie.

342.    David Bradberry and the Class Members were easily within the zone of foreseeable harm from Abercrombie's negligent acts and omissions.  Abercrombie's negligent acts and omissions foreseeably created substantial risk of Jeffries and his co-conspirators committing sex crimes against young men with whom he was in contact.  Tragically, David Bradberry and the Class Members fell within that zone.

343.    Because of Abercrombie's negligent failure to prevent physical harm to David Bradberry and the Class Members, it is liable to David Bradberry and the Class Members for damages suffered as a direct and proximate result.

344.    At all relevant times, Abercrombie acted with reckless disregard for the safety of the Plaintiff and others who were subjected to Jeffries's sexual abuse.

345.    As a result, Plaintiff alleges that one or more exemptions set forth in N.Y. CPLR § 1602 applies.

346.   As a direct and proximate result of Abercrombie's negligent failure to prevent physical harm, David Bradberry and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. Abercrombie's negligent failure to exercise reasonable care directly and proximately caused Jeffries's sex crimes.

347.   By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Abercrombie is liable to David Bradberry and other Members of the Class for punitive damages.

## COUNT III
## VICARIOUS LIABILITY
## AGAINST ABERCROMBIE

348.   Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

349.   David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

350.   At all times material, Jeffries was employed by Defendant Abercrombie as the company's CEO, and was under the supervision, employ, and control of Abercrombie when he committed sexual assaults and batteries against Bradberry and

other Class Members.

351.   At all times material, Jeffries was acting as Defendant Abercrombie's agent when he was recruiting male victims to engage in sex trafficking and to sexually abuse them under the guise of legitimate modeling opportunities.

352.   Without attractive, young, male models, Abercrombie would not have been able to generate the profits they did.

353.   Throughout the entirety of the recruiting process, Jeffries and his co-conspirators were purporting to act on behalf of Abercrombie including but not limited to the following ways:

    a.  Offering what the victims believed to be legitimate modeling opportunities;

    b.  Providing victims the opportunity to meet with Abercrombie's professional photographer, Bruce Weber;

    c.  Having modeling scouts recruit and find potential victims with the promise of meeting the CEO of Abercrombie;

    d.  Providing victims Abercrombie clothing;

    e.  Requiring all the victims to wear Abercrombie attire at each of the sexual abuse events;

    f.  Providing victims gift cards to Abercrombie storefront locations; and

    g.  Having staff at the sex-trafficking events dressed in Abercrombie

clothing.

354.    Based on the above-described actions of Jeffries and his co-conspirators, Bradberry, and other victims relied on the appearance of a legitimate modeling opportunity.

355.    As a result of that reliance, Abercrombie caused physical and psychological injuries to David Bradberry and other Class Members.

356.    Further, Jeffries was aided in accomplishing his heinous sexual crimes and tortious conduct by the existence of his relationship with Abercrombie.

357.    But for Jeffries position as the CEO, he would not have been afforded the opportunity to recruit, solicit, entice, coerce, harbor, transport, or obtain David Bradberry and other Class Members for commercial sex acts, criminal sex acts, and tortious conduct.

358.    Jeffries position as CEO provided the perfect recipe for the sex-trafficking venture to be viewed as legitimate operation to find Abercrombie's next male model. Abercrombie allowed Jeffries to continue to engage in this conduct, and he was aided in accomplishing his heinous acts solely due to his relationship with Abercombie.

359.    At all relevant times, Abercrombie acted with reckless disregard for the safety of the Plaintiff and others who were subjected to Jeffries's sexual abuse.

360.    As a result, Plaintiff alleges that one or more exemptions set forth in

N.Y. CPLR § 1602 applies.

361.  As a direct and proximate result of Abercrombie's actions, David Bradberry and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy.  Abercrombie is vicariously liable for Jeffries's tortious conduct.

362.  By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Abercrombie is liable to David Bradberry and other Members of the Class for punitive damages.

**COUNT IV**
**VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 10-1101 AGAINST ABERCROMBIE**

363.  Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

364.  David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

365.  Abercrombie committed, directed, enabled, participated in, or conspired in the sex-trafficking venture and Jeffries's sexual abuse which resulted in a violent act motivated by gender after Jeffries raped David Bradberry and other

Class Members and subjected them to sexual abuse within the meaning of the Victims of Gender-Motivated Violence Protection Law (hereinafter referred to as "VGM"). Admin. Code of City of N.Y. § 10-1101.

366.   At all times material hereto, Abercrombie employed Jeffries as its CEO.

367.   Jeffries committed acts of gender-motivated violence against David Bradberry and other similarly situated Class Members when he raped them and subjected them to acts of sexual abuse.

368.   The acts of gender-motivated violence against David Bradberry and other similarly situated Class Members were committed because of their gender or on the basis of their gender, and due, at least in part, to an animus based on their gender.

369.   Without Abercrombie committing, directing, enabling, participating in, or conspiring in the sex-trafficking venture and Jeffries's sexual abuse, the above offenses could not have been committed against the Plaintiff.

370.   At all relevant times, Abercrombie knew, or should have known, of Jeffries's propensity to commit the violent crimes, but failed to take any action to remove him from power, thereby enabling his predatory behavior and the subsequent crimes committed against Class Members including David Bradberry.

371.   Specifically, Abercrombie's commission, direction, enabling, participation in, and/or conspiring in the sex-trafficking venture that allowed Jeffries

to commit the violent crimes motivated by gender upon the Plaintiff and other class members includes, but is not limited to, the following:

    a. Allowing Jeffries unfettered access to aspiring young models with hopes of being hired by Jeffries as the CEO of Abercrombie for one of the most exclusive modeling opportunities in the world;

    b. Providing Jeffries with unfettered access to Abercrombie resources and financial accounts to utilize in furtherance of the sex-trafficking operation;

    c. Allowing Jeffries to utilize Abercrombie assets to travel, facilitate travel, and operate the sex-trafficking operation; and

    d. Failing to sufficiently oversee Jeffries in order to prevent him from sexually abusing and trafficking men around the world.

372. A substantial majority of the acts recounted in the previous paragraph were committed by Abercrombie within New York City, and specifically within Manhattan. For example, Abercrombie enabled, participated in, and conspired in Jeffries's sex trafficking, sexual abuse, and gender-motivated violence within Manhattan.

373. In Manhattan and elsewhere, Abercrombie conspired with Jeffries and enabled his sex trafficking, sexual abuse, and gender-motivated violence from at least 1992 through 2014. Abercrombie committed overt acts in furtherance of the

conspiracy between 1992 and 2014 in Manhattan.

374.    Abercrombie intentionally conspired with Jeffries and others, including Jeffries's co-conspirators, by both agreement and understanding, to commit crimes of violence motivated by gender, including crimes proscribed by New York, and including crimes proscribed by federal law, including 18 U.S.C. §§ 1591-95.

375.    Abercrombie conspired with Jeffries specifically to further the sex-trafficking venture and his sexual abuse with the purpose of facilitating and the specific intent to facilitate the sex-trafficking venture. Abercrombie had actual knowledge of the sex-trafficking venture and Jeffries's rampant abuse.

376.    Abercrombie's complete failure to terminate Jeffries as CEO of Abercrombie demonstrates its commission, direction, enabling, participation, and/or conspiracy in the sex-trafficking venture which included Jeffries's predatory actions and violent crimes committed against the Plaintiff and other Class Members on the basis of their gender.

377.    Abercrombie's obvious protection of Jeffries, or at the very least, deliberate failure to take action against him despite legal requirements to do, demonstrates how Abercrombie committed, directed, enabled, participated in, and/or conspired in the sex-trafficking venture and allowed Jeffries to engage in the behavior and violent crimes that David Bradberry and other class members ultimately suffered from.

378.  At all relevant times, Abercrombie knew or, in the exercise of reasonable care should have known, that allowing Jeffries to act as CEO of the company without adequate supervision presented a threat to the safety and welfare of countless young men including David Bradberry and other Class Members.

379.  Yet, despite this knowledge, Abercrombie repeatedly failed to take any corrective action demonstrating to Jeffries that he was free to do as he pleased without any repercussions.

380.  At all relevant times, Abercrombie acted with reckless disregard for the safety of the Plaintiff and others who were subjected to Jeffries's sexual abuse.

381.  As a result, Plaintiff alleges that one or more exemptions set forth in N.Y. CPLR § 1602 applies.

382.  As a direct and proximate cause of Defendant's unlawful conduct in violation of the VGM, Plaintiff has suffered damages, including physical and emotional pain and suffering, mental anguish, and the loss of capacity for the enjoyment of life.

383.  As a direct and proximate result of Defendant's unlawful conduct in violation of the VGM, Plaintiff is entitled to punitive damages.

**COUNT V**
**KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595 AGAINST ABERCROMBIE**

384.    Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

385.    David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

386.    Abercrombie knowingly and intentionally benefitted, financially and by receiving things of value, from participating in, assisting, supporting, and facilitating an illegal coercive sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

387.    Abercrombie took many concrete steps to aid and participate in the sex-trafficking venture. Among the concrete steps that Abercrombie took to aid Jeffries were:

    a.   Allowing Jeffries unfettered access to aspiring young models with hopes of being hired by Jeffries as the CEO of Abercrombie for one of the most exclusive modeling opportunities in the world;

    b.  Providing Jeffries with unfettered access to Abercrombie resources and financial accounts to utilize in furtherance of his sex-trafficking operation;

    c.  Allowing Jeffries to utilize Abercrombie assets to travel, facilitate travel, and operate his sex-trafficking operation; and

d.  Failing to sufficiently oversee Jeffries in order to prevent him from sexually abusing and trafficking men around the world.

388.  Abercrombie's willingness to provide large amounts of cash to Jeffries was the quid pro quo for it receiving financial benefits from Jeffries.

389.  The position of power and the financial resources that Abercrombie provided to Jeffries were necessary for Jeffries to coerce David Bradberry as well as other Class Members to engage in commercial sex acts.

390.  By providing financial resources that Abercrombie knew would be used to fund the sex trafficking venture, Abercrombie actively participated in the recruitment of victims of the venture.

391.  Allowing Jeffries to host model interviews in his home wherein he would require sexual gratification in exchange for an opportunity to model for the company was entirely inconsistent with the ordinary duties of a major corporation or its employees.

392.  The reason that Abercrombie ignored the numerous red flags about Jeffries was to receive financial benefits from Jeffries and the sex-trafficking venture.  Abercrombie knew that it would gain far-from-routine financial benefits by ignoring the red flags associated with Jeffries and by participating in the sex-trafficking venture.

393.  Specifically, Abercrombie received benefits by keeping Jeffries as the

CEO as he transformed the company from one that was losing $25 million a year to a brand that was grossing $2 billion annually.

394.   Abercrombie financially benefited in that as a by-product of the sex-trafficking venture, Abercrombie was able to employ male models to further promote their brand image, while simultaneously keeping Jeffries happy and productive, allowing him to rebrand the company's image and transform it into a billion-dollar industry leader.

395.   By taking the concrete steps outlined above (along with the others alleged in this complaint), Abercrombie knowingly participated in sex trafficking and furthered the sex-trafficking venture.

396.   The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success.  The concrete steps above constituted active engagement by Abercrombie in the sex-trafficking venture.

397.   Abercrombie knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking venture, in which Jeffries, with Abercrombie's knowledge, or its reckless disregard of the fact, that Jeffries would use means of force, threats of force, fraud, coercion, and a combination of such means to cause David Bradberry, as well as other Class Members, to engage in commercial sex acts.

398.   Abercrombie actually knew, through Jeffries and other officers and

employees, that it was participating in a particular sex-trafficking venture—*i.e.*, the coercive sex-trafficking venture outlined above.

399.   Abercrombie's knowledge went far beyond having an abstract awareness of sex trafficking in general.

400.   Indeed, Abercrombie discussed internally Jeffries's specific sex trafficking and the large amounts of cash that Abercrombie was giving him.  Thus, Abercrombie did not simply fail to adequately detect signs of Jeffries's sex trafficking; it did detect multiple signs of the coercive sex-trafficking venture and continued to participate in the venture.  Abercrombie knew that the venture was ongoing, which was why Jeffries required vast sums of cash.

401.   Abercrombie's actions extend well beyond a situation of failing to train its staff about recognizing the warning signs of sex trafficking. Abercrombie's employees did recognize the signs of the sex trafficking. Abercrombie's employees knew about the sex-trafficking venture.  But Abercrombie decided to continue facilitating the sex-trafficking venture rather than ending its participation in the venture.

402.   Among the signs that Abercrombie was facilitating the sex trafficking venture were those facts that came to the attention of Abercrombie through Jeffries himself.  Because of those observations Abercrombie knew to a certainty that Jeffries was engaged in sex trafficking.

403.   Abercrombie's actual knowledge extended to the fact that specific individual men were being coercively sex trafficked by Jeffries between the time of his on-boarding and the termination of its relationship with Jeffries.   Even if Abercrombie did not know all the names of Jeffries's victims, it knew that specific victims (*e.g.*, David Bradberry) of a specific trafficker (Jeffries) at a specific time period (2010) existed and were being forced to engage in commercial sex acts. Abercrombie was on notice, and knew, that such victims were being coercively trafficked by the sex-trafficking venture.

404.   Abercrombie helped to conceal the names of Jeffries's victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking venture.

405.   Abercrombie's concealment included failing to follow through on enhanced monitoring that was required for someone like Jeffries. Abercrombie failed to implement that enhanced monitoring specifically to help conceal the ongoing sex-trafficking.   Abercrombie knew that if it implemented that enhanced monitoring, it would have to stop providing Jeffries with the power and financial infrastructure that he needed to run the sex-trafficking venture.

406.   In addition to having actual knowledge that it was participating in the sex trafficking venture, Abercrombie had constructive knowledge that it was participating in Jeffries's sex trafficking venture.

407.   Abercrombie also had constructive knowledge that David Bradberry, as well as other Members of the Class, were being coercively sex trafficked by Jeffries.  Its constructive knowledge extended to the names of Jeffries's victims, because Jeffries and his associates knew the names of the victims.

408.   Abercrombie had constructive knowledge of the sex-trafficking venture because of specific acts by Jeffries that put it on notice of a particular and ongoing sex trafficking venture.  Among the specific acts were Jeffries's use of vast sums of cash in circumstances that prompted Abercrombie employees to specifically raise questions about Jeffries's sex-trafficking.

409.   Abercrombie knowingly received financial benefits in return for its assistance, support, and facilitation of the sex-trafficking venture.  Abercrombie knew that if it stopped providing assistance, support, and facilitation of the sex-trafficking venture, it would no longer receive those benefits.

410.   Abercrombie knew, and was in reckless disregard of the fact, that it was Jeffries's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young men for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

411.   Abercrombie and its employees had actual knowledge that they were facilitating Jeffries's sexual abuse and sex trafficking conspiracy to recruit, solicit,

entice, coerce, harbor, transport, obtain and provide David Bradberry, as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion, and a combination of all these means.

412.    Despite such knowledge, Abercrombie intentionally paid for, facilitated, and participated in Jeffries's violations of 18 U.S.C. § 1591(a)(1), which Abercrombie knew, and was in reckless disregard of the fact that, Jeffries would coerce, defraud, and force David Bradberry, as well as other Members of the Class, to engage in commercial sex acts.

413.    Abercrombie, through its employees and agents (including Jeffries), actively participated in the sex trafficking conspiracy and led David Bradberry, as well as other Class Members, to believe that they would be rewarded if they cooperated and acquiesced to Jeffries's coercive demands.

414.    Abercrombie's affirmative conduct was committed knowingly, and in reckless disregard of the facts, that Jeffries would use cash and financial support provided by Abercrombie, as well as his position as CEO of Abercrombie, as a means of defrauding, forcing, and coercing sex acts from David Bradberry, as well as other Members of the Class.    Abercrombie's conduct was outrageous and intentional.

415.    In addition to actual knowledge that it was participating in and

facilitating the sex-trafficking venture, Abercrombie also should have known that it was participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

416.    In exchange for facilitating and covering up the commercial sex trafficking, Abercrombie's officers and employees (including Jeffries) advanced in their careers at Abercrombie and received financial benefits therefrom by securing the Abercrombie-Jeffries relationship.

417.    Facilitating and covering up the sexual trafficking and misconduct was a means of obtaining economic success and promotion within the Abercrombie hierarchy.

418.    Abercrombie's knowing and intentional conduct has caused David Bradberry, and the other Members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

419.    Abercrombie's knowing and intentional conduct has caused David Bradberry and the other Members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

420.    This case does not involve mere fraud. Instead, Abercrombie's conduct in violating the TVPA was outrageous and intentional, because it was in deliberate

furtherance of a widespread and dangerous criminal sex trafficking organization. Abercrombie's conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Abercrombie's conduct was directed specifically at David Bradberry and other members of the Class, who were the victims of Jeffries's sexual abuse and sex trafficking organization.

421. By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, Abercrombie is liable to David Bradberry and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

422. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, Abercrombie is liable to David Bradberry and other members of the Class for punitive damages.

## COUNT VI
## PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(1), 1595 AGAINST ABERCROMBIE

423. Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

424. David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

425. Abercrombie knowingly and intentionally, through various means,

participated in, perpetrated, assisted, supported, facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

426.   Among other things, Abercrombie knowingly and intentionally, through various means, recruited, enticed, provided, obtained, advertised, and solicited by various means David Bradberry, as well as other Class Members, knowing that Jeffries would use means of force, threats of force, fraud, coercion, and a combination of such means to cause David Bradberry, as well as other Class Members to engage in commercial sex acts.

427.   Abercrombie and its officers and employees (including Jeffries) had actual knowledge that they were perpetrating and facilitating Jeffries's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide David Bradberry, as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

428.   Despite such knowledge, Abercrombie intentionally paid for, facilitated, perpetrated, and participated in Jeffries's violations of 18 U.S.C. § 1591(a)(1), which Abercrombie knew, and were in reckless disregard of the fact that, Jeffries would coerce, defraud, and force David Bradberry, as well as other Class Members, to engage in commercial sex acts.

429.   As part of perpetrating TVPA violations and enticing and recruiting victims, between 1992 – 2014, Abercrombie concealed its delivery of vast sums of cash to Jeffries and his associates.

430.   Abercrombie's affirmative conduct was committed knowing, and in reckless disregard of the facts, that Jeffries would use cash and the financial support provided by Abercrombie as a means of defrauding, forcing, and coercing sex acts from David Bradberry, as well as other Class Members.  Abercrombie's conduct was outrageous and intentional.

431.   Abercrombie's knowing and intentional conduct has caused David Bradberry and the other Class Members serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

432.   Abercrombie's knowing and intentional conduct has caused David Bradberry and the other Members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

433.   This case does not involve mere fraud.  Instead, Abercrombie's conduct in perpetrating TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.

434.    Abercrombie's conduct (including Jeffries conduct on behalf of Abercrombie) also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Abercrombie's conduct was directed specifically at David Bradberry and other members of the Class, who were the victims of Jeffries's sexual abuse and sex-trafficking organization.

435.    By virtue of its knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Abercrombie is liable to David Bradberry and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

436.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Abercrombie is liable to David Bradberry and other members of the Class for punitive damages.

### COUNT VII
### CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(c), 1591, 1595 AGAINST ABERCROMBIE

437.    Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

438.    David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

439.    Abercrombie intentionally conspired with others, including Jeffries and his other co-conspirators, by agreement and understanding, to violate 18 U.S.C. §§

1591(a)(1) & (a)(2) & 1591(d), and to further the sex-trafficking venture to coerce commercial sex acts from David Bradberry and other Class Members, all in violation of 18 U.S.C. § 1594(c). Abercrombie officers and employees directly conspired with Jeffries himself to further the sex-trafficking venture.

440.   Abercrombie's conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and Abercrombie thereby violated Chapter 77, Title 18.  Abercrombie's conspiracy directly, proximately, and foreseeably harmed David Bradberry, as well as other members of the Class, by directly leading to them forcibly being caused to engage in commercial sex acts and in other ways. Abercrombie's conspiracy victimized David Bradberry and the other members of the Class.

441.   Abercrombie's conspiracy to violate 18 U.S.C. 1591 was forbidden by 18 U.S.C. § 1594(c), and Abercrombie thereby violated Chapter 77, Title 18. Abercrombie's conspiracy directly, proximately, and foreseeably harmed David Bradberry as well as other members of the Class, by directly leading to them forcibly being caused to engage in commercial sex acts and in other ways.  Abercrombie's conspiracy victimized David Bradberry and the other Members of the Class.

442.   Abercrombie conspired with Jeffries and his other co-conspirators to further the sex-trafficking venture and with the purpose of facilitating Jeffries's illegal sex trafficking.  Abercrombie had actual knowledge of the sex-trafficking

venture.   Abercrombie acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2), that is, with consciousness of the nature of the sex-trafficking venture and with the specific intent to further venture.  Abercrombie and Jeffries had a meeting of the minds as to the essential nature of the plan.

443.   Abercrombie's conspiracy with Jeffries was part of its participation in the sex-trafficking venture.  Without Abercrombie agreeing to facilitate the venture, Jeffries would not have been a position to move forward with his sex-trafficking venture and to recruit and entice victims of the venture.

444.   Abercrombie also conspired with Jeffries and his other co-conspirators to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d).  The conspiracy included an agreement to keep the sex-trafficking venture secret or, at least, concealed to the greatest extent possible. The agreement to keep the sex-trafficking venture a secret began in 1992 once Jeffries was hired and continued at least through 2014 once Jeffries was terminated from Abercrombie.

445.   Within this District, Abercrombie intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating the recruiting, enticing, coercing, harboring, transporting, and inducing and forcibly causing David Bradberry and other Class Members to engage in commercial sex

acts, through providing financial support for the sex-trafficking venture. A number of those acts were committed by Abercrombie's CEO, Jeffries, acting within the actual and apparent scope of his employment to further Abercrombie's interests.

446.   Among the many overt acts intentionally committed by Abercrombie in furtherance of the sex-trafficking venture were creating and maintaining a special relationship between Abercrombie and Jeffries designed to facilitate the sex-trafficking.

447.   Abercrombie's actions in furtherance of Jeffries's conspiracy were intertwined with the sex-trafficking venture, as the funding for the sex-trafficking venture were essential tools for Jeffries to commit coercive commercial sex acts.

448.   It was part of the conspiracy that Abercrombie would financially benefit from providing financial support for the sex-trafficking venture. Abercrombie did financially benefit from its participation in the venture, including receiving valuable business opportunities from Jeffries.

449.   Abercrombie's participation in furthering the sex-trafficking venture was intentional and willful and, therefore, Abercrombie intentionally and willfully caused Jeffries's commission of the forcible commercial sex acts with David Bradberry and other Class Members through its affirmative and overt acts supporting Jeffries.

450.   Abercrombie knew, and was in reckless disregard of the fact, that

means of force, threats of force, fraud, coercion, and a combination of such means would be used by Jeffries and his other co-conspirators to cause David Bradberry and other Class Members to engage in commercial sex acts.

451.   Abercrombie knew, acted in reckless disregard of the fact, and should have known, that its conspiracy would directly and proximately lead to unlawful coercive commercial sex acts by Jeffries with young men, including David Bradberry and other Class Members.

452.   The conspiracy that Abercrombie joined had specific knowledge that David Bradberry, as well as other Members of the Class, were being coercively sex trafficked by Jeffries. The conspiracy's knowledge extended to the names of Jeffries's victims, because Jeffries and his co-conspirators knew the names of the victims, including David Bradberry's name.

453.   Abercrombie conspired to violate 18 U.S.C. § 1591(a) with Jeffries and through its affirmative acts and substantial support to Jeffries committed, perpetrated, and directly and proximately caused David Bradberry and other Class Members to engage in commercial sex acts through means of force, threats of force, fraud, coercion, and a combination of such means.

454.   In addition to acting with knowledge that they were conspiring to support the sex-trafficking venture, Abercrombie benefited financially from conspiring to participate in the sex-trafficking venture, which Abercrombie knew

and should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2), as well as obstruction of the enforcement of the TVPA in violation of 18 U.S.C. § 1591(d).

455.   Abercrombie's conspiracy has caused David Bradberry and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.  That harm was directly and proximately caused by the conspiracy and the harm resulting from conspiracy was foreseeable.

456.   Abercrombie's conspiracy has caused David Bradberry harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

457.   This case does not involve mere fraud. Instead, Abercrombie's conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.   Abercrombie's conspiracy also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

458.   Abercrombie's conspiracy was directed specifically at David Bradberry and other members of the Class, who were the victims of the sex trafficking

organization.

459.  By virtue of these violations of 18 U.S.C. § 1594(c) Abercrombie is liable to David Bradberry and the other Members of the Class for the damages they sustained and reasonable attorneys' fees under 18 U.S.C. § 1595.

460.  By virtue of its intentional and outrageous conspiracy to violate 18 U.S.C. §§ 1594(c), Abercrombie is liable to David Bradberry and other members of the Class for punitive damages under 18 U.S.C. § 1595.

## COUNT VIII
## ATTEMPT TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(a), 1591, 1595 AGAINST ABERCROMBIE

461.  Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

462.  David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

463.  Abercrombie intentionally attempted to violate 18 U.S.C. § 1591(a)(1) and (a)(2), and to further the sex-trafficking venture to coerce commercial sex acts from David Bradberry and other Class Members, all in violation of 18 U.S.C. § 1594(a).

464.  Abercrombie officers and employees, including Jeffries, deliberately took substantial steps to attempt to violate 18 U.S.C. § 1591(a)(1) & (a)(2) within this District.

465. Abercrombie deliberately took substantial steps toward attempting to violate 18 U.S.C. § 1591(a)(1) & (a)(2), by providing substantial financial support for the sex-trafficking venture.

466. Among the many substantial steps taken by Abercrombie to deliberately attempt to violate 18 U.S.C. § 1591(a)(1) & (a)(2) was creating a special and unusual relationship between Abercrombie and Jeffries that was designed to, and did, facilitate the sex-trafficking venture and the sex trafficking of David Bradberry, as well as other Members of the Class.

467. It was part of the attempt to violate 18 U.S.C. 1591(a) that Abercrombie would financially benefit from participating in and providing financial support for the sex-trafficking venture.

468. Abercrombie did financially benefit from its participation in the venture.

469. Abercrombie's attempt to violate the TVPA by furthering the sex-trafficking venture was intentional and willful and, therefore, Abercrombie intentionally and willfully caused Jeffries's commission of sexual abuse and commercial sex acts with David Bradberry and other Class Members through its affirmative and overt acts supporting Jeffries.

470. Abercrombie knew and acted in reckless disregard of the fact, that its acts and conduct attempting to support and facilitate Jeffries would lead to sexual

abuse and unlawful coercive commercial sex acts by Jeffries with young men, including David Bradberry and other Class Members.

471.   In addition to acting intentionally and with knowledge that they were supporting the sex-trafficking venture, Abercrombie benefited financially from attempting to participate in the sex-trafficking venture which Abercrombie should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2).

472.   This case does not involve mere fraud.  Instead, Abercrombie's conduct in attempting to violate the TVPA was outrageous and intentional, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization.

473.   Abercrombie's attempts also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

474.   Abercrombie's attempt was directed specifically at David Bradberry and other members of the Class, who were the victims of Abercrombie's sex trafficking organization.

475.   Abercrombie's conduct has caused David Bradberry and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.  This harm was a direct, proximate, and foreseeable

result of Abercrombie's attempt in violation of 18 U.S.C. § 1594(a).

476.   By virtue of these violations of 18 U.S.C. § 1594(a), Abercrombie is liable to David Bradberry and the other Members of the Class for the damages they sustained and reasonable attorneys' fees under 18 U.S.C. § 1595.

477.   By virtue of its intentional and outrageous attempt to violate 18 U.S.C. § 1594(a), Abercrombie is liable to David Bradberry and other members of the Class for punitive damages under 18 U.S.C. § 1595.

## COUNT IX
## BATTERY/VIOLATION OF SECTION 130
## AGAINST JEFFRIES

478.   Plaintiff David Bradberry realleges and incorporates by reference paragraphs 1 – 304, as if fully set forth in this Count.

479.   David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

480.   The intentional acts of Jeffries against the Plaintiff, and the Class Members, constitute a sexual offense as defined in New York Penal Law § 130, including but not limited to the following:

   a.  Sexual misconduct as defined in §130.20 inasmuch as Jeffries engaged in sexual intercourse with Plaintiff without his consent;

   b.  Rape in the first degree as defined in §130.35 inasmuch as Jeffries engaged in sexual intercourse with Plaintiff by forcible compulsion;

c. Criminal sexual act in the first degree as defined in §130.50 inasmuch as Jeffries engaged in oral sexual conduct with Plaintiff by forcible compulsion;

d. Forcible touching as defined in §130.52 inasmuch as Jeffries, intentionally and for no legitimate purpose, engaged the forcible sexual touching of the Plaintiff for the purpose of degrading or abusing them or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in §130.66 inasmuch as Jeffries inserted a foreign object in the anus of the Plaintiff by forcible compulsion.

481. At all relevant times, Jeffries acted with reckless disregard for the safety of the Plaintiff and others who were subjected to Jeffries's sexual abuse.

482. As a result, Plaintiff alleges that one or more exemptions set forth in N.Y. CPLR § 1602 applies.

483. As a direct and proximate result of Jeffries's violation of New York Penal Laws § 130, Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of his privacy and a loss of his capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

484. By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal

indifference to civil obligations, Jeffries is liable to David Bradberry and other Members of the Class for punitive damages.

**COUNT X**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST JEFFRIES**

485.    Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

486.    David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

487.    As a direct and proximate result of Jeffries's tortious conduct and sex crimes in violation of Chapter 130, Jeffries intentionally inflicted emotional distress against David Bradberry and the Class Members.

488.    Jeffries's actions, described above, constitute extreme and outrageous conduct that shocks the conscience.

489.    Jeffries's conduct was especially extreme and outrageous due to David Bradberry and the Class Members' particular vulnerabilities as targets of a sex-trafficking venture.

490.    Jeffries intended to cause, and did cause, David Bradberry and the Class Members severe emotional distress.

491.    Jeffries's conduct as described herein was intentionally directed at David Bradberry and these particular Class Members to cause them each specific

harm as evidenced by the specific 130 crimes that were carried out by Jeffries personally.

492.   Because Jeffries intentionally inflicted extreme emotional distress on David Bradberry and the Class Members, he is liable to David Bradberry and the Class Members for damages they suffered as a direct and proximate result.

493.   At all relevant times, Jeffries acted with reckless disregard for the safety of the Plaintiff and others who were subjected to Jeffries's sexual abuse.

494.   As a result, Plaintiff alleges that one or more exemptions set forth in N.Y. CPLR § 1602 applies.

495.   As a direct and proximate result of Jeffries's conduct, David Bradberry and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy.

496.   By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Jeffries is liable to David Bradberry and other Members of the Class for punitive damages.

## COUNT XI
## VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 10-1101 AGAINST JEFFRIES

497.   Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

498.   David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

499.   Abercrombie's sex-trafficking venture resulted in a violent crime motivated by gender when Jeffries raped Plaintiff and subjected him to sexual abuse within the meaning of the Victims of Gender-Motivated Violence Protection Law (hereinafter referred to as "VGM"). Admin. Code of City of N.Y. § 10-1101.

500.   Jeffries committed acts of gender-motivated violence against David Bradberry and other similarly situated class members when he raped them and subjected them to acts of sexual abuse.

501.   The acts of gender-motivated violence against David Bradberry and other similarly situated class members were committed because of gender or on the basis of gender, and due, at least in part, to an animus based on their gender.

502.   Specifically, the sex-trafficking venture allowed Jeffries to commit violent sexual crimes motivated by gender upon the Plaintiff and other class members.

503.   David Bradberry and other Class Members were sexually abused by Jeffries in New York City, and specifically within Manhattan.

504.   At all relevant times, Jeffries acted with reckless disregard for the safety

of the Plaintiff and others who were subjected to Jeffries's sexual abuse.

505.   As a result, Plaintiff alleges that one or more exemptions set forth in N.Y. CPLR § 1602 applies.

506.   As a direct and proximate cause of Jeffries's unlawful conduct in violation of the VGM, Plaintiff has suffered damages, including physical and emotional pain and suffering, mental anguish, and the loss of capacity for the enjoyment of life.

507.   As a direct and proximate result of Jeffries's unlawful conduct in violation of the VGM, Plaintiff is entitled to punitive damages.

**COUNT XII**
**PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION**
**OF THE TRAFFICKING VICTIMS PROTECTION ACT 18 U.S.C. §§**
**1591(a)(1), 1595**
**AGAINST JEFFRIES**

508.   Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

509.   David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

510.   Jeffries knowingly and intentionally, through various means, participated in, perpetrated, assisted, supported, and facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, in violation of 18 U.S.C. § 1591(a)(1).

511.  At all times material hereto, Jeffries, through means of force, threats of force, fraud, and/or coercion, caused David Bradberry and other Class Members to engage in commercial sex acts.

512.  Specifically, David Bradberry was forced to engage in commercial sex acts with Jeffries in New York City, the Hamptons, London, and France.

513.  Jeffries, at all times material hereto, was sexually trafficking David Bradberry through means of force, fraud, and/or coercion including but not limiting to:

    a.  Providing false promises of a career as a future Abercrombie model;

    b.  Paying David Bradberry in cash for the sexual acts he subjected him to;

    c.  Providing David Bradberry clothing for the sexual acts he subjected him to;

    d.  Threatening their careers as a model if they refused to engage in commercial sex acts with him or any of his associates.

514.  By virtue of Jeffries knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Jeffries is liable to David Bradberry and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

515.  By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Jeffries is liable to David Bradberry and other members of the Class for punitive damages.

## COUNT XIII
## <u>KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT 18 U.S.C. §§ 1591(a)(1), 1595 AGAINST JEFFRIES</u>

516.    Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

517.    David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

518.    Jeffries knowingly and intentionally benefited, financially and personally by receiving things of value, from participating in, assisting, supporting, and facilitating an illegal coercive ex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

519.    Jeffries took many steps to aid and participate in Abercrombie's sex-trafficking venture, including but not limited to organizing the events at which Class Members were abused; promising the Class Members that they could have a future as Abercrombie models; and personally abusing the victims himself.

520.    The promises that Jeffries was making to his victims were necessary for the Class Members to engage in commercial sex acts, as they genuinely believed there were legitimate career opportunities associated with the events.

521.    By making these false promises, Jeffries knew that he would be able to

coerce David Bradberry and other victims to engage in commercial sex acts.

522.    Jeffries knowingly and intentionally benefited from, and received value, for his participation in Abercrombie's sex-trafficking venture, as Jeffries was able to achieve sexual gratification as a result of his conduct.

523.    Jeffries understood, and was in reckless disregard of the fact, that it was the Abercrombie sex-trafficking venture's practice to use the channels and instrumentalities of interstate and foreign commerce, to entire, recruit, solicit, harbor, provide, obtain, and transport young victims, like David Bradberry for purposes of causing commercial sex acts in violation of 18 U.S.C. § 1591 (a)(1).

524.    By virtue of Jeffries knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Jeffries is liable to David Bradberry and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

525.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Jeffries is liable to David Bradberry and other members of the Class for punitive damages.

## COUNT XIV
## CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(c), 1591, 1595 AGAINST JEFFRIES

526.    Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

527.    David Bradberry brings this Count individually and on behalf of the

other Class Members he respectively seeks to represent.

528.   Jeffries intentionally conspired with others, including Abercrombie and his other co-conspirators, by agreement and understanding, to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2) & 1591(d), and to further the sex-trafficking venture to coerce commercial sex acts from David Bradberry and other Class Members, all in violation of 18 U.S.C. § 1594(c). Jeffries directly conspired with Abercrombie officers and employees to further the sex-trafficking venture.

529.   Jeffries's conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and Jeffries thereby violated Chapter 77, Title 18. Jeffries's conspiracy directly, proximately, and foreseeably harmed David Bradberry, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways.   Jeffries's conspiracy victimized David Bradberry and the other members of the Class.

530.   Jeffries's conspiracy to violate 18 U.S.C. 1591 was forbidden by 18 U.S.C. § 1594(c), and Jeffries thereby violated Chapter 77, Title 18.   Jeffries's conspiracy directly, proximately, and foreseeably harmed David Bradberry as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways.  Jeffries's conspiracy victimized David Bradberry and the other Members of the Class.

531.   Jeffries conspired with Abercrombie and his other co-conspirators to

further the sex-trafficking venture and with the purpose of facilitating illegal sex trafficking. Jeffries had actual knowledge of the sex-trafficking venture. Jeffries acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2), that is, with consciousness of the nature of the sex-trafficking venture and with the specific intent to further venture. Jeffries and Abercrombie had a meeting of the minds as to the essential nature of the plan.

532.    Jeffries's conspiracy with Abercrombie was part of his participation in the sex-trafficking venture. Without Abercrombie agreeing to facilitate the venture, Jeffries would not have been a position to move forward with his sex-trafficking venture and to recruit and entice victims of the venture. The agreement began in 1992 once Jeffries was hired and continued at least through 2014 once Jeffries was terminated from Abercrombie.

533.    Jeffries also conspired with Abercrombie and his other co-conspirators to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d). The conspiracy included an agreement to keep the sex-trafficking venture secret or, at least, concealed to the greatest extent possible.

534.    Within this District, Jeffries intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating

the recruiting, enticing, coercing, harboring, transporting, and inducing and forcibly causing David Bradberry and other Class Members to engage in commercial sex acts. A number of those acts were committed by Jeffries himself.

535.  Among the many overt acts intentionally committed by Jeffries in furtherance of the sex-trafficking venture were creating and maintaining a special relationship between Abercrombie and Jeffries designed to facilitate the sex-trafficking.

536.  Jeffries's actions in furtherance of the conspiracy with Abercrombie were intertwined with the sex-trafficking venture, as Abercrombie's funding for the sex-trafficking venture were essential tools for Jeffries to commit coercive commercial sex acts.

537.  It was part of the conspiracy that Abercrombie would financially benefit from providing financial support for the sex-trafficking venture. Abercrombie did financially benefit from his participation in the venture, including receiving valuable business opportunities from Jeffries.

538.  It was also part of the conspiracy that Jeffries would benefit for participating in the sex trafficking venture. Jeffries had access to an almost unlimited number of young attractive male models to sexually abuse and traffic. Jeffries's access was due solely to his role as CEO of Abercrombie.

539.  Jeffries's participation in furthering the sex-trafficking venture was

121

intentional and willful and, therefore, Jeffries's intentionally and willfully committed forcible commercial sex acts with David Bradberry and other Class Members through his affirmative and overt acts conspiring with Abercrombie.

540.   Jeffries knew, and was in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, and a combination of such means would be used by him and his other co-conspirators to cause David Bradberry and other Class Members to engage in commercial sex acts.

541.   Jeffries knew, acted in reckless disregard of the fact, and should have known, that his conspiracy would directly and proximately lead to unlawful coercive commercial sex acts with young men, including David Bradberry and other Class Members.

542.   The conspiracy that Jeffries joined had specific knowledge that David Bradberry, as well as other Members of the Class, were being coercively sex trafficked. The conspiracy's knowledge extended to the names of Jeffries's victims, because Jeffries and his co-conspirators knew the names of the victims, including David Bradberry's name.

543.   Jeffries conspired to violate 18 U.S.C. § 1591(a) with Abercrombie and through his affirmative acts and substantial support from Abercrombie committed, perpetrated, and directly and proximately caused David Bradberry and other Class Members to engage in commercial sex acts through means of force, threats of force,

fraud, coercion, and a combination of such means.

544.   In addition to acting with knowledge that he was conspiring to support and continue the sex-trafficking venture, Jeffries benefited from conspiring to participate in the sex-trafficking venture, which Jeffries knew and should have known had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2), as well as obstruction of the enforcement of the TVPA in violation of 18 U.S.C. § 1591(d).

545.   Jeffries's conspiracy has caused David Bradberry and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.  That harm was directly and proximately caused by the conspiracy and the harm resulting from conspiracy was foreseeable.

546.   Jeffries's conspiracy has caused David Bradberry harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

547.   This case does not involve mere fraud. Instead, Jeffries's conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  Jeffries's conspiracy also evinced a high degree of moral turpitude

and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

548.   Jeffries's conspiracy was directed specifically at David Bradberry and other members of the Class, who were the victims of the sex trafficking organization.

549.   By virtue of these violations of 18 U.S.C. § 1594(c) Jeffries is liable to David Bradberry and the other Members of the Class for the damages they sustained and reasonable attorneys' fees under 18 U.S.C. § 1595.

550.   By virtue of his intentional and outrageous conspiracy to violate 18 U.S.C. §§ 1594(c), Jeffries is liable to David Bradberry and other members of the Class for punitive damages under 18 U.S.C. § 1595.

## COUNT XV
## ATTEMPT TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(a), 1591, 1595 AGAINST JEFFRIES

551.   Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

552.   David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

553.   Jeffries intentionally attempted to violate 18 U.S.C. § 1591(a)(1) and (a)(2), and to further the sex-trafficking venture to coerce commercial sex acts from David Bradberry and other Class Members, all in violation of 18 U.S.C. § 1594(a).

554.   Jeffries deliberately took substantial steps to attempt to violate 18

U.S.C. § 1591(a)(1) & (a)(2) within this District.

555.   Jeffries deliberately took substantial steps toward attempting to violate 18 U.S.C. § 1591(a)(1) & (a)(2), by creating a "model casting" ruse used over and over to entice and trap young attractive male models into the sex-trafficking venture.

556.   Among the many substantial steps taken by Jeffries to deliberately attempt to violate 18 U.S.C. § 1591(a)(1) & (a)(2) was creating a special and unusual relationship between Abercrombie and Jeffries that was designed to, and did, facilitate the sex-trafficking venture and the sex trafficking of David Bradberry, as well as other Members of the Class.

557.   It was part of the attempt to violate 18 U.S.C. 1591(a) that Jeffries would benefit from participating in and creating the casting ruse to bring young attractive male models into the sex-trafficking venture.

558.   Jeffries did benefit from his participation in the venture because he had access to an almost unlimited number of young attractive male models to sexually abuse and traffic.

559.   Jeffries's attempt to violate the TVPA by furthering the sex-trafficking venture was intentional and willful and, therefore, Jeffries intentionally and willfully caused Abercrombie to provide the financial support to allow him to commit sexual abuse and commercial sex acts with David Bradberry and other Class Members through its affirmative and overt acts supporting Jeffries.

560.   Jeffries knew and acted in reckless disregard of the fact, that his acts and conduct would lead to sexual abuse and unlawful coercive commercial sex acts by him with young men, including David Bradberry and other Class Members.

561.   In addition to acting intentionally and with knowledge that he was supporting the sex-trafficking venture, Jeffries benefited from attempting to participate in the sex-trafficking venture which Jeffries should have known had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2).

562.   This case does not involve mere fraud.  Instead, Jeffries's conduct in attempting to violate the TVPA was outrageous and intentional, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization.

563.   Jeffries's attempts also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

564.   Jeffries's attempt was directed specifically at David Bradberry and other members of the Class, who were the victims of the Abercrombie sex trafficking organization.

565.   Jeffries's conduct has caused David Bradberry and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.  This harm was a direct, proximate, and foreseeable

result of Jeffries's attempt in violation of 18 U.S.C. § 1594(a).

566.    By virtue of these violations of 18 U.S.C. § 1594(a), Jeffries is liable to David Bradberry and the other Members of the Class for the damages they sustained and reasonable attorneys' fees under 18 U.S.C. § 1595.

567.    By virtue of his intentional and outrageous attempt to violate 18 U.S.C. § 1594(a), Jeffries is liable to David Bradberry and other members of the Class for punitive damages under 18 U.S.C. § 1595.

## COUNT XVI
## BATTERY/VIOLATION OF SECTION 130
## AGAINST SMITH

568.    Plaintiff David Bradberry realleges and incorporates by reference paragraphs 1 – 304, as if fully set forth in this Count.

569.    David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

570.    The intentional acts of Smith against Plaintiff, and the Class Members, constitute a sexual offense as defined in New York Penal Law § 130, including but not limited to the following:

    a.  Sexual misconduct as defined in §130.20 inasmuch as Smith engaged in sexual intercourse with Plaintiff without his consent;

    b.  Rape in the first degree as defined in §130.35 inasmuch as Smith engaged in sexual intercourse with the Plaintiff by forcible compulsion;

    c. Criminal sexual act in the first degree as defined in §130.50 inasmuch as Smith engaged in oral sexual conduct with the Plaintiff by forcible compulsion;

    d. Forcible touching as defined in §130.52 inasmuch as Smith, intentionally and for no legitimate purpose, engaged the forcible sexual touching of the Plaintiff for the purpose of degrading or abusing them or for the purpose of gratifying his own sexual desire; and

    e. Sexual abuse in the third degree as defined in §130.66 inasmuch as Smith inserted a foreign object in the anus of the Plaintiff by forcible compulsion.

571.   At all relevant times, Smith acted with reckless disregard for the safety of the Plaintiff and others who were subjected to Jeffries's sexual abuse.

572.   As a result, Plaintiff alleges that one or more exemptions set forth in N.Y. CPLR § 1602 applies.

573.   By virtue of Smith's knowing and intentional violations of N.Y. Penal Laws § 130, Smith is liable to David Bradberry and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

574.   By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Smith is liable to David Bradberry and other Members of the Class for punitive damages.

**COUNT XVII**
**<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>**
**<u>AGAINST SMITH</u>**

575.   Plaintiff David Bradberry realleges and incorporates by paragraphs 1 –

304, as if fully set forth in this Count.

576.   David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

577.   As a direct and proximate result of Smith's tortious conduct and sex crimes in violation of Chapter 130, Smith intentionally inflicted emotional distress against David Bradberry and the Class Members.

578.   Smith's actions, described above, constitute extreme and outrageous conduct that shocks the conscience.

579.   Smith's conduct was especially extreme and outrageous due to David Bradberry and the Class Members' particular vulnerabilities as targets of a sex-trafficking venture.

580.   Smith intended to cause, and did cause, David Bradberry and the Class Members severe emotional distress.

581.   Smith's conduct as described herein was intentionally directed at David Bradberry and these particular Class Members to cause them each specific harm as evidenced by the specific 130 crimes that were carried out by Jeffries personally.

582.   Because Smith intentionally inflicted extreme emotional distress on David Bradberry and the Class Members, he is liable to David Bradberry and the Class Members for damages they suffered as a direct and proximate result.

583.   At all relevant times, Smith acted with reckless disregard for the safety

of the Plaintiff and others who were subjected to Smith's sexual abuse.

584.   As a result, Plaintiff alleges that one or more exemptions set forth in N.Y. CPLR § 1602 applies.

585.   By virtue of Smith's intentional conduct, Smith is liable to David Bradberry and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

586.   By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Smith is liable to David Bradberry and other Members of the Class for punitive damages.

**COUNT XVIII**
**AIDING, ABETTING, AND FACILITATING BATTERY**
**AGAINST JEFFRIES FAMILY OFFICE**

587.   Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

588.   David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

589.   Between about 1992 and 2014, in this District in New York, Jeffries intentionally committed batteries and other intentional tortious conduct, including crimes in violation of New York Penal Law Chapter 130 such as New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66 (hereinafter "Chapter 130

crimes"), against David Bradberry and the Class Members. Jeffries committed intentional tortious conduct and crimes against David Bradberry and Class Members when they were 18 years of age or older.

590.   As described throughout this complaint, Jeffries intentionally and non-consensually touched David Bradberry and the Class Members in a harmful and offensive manner that resulted in substantial injuries, including damages from physical and psychological injury, extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy.

591.   The resulting injuries that David Bradberry and the Class Members suffered include injuries directly and proximately suffered as a result of sex offenses committed by Jeffries and other co-conspirators and criminalized under article 130 of the New York Penal Laws.  The offenses included sexual intercourse without consent and oral sexual conduct without consent, forbidden by New York Penal Law § 130.20.  The offenses included forcible touching of sexual or other intimate parts without consent, forbidden by New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66.

592.   Regardless of when the tortious conduct (*e.g.*, battery) and Chapter 130 Crimes were committed by Jeffries, the conduct and crimes are now civilly actionable, regardless of any statute of limitations to the contrary, because they are covered by the one-year "look back" window in New York Adult Survivors Act.

*See* N.Y. C.P.L.R. § 214-j.

593.    Between at least 1992 and 2014, the Jeffries Family Office knowingly and intentionally aided, abetted, and facilitated Jeffries's intentional tortious conduct (*e.g.*, battery), through Chapter 130 Crimes recounted in the preceding paragraphs of this Count.

594.    Because the Jeffries Family Office aided, abetted, and facilitated Jeffries's conduct and crimes in violation of Chapter 130, it is liable for damages caused by the conduct and crimes.

595.    Between at least 1992 and 2014, when it provided substantial assistance to Jeffries, the Jeffries Family Office was well aware of its important and substantial role as a part of Jeffries's intentionally tortious and illegal activity in committing Chapter 130 Crimes.

596.    As a direct and proximate result of Jeffries's tortious conduct and crimes, which the Jeffries Family Office knowingly and intentionally aided, abetted, and facilitated, David Bradberry and the Class Members have in the past suffered, and in the future will continue to suffer, substantial damages, including damages from physical and psychological injury, extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of his privacy.

597.    At the time of Jeffries's batteries, intentionally tortious conduct, and

crimes against David Bradberry and the Class Members, the Jeffries Family Office was well aware of a sex-trafficking venture and that its concrete steps in furtherance of the venture were aiding, abetting, and facilitating his batteries, tortious conduct, and crimes.

598.   At the time of Jeffries's crimes against David Bradberry and the Class Members, the Jeffries Family Office knowingly provided substantial assistance in Jeffries's tortious conduct and crimes.  That knowing substantial assistance went beyond mere knowledge and approval of Jeffries's wrongdoing.  For example, Jeffries used funds from the Jeffries Family Office to commit the coercive sex offenses described in the preceding paragraphs in this Count.  Without that support, Jeffries could not have committed his tortious conduct and crimes—a fact that the Jeffries Family Office knew.

599.   The Jeffries Family Office knowingly and intentionally committed both substantial acts in support of Jeffries and substantial deliberate omissions in support of Jeffries.  For example, the Jeffries Family Office deliberately omitted to take important steps that would have prevented the crimes thereby substantially assisting Jeffries to commit his crimes against David Bradberry and Class Members in violation of New York Penal Law Chapter 130.

600.   In aiding, abetting, and facilitating Jeffries's intentional tortious conduct and crimes, the Jeffries Family Office could readily foresee direct and

proximate injury to David Bradberry and the Class Members. The Jeffries Family Office should have foreseen direct and proximate injury from its actions and inactions to David Bradberry and the Class Members.

601. Indeed, the Jeffries Family Office did foresee injury to Jeffries's victims, including David Bradberry and Class Members.

602. In aiding, abetting, and facilitating Jeffries's tortious conduct and crimes, the Jeffries Family Office committed intentional torts directed against David Bradberry and the Class Members. The Jeffries Family Office's aiding, abetting, and facilitating Jeffries's tortious conduct and crimes were its own wrongful acts and omissions.

603. The Jeffries Family Office had a duty not to commit tortious conduct and crimes—specifically aiding, abetting, and facilitating New York sex crimes as described above— directed against David Bradberry and the Class Members.

604. At all relevant times, the Jeffries Family Office acted with reckless disregard for the safety of the Plaintiff and others who were subjected to Jeffries's sexual abuse.

605. As a result, Plaintiff alleges that one or more exemptions set forth in N.Y. CPLR § 1602 applies.

606. As a result of the foregoing, the Jeffries Family Office is liable civilly for damages it directly, tortiously, and criminally caused to David Bradberry and the

Class Members.

607.   David Bradberry and the Class Members accordingly are entitled to bring a cause of action for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of the Jeffries Family Office's aiding, abetting, and facilitating Jeffries's tortious conduct and crimes described above and for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of Jeffries's tortious conduct and crimes.

608.   By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, the Jeffries Family Office is liable to David Bradberry and other Members of the Class for punitive damages.

## COUNT XIX
## NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE TO PREVENT PHYSICAL HARM
## AGAINST JEFFRIES FAMILY OFFICE

609.   Plaintiff David Bradberry realleges and incorporates by paragraphs 1 – 304, as if fully set forth in this Count.

610.   David Bradberry brings this Count individually and on behalf of the other Class Members he respectively seeks to represent.

611.   The Jeffries Family Office owed a duty to David Bradberry and the Class Members to exercise reasonable care to avoid conduct that created a risk of physical harm to them.

135

612.    The Jeffries Family Office's duties included a duty to exercise reasonable care to avoid conduct that would combine with Jeffries's crimes, and permit Jeffries's crimes, in violation of Chapter 130.

613.    The Jeffries Family Office's own conduct in providing financial and other support for the sex trafficking venture set forces in motion that directly and proximately injured and caused physical harm to David Bradberry and the Class Members.

614.    These forces that the Jeffries Family Office set in motion caused Jeffries's intentional tortious conduct and Chapter 130 Crimes against David Bradberry and the Class Members, causing physical harm and in themselves constituted physical harm to David Bradberry and the Class Members.

615.    The Jeffries Family Office owed David Bradberry and the Class Members a duty not to set those forces in motion because they unreasonably created a risk of physical harm.

616.    The Jeffries Family Office reasonably could foresee, and did in fact foresee, that its negligent failure to prevent physical harm would result in physical harm to David Bradberry and the Class Members.  The Jeffries Family Office owed a duty to prevent that physical harm.

617.    The Jeffries Family Office failed to act objectively reasonably in failing to take precautions to prevent Jeffries's intentional tortious conduct and sex-

trafficking and sex crimes in violation of Chapter 130, which were committed against David Bradberry and the Class Members.

618.   If the Jeffries Family Office had acted reasonably to prevent physical harm, it would not have supported and allowed Jeffries's tortious conduct and sex-trafficking and sex crimes to occur. The Jeffries Family Office owed David Bradberry and the Class Members a duty to act objectively reasonably.

619.   At the time of the Jeffries Family Office's own negligent conduct, the Jeffries Family Office both realized and should have realized the likelihood that it was creating an opportunity for Jeffries to commit intentional tortious conduct and Chapter 130 Crimes against David Bradberry and the Class Members.

620.   Indeed, the Jeffries Family Office knew that its own conduct was necessary to create Jeffries's opportunities to engage in that conduct and commit those crimes.  The Jeffries Family Office owed David Bradberry and the Class Members a duty not to create those opportunities for Jeffries.

621.   The Jeffries Family Office's breaches of its legal duties were the direct—*i.e.*, the but-for—cause of physical and psychological injuries to David Bradberry and the Class Members.  Without the Jeffries Family Office's breaches of legal duties, those injuries would not have occurred.  The injuries that occurred were readily foreseeable to the Jeffries Family Office.

622.   David Bradberry and the Class Members were easily within the zone of

foreseeable harm from the Jeffries Family Office's negligent acts and omissions. The Jeffries Family Office's negligent acts and omissions foreseeably created substantial risk of Jeffries and his co-conspirators committing sex crimes against young men with whom he was in contact. Tragically, David Bradberry and the Class Members fell within that zone.

623. Because of the Jeffries Family Office's negligent failure to prevent physical harm to David Bradberry and the Class Members, it is liable to David Bradberry and the Class Members for damages suffered as a direct and proximate result.

624. At all relevant times, the Jeffries Family Office acted with reckless disregard for the safety of the Plaintiff and others who were subjected to Jeffries's sexual abuse.

625. As a result, Plaintiff alleges that one or more exemptions set forth in N.Y. CPLR § 1602 applies.

626. As a direct and proximate result of the Jeffries Family Office's negligent failure to prevent physical harm, David Bradberry and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. The Jeffries Family Office's negligent failure to exercise reasonable care

directly and proximately caused Jeffries's sex crimes.

627.    By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, the Jeffries Family Office is liable to David Bradberry and other Members of the Class for punitive damages.

## X. REQUEST FOR RELIEF

David Bradberry respectfully requests that the Court enter judgment in his favor, and against Abercrombie, Michael Jeffries, Matthew Smith, and the Jeffries Family Office as follows:

a.  That the Court certify the Class, name David Bradberry as Class Representative, and appoint his lawyers as Class Counsel;

b.  That the Court award Plaintiff and the other members of the Class compensatory, consequential, general, nominal, and punitive damages against Defendant in an amount to be determined at trial;

c.  That the Court award punitive and exemplary damages against Defendant in an amount to be determined at trial;

d.  That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e.  That the Court award pre- and post-judgment interest at the maximum

legal rate;

f.  That the Court toll the above causes of actions for all unnamed class members because the pendency of a class action tolls the statute of limitations on their putative claims; and

g.  That the Court grant all such other and further relief as it deems just and proper.

## XI.  JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 13, 2024

> Respectfully Submitted,
> EDWARDS HENDERSON
>
> By:  */s/ Bradley Edwards*
> Bradley J. Edwards
> 425 N. Andrews Ave., Suite 2
> Fort Lauderdale, FL 33301
> (954)-524-2820
> Fax: (954)-524-2822
> Email: brad@cvlf.com
>
> Brittany N. Henderson
> 145 East 15th Street, Unit 10E
> New York, NY
> (954)-524-2820
> Fax: (954)-524-2820
> Email: brittany@cvlf.com