UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| David Bradberry individually and On behalf of all others similarly situated, | |
| Plaintiff, | Case No.  1:23-cv-09440-JHR |
| v. | |
| Abercrombie & Fitch Co., Michael S. Jeffries, Matthew Smith, and The Jeffries Family Office, LLC, | |
| Defendants. | |

**PLAINTIFF DAVID BRADBERRY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ABERCROMBIE & FITCH CO.'S MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL OVERVIEW ........................................................................................................... 1

ARGUMENT ............................................................................................................................. 3

   I.    BRADBERRY'S TVPA CLAIMS ARE NOT BARRED BY THE 10-YEAR STATUTE OF LIMITATIONS. ................................................................................................................. 4

       A.   Bradberry Had Until December 9, 2024, to File his TVPA Claims. ............................. 4

       B.   Bradberry's Claims Are Permitted by the Doctrine of Equitable Tolling. ..................... 5

       C.   Bradberry's Claims Are Permitted by the Doctrine of Equitable Estoppel. ................... 6

   II.   BRADBERRY'S TVPA-RELATED COUNTS DO NOT FAIL ON THE MERITS. ...... 8

       A.   The Actions of Other Defendants are Imputed to ANF. .............................................. 8

       B.   ANF Had Actual Knowledge of the Trafficking Alleged in the Complaint. ................... 9

       C.   Jeffries's Actions Are Also Imputed to ANF. ........................................................... 11

       D.   ANF Directly Participated in and Benefitted from the Jeffries Sex-Trafficking Venture. 13

          1.   Participation ................................................................................................ 13

          2.   Benefit ........................................................................................................ 14

       E.   The Amended Complaint States a Claim for TVPA Perpetrator Liability. ................... 16

       F.   The Amended Complaint States a Claim for TVPA Conspiracy (Count VII) and Attempt to Commit Violations of the TVPA (Count VIII). ................................................. 16

   III.   BRADBERRY ALLEGES TIMELY AND MERITORIOUS NEW YORK COMMON LAW AND STATUTORY CLAIMS. ..................................................................................... 17

       A.   The Amended Complaint States a Claim for Aiding and Abetting Battery (Count I).. 18

       B.   The Amended Complaint States a Claim for Negligent Failure to Exercise Reasonable Care to Prevent Physical Harm (Count II) and for Vicarious Liability (Count III). ............. 19

          1.   Bradberry Has Properly Pled Negligent Failure to Exercise Reasonable Care. ....... 20

          2.   Bradberry Has Properly Pled His Vicarious Liability Claim. ................................... 22

       C.   Bradberry Has Adequately Pled the Required Gender Motivation or Gender Animus Pursuant to Administrative Code § 10-1101—et seq. (Count IV). ....................................... 24

CONCLUSION ....................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.B. v. Marriott Int'l, Inc.*,
    455 F. Supp. 3d 171 (E.D. Pa. 2020) ...................................................................... 8

*Abbas v. Dixon*,
    480 F.3d 636 (2d Cir. 2007)................................................................................... 5

*Andre Romanelli, Inc. v. Citibank, N.A*,
    875 N.Y.S.2d 14 (1st Dept. 2009) ......................................................................... 12

*Apollo Fuel Oil v. United States*,
    195 F.3d 74 (2d Cir. 1999)..................................................................................... 11

*Ardolf v. Weber*,
    332 F.R.D. 467 (S.D.N.Y. 2019) ........................................................................... 8

*Ashcroft v. Iqbal*,
    556 U.S. 662, 678 (2009)........................................................................................ 3, 9

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................ 7

*Bensky v. Indyke*,
    24-cv-1204 (AS), 2024 WL 3676819 (S.D.N.Y. 2024)........................................... 7, 13, 16, 19

*Bisson v. Martin Luther King Jr. Health Clinic*,
    No. 07-5416-cv, 2008 WL 4951045 (Nov. 20, 2008) ............................................ 6

*Breest v. Haggis*,
    180 A.D. 3d 83 (N.Y. 1st Dept. 2019) .................................................................. 25

*Burlington Indus., Inc. v. Ellerth*,
    524 U.S. 742 (1998)................................................................................................ 22, 23

*Canosa v. Ziff*,
    18-Civ-4115 (PAE), 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019)......................... 8, 15

*Chao v. Xanadu Boutique, Inc.*,
    380 F.Supp.2d 134 (E.D.N.Y.2005) ...................................................................... 6

*Clark v. Hanley*,
    89 F. 4th 78 (2d Cir. 2023) .................................................................................... 6

*David v. Weinstein Company LLC*,
    431 F.Supp.3d 290 (S.D.N.Y. 2019)................................................................... 15

*DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009)............................................................................... 19

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
    671 F.Supp.3d 387 (S.D.N.Y. 2023)........................................ 11, 13, 14, 20, 21

*Doe v. Baram*,
    20-civ-9522 (ER), 2021 WL 4847076 (S.N.D.Y. 2021) ........................................ 4

*Doe v. Indyke*,
    465 F. Supp. 3d 452 (S.D.N.Y. 2020)........................................................ 8, 11, 13

*Fleites v. MindGeek S.A.R.L.*,
    No. CV-21-04920-CJC, 2022 WL 4456077 (C.D. Cal. July 29, 2022)................... 17

*Ford v. Grand Union Co.*,
    268 NY 243 (1935). ............................................................................................. 20

*G.G. v. Salesforce.com*,
    603 F. Supp. 3d 626 (N.D. Ill. 2022) .................................................................... 13

*Geiss v. Weinstein Company Holdings LLC*,
    383 F. Supp. 3d 156 (S.D.N.Y. 2019)...................................................... 6, 7, 14, 15

*Grede v. McGladrey & Pullen LLP*,
    421 B.R. 879 (N.D.Ill.2009) ................................................................................ 12

*Guo v. IBM 401(k) Plus Plan*,
    95 F. Supp. 3d 512 (S.D.N.Y. 2015)....................................................................... 6

*Hain v. Jamison*,
    28 N.Y.3d 524 (2016) .......................................................................................... 21

*Herman v. Wesgate*,
    94 A.D.2d 938 (N.Y. App. Div. 1983) ................................................................. 19

*Holmes v. Lorch*,
    329 F. Supp. 2d 516 (S.D.N.Y. 2004)..................................................................... 7

*Hughes v Twenty-First Century Fox, Inc.*,
    304 F. Supp 3d 429 (S.D.N.Y. 2018)................................................................... 24

*In re PetroChina Company Ltd. Securities Litigation,*
  120 F.Supp.3d 340 (S.D.N.Y. 2015).....................................................................17

*In re Roman Catholic Diocese of Rockville Centre, New York,*
  651 B.R. 146 (S.D.N.Y. 2023)..............................................................................21

*Ion Audio, LLC v. Bed, Bath & Beyond, Inc.,*
  15-CV-8292, 2019 WL 1494398 (S.D.N.Y. Apr. 2, 2019) .....................................8

*Kashef v. BNP Paribas S.A.,*
  925 F. 3d 53 (2d Cir. 2019)....................................................................................3

*Katz v. United Synagogue of Conservative Judaism,*
  135 A.D.3d 458 (N.Y. App. Div. 2016) ...............................................................20

*Kirschner v. KPMG LLP,*
  15 N.Y.3d 446 (2010) ...........................................................................................12

*Levin v. Sarah Lawrence Coll.,*
  23-cv-10236 (LJL), 2024 WL 4026966 (S.D.N.Y. Sept. 3, 2024) ..........................6

*Mancuso v. Consolidated Edison Co. of New York, Inc.,*
  905 F. Supp. 1251 (S.D.N.Y. 1995).......................................................................8

*Maurizi v. Callaghan,*
  20-CV_922JLS, 2022 WL 1446500 (W.D.N.Y. Feb. 25, 2022) ...........................18

*Moore Charitable Foundation v. PJT Partners, Inc.,*
  40 N.Y.3d 150 (2023) ...........................................................................................21

*Noble v. Weinstein,*
  335 F. Supp. 3d 504 (S.D.N.Y. 2018)...................................................................13

*Oneida Indian Nation v. County of Oneida,*
  617 F.3d 114 (2d Cir. 2010)..................................................................................16

*Ortiz v. Cornetta,*
  867 F.2d 146 (2d Cir. 1989)....................................................................................4

*Paguirigan v. Prompt Nursing Emp. Agency LLC,*
  286 F. Supp. 3d 430 (E.D.N.Y. 2017) ..................................................................17

*Pinkerton v. United States,*
  328 U.S. 640, 647 (1946).......................................................................................17

iv

*Price v. Keyes*,
    62 N.Y. 378 (1875) ............................................................................................ 12

*Ricchio v. McLean*,
    853 F.3d 553 (1st Cir. 2017) ............................................................................ 17

*Scollo ex rel. Scollo v. Nunez*,
    847 N.Y.S.2d 899 (Sup. Ct. 2007) .......................................................... 18, 19

*Thea v. Kleinhandler*,
    807 F.3d 492 (2d Cir. 2015) ............................................................................... 7

*United States v. Ben Zvi*,
    242 F.3d 89 (2d Cir. 2001) .................................................................................. 4

*United States v. Gershman*,
    31 F.4th 80 (2d Cir. 2022) ................................................................................ 17

*United States v. Kissel*,
    218 U.S. 610 (1910) ............................................................................................ 4

*United States v. Leslie*,
    658 F.3d 140 (2d Cir. 2011) ............................................................................... 5

*Wade Park Land Holdings, LLC v. Kalikow*,
    21-cv-1657 (LJL), 2022 WL 2479110 (S.D.N.Y. July 6, 2022) ................... 25

*Wagley v. JP Morgan Chase Bank. N.A.*,
    18-Civ-8668 (PGG), 2020 WL 5768688 (S.D.N.Y. 2020) .......................... 7

*Weldon v. Rivera*,
    301 A.D.2d 934 (N.Y. 2003) ........................................................................... 19

**Statutes**

18 U.S.C. § 1591(a)(1) ............................................................................................ 16

18 U.S.C. § 1594 ...................................................................................................... 16

**Other Authorities**

Restatement (Third) of Torts: Phys. & Emot. Harm § 19 ....................................... 20

Restatement of Torts (Second) of Agency § 219(2)(d) ........................................... 23

**Rules**

Fed. R. Civ. P. Rule 9(b) .......................................................................................... 9

v

**Treatises**

WAYNE R. LAFAVE & JENS DAVID OHLIN, CRIMINAL LAW § 12.3 (7th ed. 2023) .......................... 4

Plaintiff, David Bradberry ("Bradberry") submits this memorandum of law in opposition to Defendant, Abercrombie & Fitch Co.'s ("ANF"), Motion to Dismiss. [DE 95].

## PRELIMINARY STATEMENT

Michael Jeffries was the CEO of ANF from 1992 to 2014. During his tenure, Jeffries single-handedly transformed the business from a failing clothing company into a lucrative global brand by enacting a marketing scheme predicated on oversexualizing young men to sell clothes. With Abercrombie's support, Jeffries sexually exploited countless young men who had dreams of modeling for the conglomerate. In its Motion to Dismiss, ANF claims to have been "shocked and appalled" as well as "previously unaware of such allegations" intimating that Jeffries "retired from ANF in 2014" without the company's knowledge of wrongdoing. While discovery in this case—which ANF is intent on perpetually delaying—will prove that ANF was aware of the abhorrent conduct of their star CEO Mike Jeffries, at this juncture, there can be no doubt that Bradberry has pled sufficient facts against ANF in his 140-page complaint to survive dismissal.

ANF moves to dismiss every one of Bradberry's claims as meritless. The reality is that ANF asks this Court to dismiss a well-pled Amended Complaint by offering what it claims it will ultimately be able to prove at trial. But whatever the plausibility of ANF's version of events, Bradberry is entitled to pursue discovery to prove his substantial allegations. As explained in detail in his Amended Complaint, Bradberry is just one of at least 100 men who was sexually trafficked, exploited, and harmed by Jeffries's illegal and reprehensible conduct with the knowledge and assistance of ANF, a multi-billion-dollar company that chose profits over people for over a decade. Given the detailed allegations in the Amended Complaint, the Court should reject ANF's efforts to escape liability for its intentional and willful conduct at this early stage in the litigation.

## FACTUAL OVERVIEW

Mike Jeffries was "the heart and soul" of Abercrombie & Fitch. Am. Compl. ¶ 1. He has been

described as a man who, "just never stopped working for the brand, thinking for the brand." *Id.*

"Jeffries was indistinguishable from Abercrombie, and Abercrombie indistinguishable from Jeffries.

That was the case from the time that he conceptualized the oversexualization of young men as a

corporate strategy to catapult the Abercrombie brand into success, and it remained the case when he

used his role as CEO of Abercrombie to prey upon attractive young men who believed that Jeffries

was going to hire them as an Abercrombie model—the pinnacle of the modeling industry for men

during the relevant time period. Abercrombie knew that it was providing the financial lifeblood for a

sex-trafficking organization led by its CEO from at least 1992 through 2014, which allowed for him

to commit sexual crimes against young men. Jeffries was so important to the profitability of the brand

that he was given complete autonomy to perform his role as CEO however he saw fit, including

through blatant international sex-trafficking and sexual abuse of young men." *Id.* "In exchange for

providing the position of power and unfettered access to corporate resources necessary for Jeffries to

sexually terrorize aspiring male models, Abercrombie knowingly and intentionally benefited from

Jeffries and his sex-trafficking operation. Abercrombie willfully turned a blind eye to his blatant

misconduct so that the company would remain profitable during the most prominent years of Jeffries's

abuse, through the sex-charged and exploitive campaign that Jeffries instituted at Abercrombie." *Id*.

¶ 2.

As alleged in the Amended Complaint, Jeffries "was always on the clock working for

Abercrombie. He utilized the Abercrombie plane to conduct Abercrombie business while traveling to

hotel rooms that were decorated like Abercrombie storefronts where he lured young men who were

instructed to dress in Abercrombie clothes." *Id*. ¶¶ 84; 85. Every mechanism utilized in the Jeffries

sex trafficking scheme was paid for by ANF. *Id*. ¶¶ 85; 157-158. David Bradberry and other Class

Members were lured into this abusive world by the promise of an opportunity to model for ANF and

audition for its CEO. *Id*. ¶¶ 141-142. "As a by-product of the sex-trafficking venture, Abercrombie

had at its disposal, a group of male victims to employ and further promote its brand image." *Id*. ¶ 127. The company benefitted "by retaining Jeffries as its cash cow CEO" even though he "required as part of his employment, complete autonomy to utilize any methods of brand building he wanted, including the blatant use of a sex-trafficking and sexual abuse scheme." *Id*. ¶ 126. In fact, "Jeffries's abuse, at its core, epitomized the brand at the time, and through the sex-trafficking scheme, trapped these men into the Abercrombie brand." *Id*. ¶ 132; 164.[1]

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face…. A Claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The Court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Kashef v. BNP Paribas S.A.*, 925 F. 3d 53, 58 (2d Cir. 2019). ANF's Motion consistently asks this Court to depart from the well-recognized standard of review at this stage in the proceedings, and instead, apply a heightened standard akin to that at summary judgment, disputing the facts that Bradberry pleads in his Amended Complaint as "conclusory" simply because it does not agree with the well-pled and factually supported allegations. Drawing all reasonable inferences in Bradberry's favor, ANF has failed to demonstrate that Bradberry has failed to state a claim.

---

[1] "To be clear, each of the events where the Class Members were abused were Abercrombie events and the victims were invited there as Abercrombie models. Each victim was provided and made to wear Abercrombie attire, head to toe, for each event, including those events abroad that lasted several days. Each other individual working or otherwise participating in these Abercrombie sexual abuse events was also dressed entirely in Abercrombie clothing, and the decorations, including in rented hotels, was professionally organized to appear as an Abercrombie store, leaving no doubt in the minds of anyone that these events where men were routinely sexually abused at the direction of Jeffries and Matthews were ratified, endorsed and approved by Abercrombie."

I.    **BRADBERRY'S TVPA CLAIMS ARE NOT BARRED BY THE 10-YEAR STATUTE OF LIMITATIONS.**

"A court must deny a motion to dismiss based on the statute of limitations unless all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that the statute was tolled." *Doe v. Baram*, 20-civ-9522 (ER), 2021 WL 4847076 at *3 (S.N.D.Y. 2021) (denying defendant's motion to dismiss 13-year-old TVPA claims). A motion to dismiss based on timeliness "should not be granted unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (internal quotation marks omitted).

A.  **Bradberry Had Until December 9, 2024, to File his TVPA Claims.**

In this case, Bradberry alleges the existence of a coercive sex trafficking operation through (at least) December 2014 (*see, e.g.*, Am. Compl. ¶¶ 150, 154, 159, 218) and ANF fails to cite any authority for the proposition that on behalf of the Class, Bradberry needed to plead around its timeliness defense. Nonetheless, ANF contends that because Bradberry was abused through 2010, his claim is untimely. ANF ignores hornbook conspiracy law holding that, for purposes of statute of limitations, a conspiracy continues so long as overt acts in furtherance of the conspiracy continue.

For purposes of determining a statute of limitations applicable to a conspiracy, Bradberry need only prove that there was "one overt act in furtherance of the conspiratorial agreement . . . performed within that period [of the statute of limitations]." *United States v. Ben Zvi*, 242 F.3d 89, 97 (2d Cir. 2001.)[2] ANF concedes that the TVPA has a ten-year statute of limitations. *See* [DE 95] at 6. And ANF does not dispute that Bradberry alleges that Jeffries and ANF were operating the sex-trafficking

---

[2] ("[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Accord* WAYNE R. LAFAVE & JENS DAVID OHLIN, CRIMINAL LAW § 12.3 at 839 (7th ed. 2023) ("the statute of limitations for the crime of conspiracy does not begin to run at the time of the agreement or (when required by statute) the overt act, but *only from the point at which the conspiracy is terminated.* For this purpose, 'the conspiracy continues up to the abandonment or success'" (quoting *United States v. Kissel*, 218 U.S. 610 (1910)).

venture through the time that Jeffries stepped down as CEO in 2014.[3]

ANF selectively ignores pertinent allegations, including those of an on-going coverup and other acts directly causing harm to Bradberry well beyond the 2010 abuse. For example, Bradberry alleges—without dispute from ANF—that ANF made him to sign an NDA, "designed to intimidate, threaten, and deter them from ever speaking about the abuse and trafficking they endured." Am. Compl. ¶¶ 94-99; 101. With direct knowledge of this sex-trafficking conspiracy, ANF remained liable for acts of the conspiracy until it made a clean break and affirmatively communicated its abandonment of the conspiracy, which at the earliest is the date of Jeffries' departure from the company on December 9, 2014. *See United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011) (withdrawal from conspiracy requires proof of "making of a clean [break] to the authorities" or "communication of the abandonment in a manner reasonably calculated to reach co-conspirators"); Am. Compl. ¶ 150 (alleging that the sex-trafficking venture was unable to continue only once Jeffries lost the legitimate infrastructure for the criminal enterprise in 2014). Bradberry alleges that the TVPA claims against the Defendants ran through December 9, 2014, placing Jeffries's relationship with ANF and the sex-trafficking venture squarely within the limitations period.

**B. Bradberry's Claims Are Permitted by the Doctrine of Equitable Tolling.**

Similarly, "[u]nder New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007). "To benefit from equitable tolling, a litigant must allege that extraordinary circumstances prevented him from acting in a timely manner," and he must raise those allegations in

---

[3] *See, e.g.,* Am. Compl. ¶ 1 (alleging "Abercrombie knew it that it was providing the financial lifeblood for a sex-trafficking organization led by its CEO from at least 1992 through 2014…"); *id.* ¶ 61 ("From at least 1992 through 2014 Jeffries—as the CEO of Abercrombie—and Smith hosted parties for prospective Abercrombie models around the world, including at Jeffries's homes in New York City"). In fact, Bradberry goes as far as to allege that the sex-trafficking venture only ended on December 9, 2014, once ANF had finally made a clean break from Jeffries and he lost the legitimate infrastructure for the criminal enterprise. *See id.* ¶¶ 150; 159.

the Complaint. *Guo v. IBM 401(k) Plus Plan,* 95 F. Supp. 3d 512, 525 (S.D.N.Y. 2015); *Chao v. Xanadu Boutique, Inc.,* 380 F.Supp.2d 134, 136 (E.D.N.Y. 2005) (finding that equitable tolling may have applied to plaintiff's claim based off defendant's actions misleading the plaintiff and permitted the plaintiff to file an amended complaint setting forth those allegations).

With respect to equitable tolling, the Second Circuit has cautioned that it "often raises fact-specific issues premature for resolution on a Rule 12(b)(6) motion, before plaintiff can develop the factual record." *Clark v. Hanley*, 89 F. 4th 78, 94 (2d Cir. 2023). As a result, a plaintiff needs to only plead facts that plausibly suggest equitable tolling should apply. *See Bisson v. Martin Luther King Jr. Health Clinic*, No. 07-5416-cv, 2008 WL 4951045 at *1 (Nov. 20, 2008) (finding it plausible that by telling plaintiff she didn't need a follow up visit, defendants delayed discovery of her condition and prevented her from filing a timely action). Here, Bradberry has properly pled facts sufficient to justify equitable tolling with respect to his forced entry into the NDA, which he was told forbade him from talking to a lawyer or filing a lawsuit to assert his rights against ANF. Bradberry was not permitted to read or retain a copy of the NDA that he was forced to sign under duress. Am. Compl. ¶ 226. Pertinently, none of the cases cited by ANF involved an NDA, which in this case directly interfered with Bradberry's ability to pursue further action. Bradberry's fear resulting from the prevention of egress from the abuse, and his fear that he would endure physical harm if he were to report the abuse or otherwise come forward have been plausibly pled. *Id*. ¶¶ 95-110.[4]

### C. Bradberry's Claims Are Permitted by the Doctrine of Equitable Estoppel.

Equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense. *Geiss v. Weinstein Company Holdings LLC*, 383 F. Supp. 3d 156, 172-73 (S.D.N.Y. 2019). To apply the doctrine, plaintiff must show that "defendant's actions induced

---

[4] *Compare with Levin v. Sarah Lawrence Coll*., 23-cv-10236 (LJL), 2024 WL 4026966, at *13–14 (S.D.N.Y. Sept. 3, 2024) (highlighted by ANF as the court rejected equitable tolling arguments; however, in that case, Plaintiffs merely alleged that they were manipulated).

plaintiff to refrain from commencing a timely action." *Wagley v. JP Morgan Chase Bank. N.A*., 18-Civ-8668 (PGG), 2020 WL 5768688 at *8 (S.D.N.Y. 2020). Such actions "must entail 'affirmative steps to prevent a plaintiff from bringing suit.'" *Geiss*, 282 F. Supp. 3d at 172. Moreover, "when a plaintiff relies on a theory of equitable estoppel to save a claim that otherwise appears untimely on its face, the plaintiff must specifically plead facts that make entitlement to estoppel plausible (not merely possible). *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (internal citations omitted).

The doctrine of equitable estoppel was designed for a case exactly like this one, where each victim of the Jeffries sex-trafficking operation was forced to sign a Non-Disclosure Agreement under duress.[5] More alarming, "[a]fter Jeffries left the company, Abercrombie was aware of and retained emails, electronically stored correspondence, and hard copy documents evidencing the years-long sexual abuse and trafficking scheme that was operated through and for the benefit of Abercrombie, Jeffries, and Smith." Am. Compl. ¶ 279. Because of this, "Abercrombie caused Jeffries's victims to continue to live in fear for nearly another decade before his sex-trafficking operation was exposed." *Id*. ¶ 280. The allegations in the Amended Complaint leave no doubt that Bradberry was induced to stay silent about his abuse at least until the time that Jeffries left ANF in 2014. Nonetheless, this jurisdiction has routinely held that whether or not equitable estoppel applies is a question of fact for the jury. *Bensky v. Indyke*, 24-cv-1204 (AS), 2024 WL 3676819 at *11-12 (S.D.N.Y. 2024) (recognizing that equitable doctrines are inherently fact-bound and are rarely fit for a motion to dismiss); *Holmes v. Lorch*, 329 F. Supp. 2d 516, 524-26 (S.D.N.Y. 2004); *Mancuso v. Consolidated*

---

[5] *See* Am. Compl. ¶¶ 95-110, 143, 146. Bradberry and Class Members were systematically told that they had no choice but to sign the document without opportunity to read or review the content. Remarkably, they could not retain a copy of the document and were expressly told that the document prevented them from ever sharing the details of what happened with anyone under any circumstance. *Id*. ¶¶ 77-80. The men were then violently sexually assaulted while individuals wearing ANF apparel and at times carrying firearms prevented them from leaving the ANF casting events and were told that if they ever came forward, they would be made to suffer physically, financially, reputationally, and otherwise. *Id*. ¶¶ 102-105; 123; 236. Because of the extreme power imbalance between the men and ANF, the men reasonably believed that defiance would result in serious harm to them.

*Edison Co. of New York, Inc.,* 905 F. Supp. 1251, 1258-1259 (S.D.N.Y. 1995). Therefore, ANF's

argument against equitable estoppel is at best an argument to be made at Summary Judgment, if not

ultimately before a jury, and is not a basis for dismissal given the sufficiency of the factual allegations

pled in Bradberry's Amended Complaint. *Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*, 15-CV-8292,

2019 WL 1494398 at *10 (S.D.N.Y. Apr. 2, 2019).

## II.    BRADBERRY'S TVPA-RELATED COUNTS DO NOT FAIL ON THE MERITS.

The TVPA provides a civil cause of action for sex-trafficking victims against entities, like

ANF, who participate in a sex-trafficking venture. In his Amended Complaint, Bradberry brings four

causes of action against ANF under the TVPA, including: Count V (Knowing Beneficiary in a Sex

Trafficking Venture), Count VI (Participating in a Sex-Trafficking Venture), Count VII (Conspiracy

to Commit Violations of the TVPA), and Count VIII (Attempt to Commit Violations of the TVPA).

Pursuant to the TVPA, "[A] plaintiff must allege that a defendant violated either §1591(a)(1) by

knowingly recruiting, enticing, transporting, providing, obtaining, advertising, patronizing or

soliciting a person or (a)(2) by knowingly benefiting from participation in a venture that has engaged

in any act described in § 1591(a)(1)." *Doe v. Indyke*, 465 F. Supp. 3d 452, 463 (S.D.N.Y. 2020).  In

assessing these issues, the court must construe the applicable TVPA provisions broadly because

remedial provisions, like Section 1595 of the TVPA, require broad interpretation.[6] In doing so, the

Court should deny ANF's Motion.

### A.  The Actions of Other Defendants are Imputed to ANF.

ANF seemingly concedes that the "numerous allegations about the supposed actions of the

Jeffries Family Office and Jeffries" are sufficient to state a cause of action under the TVPA but

wrongly claims that "[t]hose purported actions are not attributable to ANF." [DE 95] at 9. In this

---

[6] *See, e.g., Canosa v. Ziff*, 18-Civ-4115 (PAE), 2019 WL 498865 at *23 (S.D.N.Y. Jan. 28, 2019); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 189 (E.D. Pa. 2020); *Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019).

section of its motion, ANF only disputes whether the company was in fact an alter ego of Jeffries. Yet Bradberry expressly alleged that ANF "was an alter ego of Michael Jeffries," with multiple supporting factual grounds.[7] Regardless, a legal determination on alter ego is insignificant to whether Bradberry has properly alleged a TVPA claim sufficient to withstand dismissal. While Jeffries's knowledge is clearly imputed to ANF (*infra* at II(C)), Bradberry's TVPA claims against ANF do not rely solely on a theory of imputation or alter ego and are supported by a plethora of allegations evidencing ANF's direct participation in the trafficking operation. *See, e.g.*, Am. Compl. ¶¶ 1-2; 50-60; 84-85; 88; 126-132; 141-142; 157-158; 164.

**B. ANF Had Actual Knowledge of the Trafficking Alleged in the Complaint.**

ANF claims that Bradberry fails to allege that it had knowledge of the alleged trafficking and sexual misconduct by Jeffries. Rule 9(b) permits "knowledge, and other conditions of a person's mind" to "be alleged generally." *Ashcroft*, 556 U.S. at 662. Even so, there are dozens of allegations in the Amended Complaint regarding ANF's direct knowledge of trafficking. *See, e.g.*, Am. Compl. ¶¶ 1-2; 4; 60, 70; 73; 74; 84-85, 88-89; 121-122; 134; 145; 151-152; 154; 157-158; 161; 258; 261; 263; 268; 290-292; *compare with* ¶¶ 114, 132, 164, 272, 398, 446 (encompassing the paragraphs cited by ANF as insufficient to allege knowledge).

ANF more specifically claims that the Amended Complaint does not "plausibly allege that anyone at ANF other than Jeffries was aware of his alleged actions." [DE 95] at 11. To the contrary, Bradberry goes as far as to allege that:

> "At one point, a video circulated within the Abercrombie office, which depicted Mike Jeffries sniffing what was believed to be cocaine off a man's penis, and while Abercrombie tried to prevent the video from being more widely disseminated, the company did nothing to discourage the behavior captured in the video and in fact continued to financially reward Jeffries for his methods of recruiting young models, even

---

[7] *See* Am. Compl. ¶¶ 1, 2, 11, 47, 68-87 (evincing Jeffries's complete domination over the company that his life-partner had managerial authority at the company), 88-89 (evincing Jeffries's complete domination of the company that his family office shared employees with the company and stored confidential information and data related to Abercrombie), 129, 132.

though those methods were known to include rampant sexual abuse of young men."
Am. Compl. ¶ 57.

Bradberry alleges that Abercrombie employees were required to "properly pack his sex toy bag for his business trips." *Id*. ¶ 269. Continuing, "[o]ver many years, many Abercrombie employees were aware of Jeffries's sexually exploitative and abusive behavior. Abercrombie's leadership ignored this knowledge and ultimately decided to keep Jeffries at the helm as the CEO of the corporation." *Id*. ¶ 272; *see also* ¶ 282 (alleging that "dozens of employees of Abercrombie learned of Jeffries's and Smith's sexual abuse of men in their role as CEO and the partner to the CEO."). Bradberry even alleges communication between Jeffries Family Office and ANF related to the procurement of prospective models, and the sexual abuse and trafficking thereof. *Id*. ¶ 114. Moreover, Abercrombie was even contemplated as a Related Party in the NDA that all victims of sexual trafficking and abuse were forced to sign. *Id*. ¶ 103. Defendant argues illogically that the lack of public knowledge of Jeffries's criminal actions somehow proves a lack of knowledge on ANF's part. [DE 95] at 11. This irrational argument should be given no weight as Plaintiff has extensively pled ANF's constructive and actual knowledge Jeffries's sexual misconduct and the fact that these allegations never became news to anyone outside of ANF has no bearing as to the company's underlying knowledge.

Bradberry further alleges that "Jeffries was even permitted to pay hush money to victims and others using Abercrombie funds for a number of years before his departure from Abercrombie." Am. Compl. ¶ 161. And, that "[t]hrough information and belief, Abercrombie paid settlements to various individuals related to improper acts of Jeffries or Smith, some of which were related to sexual harassment or abuse." *Id*. ¶ 160. These allegations explicitly state that ANF not only had actual or constructive knowledge of the purported conduct at issue, but that the company took affirmative actions to cover it up (from the public) in furtherance of the trafficking operation. Bradberry even cites a Verified Shareholder Complaint brought against ANF as a result of its poor oversight of Jeffries. *See e.g. id*. ¶¶ 155-157. Given the broad allowances by Rule 9(b) with respect to pleading

knowledge, Bradberry has sufficiently pled actual and constructive knowledge.

ANF also murmurs that Bradberry's allegations are not well-pled because they do not provide the names of the ANF employees referenced in multiple paragraphs. [DE 95] at 13. This exact issue was addressed in *Doe v. Indyke* wherein the Court held that, "[w]hile, the Amended Complaint does not identify which specific employees took the action (though it does, as previously mentioned, explain who they were employed by), Defendants point to no authority suggesting that such specificity is required under Fed. R. Civ. P. 8(a)." 465 F. Supp. 3d at 465–66.[8]

### C. Jeffries's Actions Are Also Imputed to ANF.

In addition to actual knowledge of the abuse, ANF had imputed knowledge. "[W]hen an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal." *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F.Supp.3d 387, 407 (S.D.N.Y. 2023) (citing *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999)). *Deutsche Bank* is particularly instructive on the point of imputation in that Judge Rakoff held "if the allegations in plaintiffs' complaints are taken as true, Mr. Staley had actual first-hand knowledge that Epstein conducted a sex-trafficking venture." *Id*. "Through attribution of Mr. Staley's alleged knowledge to JP Morgan, the complaints might well support an allegation that JP Morgan actually knew that Jeffrey Epstein ran a sex-trafficking venture." *Id*.  There, Jes Staley was a high-level executive whose knowledge of sexual assault and trafficking, in which it was alleged that he personally participated, was imputed to JP Morgan.  *See id*.  Here, Jeffries was the CEO of ANF whose knowledge is no doubt imputed to the company for purposes of TVPA liability. ANF argues that Jeffries's knowledge cannot be attributed to ANF because: (1) he acquired it outside the scope of

---

[8] (citing *Twombly* and rejecting "a heightened standard that requires a complaint to include specific evidence, factual allegations in addition to those required by Rule 8," and reminding that, "[i]nstead, the Federal Rules require "only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests.")

his employment, and (2) because intentional torts cannot be committed in furtherance of a legitimate business interest. But the Amended Complaint makes very specific contrary allegations that Jeffries systematically carried out dozens of actions in furtherance of the trafficking operation that fell squarely within the scope of his employment and that occurred before, during, and after the commission of intentional torts.[9]

A fundamental principle has informed the law of agency and corporations for centuries, "namely, the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467 (2010) (internal citations omitted). It follows from this principle that a corporation must be responsible for the acts of its authorized agents even if particular acts were unauthorized and that the risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent. *Id.* (citing *Andre Romanelli, Inc. v. Citibank, N.A*, 875 N.Y.S.2d 14 (1st Dept. 2009)).[10] To allow a corporation to avoid the consequences of corporate acts simply because an employee performed them with his personal gain in mind would enable the corporation to disclaim, at its convenience, virtually every act its officers undertake. *Id.* at 467. This is because "corporate officers, even in the most upright enterprises, can always be said, in some meaningful sense, to act for their own interests." *Id.* (citing *Grede v. McGladrey & Pullen LLP*, 421 B.R. 879, 886 (N.D.Ill.2009)).

Here, the vast majority, if not all, of Jeffries' knowledge was acquired within the scope of his employment, for the benefit of his employer, and is properly imputed to ANF. Am. Compl. ¶¶ 6; 75; 81; 84; 85; 145; 182; 219; 221-223; 236. Jeffries engaged in the actions cited in those paragraphs of

---

[9] *See infra* discussion of Restatement of Torts on Agency Section 219(2)(d) in Section III(B) below.

[10] In *Kirschner*, the court pertinently reasoned that "the principal is generally better suited than a third party to control the agent's conduct, which at least in part explains why the common law has traditionally placed the risk on the principal." *Kirschner*, 15 N.Y.3d at 467. In fact, "agency law presumes imputation even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud. *Id.* (citing *Price v. Keyes*, 62 N.Y. 378, 384–385 (1875) (identifying that the critical analysis is on whether the agent was acting in furtherance of his duties, regardless of his "selfish motive."))."

the Amended Complaint during regular business hours, while hosting ANF events with victims and

staff modeling exclusively ANF clothing, conducting business for ANF, being paid by ANF, touting

his CEO of ANF status, and in furtherance of his objective to build the company brand, which was

outwardly sexually exploitive at the time. All knowledge that Jeffries acquired up until the moment

that he committed each intentional act of battery, and all knowledge that he acquired while watching

others engage in tortious conduct against Bradberry, was acquired in the course and scope of his

employment and thus must be imputed to ANF.

### D. ANF Directly Participated in and Benefitted from the Jeffries Sex-Trafficking Venture.

Bradberry alleges that ANF knowingly benefitted from participation in a venture that has

engaged in acts described in § 1591, in parallel with other similar TVPA cases from this district. *See,*

*e.g.*, *Indyke*, 465 F. Supp. 3d at 463 (finding that the participation and benefit elements were properly

pled to include specific allegations about how the Corporate Defendants' conduct facilitated Epstein's

abuse); *Deutsche Bank Aktiengesellschaft*, 671 F.Supp.3d at 401-402 (finding that Plaintiff properly

alleged benefit and participation in the sex trafficking operation by both JP Morgan and Deutsche

Bank); *Bensky,* 2024 WL 3676819 at * 9 (finding that Plaintiff properly pled both benefit and

participation against those that facilitated Epstein's conduct).

1.  Participation

Participation requires "specific conduct that furthered the sex trafficking venture," *Deutsche*

*Bank*, 671 F.Supp.3d at 387 (citing *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018))—

"more than just passive facilitation, but some level of active engagement." *Id.* (citing *G.G. v.*

*Salesforce.com*, 603 F. Supp. 3d 626, 644 (N.D. Ill. 2022)). In *Deutsche Bank*, JP Morgan and

Deutsche Bank both argued that they did not participate in the Epstein sex-trafficking venture because

they merely provided their usual banking services to Epstein. *Id*. at 405. Here, ANF similarly argues

non-participation. [DE 95] at 17. However, as Bradberry painstakingly alleges, ANF's involvement

here went far beyond any involvement by the bank in *Deutsche Bank*.[11] Each of these acts constitute specific ANF conduct that goes far beyond passive participation or usual services.[12]

## 2. Benefit

Bradberry has also adequately alleged that ANF benefited from its participation in Jeffries's sex-trafficking venture. To properly allege benefit, "there must be a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit." *See, e.g.*, *Deutsche Bank*, 671 F.Supp 3d at 408 (holding that plaintiffs sufficiently pled benefit by alleging that "JP Morgan chose to ignore warnings that Epstein was involved in sex-trafficking because JP Morgan understood that it would lose a lot of money if it fired Epstein as a client.").

Here, Bradberry has made very specific allegations that are parallel to, and stronger than, the allegations in *Deutsche Bank* and distinguish this case from *Geiss*, which held that the plaintiff had failed to allege benefits stemming from the Company's facilitation of Weinstein's sexual misconduct. 383 F.Supp.3d at 169. For example, as in *Deutsche Bank*, Bradberry alleges that ANF chose to ignore warning that Jeffries was involved in sex-trafficking because ANF knew that it would lose money in addition to male models promoting the brand if it fired Jeffries as CEO. Am. Compl. ¶¶ 69, 270, 291.

The Amended Complaint details ANF's calculated and deliberate decision, made with knowledge of Jeffries' abhorrent behavior, that, if it stopped participating in the venture, it would lose

---

[11] ANF itself hosted events where he and other men were abused by Jeffries (Am. Compl. ¶ 164 ("each of the events where the Class Members were abused were Abercrombie events")); that victims were invited to the ANF events as ANF models (*id.*); that ANF directly provided ANF-style clothing to victims including Bradberry (*id.* ¶¶ 164; 219; 266); that ANF provided the decorations making the abusive ANF events appear like an ANF store (*id.* ¶ 164); that the ANF corporate jet was used in the operation of the Jeffries's trafficking operation (*id.* ¶¶ 85; 219; 266); that the hotel rooms where the abuse took place were paid for by ANF (*id.* 85; 158; 266); that ANF used corporate money and travel benefits to transport Jeffries to abuse men (*id.* ¶¶ 157; 182); that "Abercrombie employees [were required to] properly pack his sex toy bag for his business trips" (*id.* ¶ 269); and that ANF paid hush money to victims prior to Jeffries's departure from ANF in order to perpetuate the trafficking operation (*id.* ¶¶ 160, 161).

[12] *Compare with Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d at 405-406 ("But even if participation requires such engagement, plaintiffs adequately allege that defendants so participated in Jeffrey Epstein's sex-trafficking venture. JPM Jane Doe and the USVI allege, inter alia, that JP Morgan assisted with 'structuring' cash withdrawals so those withdrawals would not appear suspicious…They allege that JP morgan delayed filing suspicious activity reports concerning Epstein's activities…And they allege that JP Morgan actually trafficked women and girls for Epstein through its subsidiary").

the substantial financial benefits that Jeffries was bringing to the company. While ANF certainly did benefit generally because of Jeffries' efforts as CEO, ANF's benefit went far beyond maintaining an alleged wrongdoer as an employee. For that reason, this case is more akin to *Canosa v. Ziff*, 18-Civ-4115 (PAE), 2019 WL 498865 at \*22-25 (S.D.N.Y. Jan. 28, 2019) where the court found sufficient facts to sustain a TVPA participation claim, than it is to the *Geiss* or *Nobel* cases cited by ANF. *See also David v. Weinstein Company LLC*, 431 F.Supp.3d 290, 299 (S.D.N.Y. 2019) (highlighting that numerous judges in this district have denied motions to dismiss similar TVPA claims). This case is not like *Geiss*, where the plaintiff alleged that the production company defendant benefited from participating in sex trafficking simply due to Harvey Weinstein's continued employment, which generated revenue for the company "in spite of"—not because of—the trafficking. 383 F. Supp. 3d at 169–70. Here, the Amended Complaint alleges in detail the quid pro quo between Jeffries and ANF, and the benefits ANF received in direct exchange for its participation in the venture—such as millions of dollars in revenue from Jeffries's extreme oversexualization of the brand for enhanced marketing. Am. Compl. ¶¶ 1; 11; 52; 128; 129; 273; 287; 288. These allegations are similar to those in *Canosa*, where the complaint alleged "a symbiotic relationship between the TWC Companies and Weinstein, in which the companies affirmatively enabled and concealed Weinstein's predations as a means of keeping him happy, productive, and employable which led the companies to achieve fame and reap financial benefits." 2019 WL 498865 at \*24.

To put the finest point on this argument, ANF's brand was wholly reliant on advertising that depicted good-looking young men clad in ANF clothing seemingly on the verge of a sexual encounter. Am. Compl. ¶ 55. ANF knew and understood that Jeffries's sexual abuse and trafficking was part and parcel of his marketing vision—one did not exist without the other. *Id*. ¶ 128. Before, during, and after each of these events, whether in New York or anywhere else in the world, whether hours long or days long, the young and attractive victims were provided with and forced to wear/model ANF

attire at all times, constantly providing cheap advertising and marketing for ANF. *Id*. ¶ 164. ANF, chose profits over people, decided to stick with Jeffries's strategy, because ANF was benefitting financially. *Id.*; ¶ 292.

### E. The Amended Complaint States a Claim for TVPA Perpetrator Liability.

Count VI of Bradberry's Amended Complaint states a claim for "Participating in a Sex-Trafficking Venture" in violation of 18 U.S.C. § 1591(a)(1). As discussed in *Bensky*, when a plaintiff pleads multiple violations of the TVPA in line with various sections of the criminal statute, as Bradberry has done here, the Court only needs to find that "the complaint plausibly alleges one violation" of section 1595 because "the civil cause of action doesn't distinguish between different violations." *Bensky*, 2024 WL 3676819 at *9. It follows that "if the complaint plausibly alleges one violation, the § 1595 claim survives, and the Court need not address the others at the time of a Motion to Dismiss. *Id.* (citing *Oneida Indian Nation v. County of Oneida*, 617 F.3d 114, 139 (2d Cir. 2010) ("[T]he essence of a cause of action is found in the facts alleged and proven by the plaintiff, not the particular legal theories articulated.")).

Accordingly, Bradberry simply reincorporates his arguments related to his TVPA claims here, and thus the Court need not address the additional TVPA claims at this juncture.

### F. The Amended Complaint States a Claim for TVPA Conspiracy (Count VII) and Attempt to Commit Violations of the TVPA (Count VIII).

ANF also moves for dismissal of Count VII, which alleges that ANF conspired to violate the TVPA—a conspiracy prohibited by 18 U.S.C. § 1594, which states that, "[w]hoever conspires with another to violate section 1591" is guilty of an offense. Under section 1594(c), Bradberry has adequately alleged that ANF conspired with Jeffries to violate section 1591. As explained above, Jeffries was engaged in a sex-trafficking venture, and ANF knowingly and intentionally agreed to provide Jeffries with the means to effectuate and continue that venture with the corporate airplane, corporate merchandise, and corporate funds used to pay for the locations of the abuse. *See e.g.,* Am.

16

Compl. ¶¶ 85; 157; 158; 164; 182; 219; 266. Such is sufficient to state a claim for conspiracy under the TVPA. *See Fleites v. MindGeek S.A.R.L.*, No. CV-21-04920-CJC, 2022 WL 4456077 at *10 (C.D. Cal. July 29, 2022) (plaintiff adequately alleged TVPA conspiracy claim based on "Visa's alleged knowing decision to provide the means through which MindGeek could monetize child porn videos, like those featuring Plaintiff").

Not every conspirator will have knowledge as to every detail of the conspiracy's day-to-day operations. And yet it is well-settled law that a person, by virtue of being a party to a conspiracy, may be held responsible for the actions of his "partner[s] in crime" even if he or she did not participate in or know about those actions. *Pinkerton v. United States*, 328 U.S. 640, 647 (1946).[13] Under this established principle, once ANF agreed with Jeffries to further his sex-trafficking venture in violation of the TVPA, it became liable for Jeffries's actions in furtherance of the conspiracy. And given the quid pro quo allegations in the Amended Complaint, allegations of ANF's scienter are far more than plausible. ANF is thus properly subject to a civil claim for TVPA conspiracy.[14]

ANF rehashes similar, unpersuasive arguments in asking the Court to dismiss Count VIII, which alleges that ANF attempted to violate the TVPA. The same reasons for rejecting ANF's Motion to Dismiss the conspiracy count also apply to the attempt count. The Amended Complaint adequately alleges both that ANF intended to knowingly benefit from the sex-trafficking venture and that ANF's conduct amounted to a substantial step toward the TVPA offense.

## III.    BRADBERRY ALLEGES TIMELY AND MERITORIOUS NEW YORK COMMON LAW AND STATUTORY CLAIMS.

The Amended Complaint adequately pleads a cognizable claim for which relief can be granted

---

[13] *See also United States v. Gershman*, 31 F.4th 80, 99 (2d Cir. 2022) (discussing "*Pinkerton* liability" under which a defendant may be held responsible for crime he did not personally commit); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 440 (E.D.N.Y. 2017) (conspiracy can be inferred if the co-conspirators "entered into a joint enterprise with consciousness of its general nature and extent").

[14] *See, e.g.*, *Ricchio v. McLean*, 853 F.3d 553, 555–58 (1st Cir. 2017); *see also In re PetroChina Company Ltd. Securities Litigation,* 120 F.Supp.3d 340, 361-63 (S.D.N.Y. 2015) (recognizing that the individual defendant's scienter could be imputed to the company for which he served as CEO).

under New York Civil Practice Law and Rules § 214-j:

> "[E]very civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older … which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or notice of intention to file a claim, is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section."

In the instant case, Bradberry has more than satisfied this pleading burden while alleging intentional violations of Article 130 crimes by Jeffries. Am. Compl. ¶ 251.

**A.  The Amended Complaint States a Claim for Aiding and Abetting Battery (Count I).**

Under New York Law, to allege a cause of action for aiding and abetting an assault and battery, the plaintiff must allege: "(1) a wrongful act producing an injury; (2) the defendant's awareness of a role as a part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant's knowing and substantial assistance in the principal violation." *Scollo ex rel. Scollo v. Nunez*, 847 N.Y.S.2d 899 (Sup. Ct. 2007), aff'd, 60 A.D.3d 840 (N.Y. App. Div. 2009). Bradberry has adequately alleged each element: (1) Bradberry was sexually abused by Jeffries amounting to a battery; (2) ANF was aware of its role in Jeffries's sex-trafficking venture and its intentional criminal conduct; and (3) ANF provided knowing and substantial assistance. *See Maurizi v. Callaghan*, 20-CV-922JLS, 2022 WL 1446500 at *14 (W.D.N.Y. Feb. 25, 2022) (denying motion to dismiss aiding and abetting claims where complaint alleged that defendant knew coach was engaging in sexual activity yet endorsed him for a coaching position where his abuse continued).

ANF relies on its prior argument that Bradberry has failed to allege that ANF had knowledge of Jeffries's alleged sexual batteries to claim that Bradberry likewise failed to plead that ANF provided "substantial assistance" to Jeffries in his commission of the underlying torts. [DE 95] at 22. As acknowledged by the court in *Bensky*, "knowledge is always tricky prior to discovery" because "a

18

plaintiff realistically cannot be expected to plead a defendant's actual state of mind." 2024 WL 3676819 at *8 (citing *DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009)[15].

Here, Bradberry has gone above and beyond simply alleging facts that give rise to an inference of knowledge. Bradberry has alleged that ANF provided substantial assistance to Jeffries by way of a plethora of allegations in his Amended Complaint. Am. Compl. ¶¶ 4, 6, 84, 85, 122, 151, 157, 158, 164, 182, 219, 236, 266, 269, 272, 282.

Tort liability for a sexual assault can rest "upon the principle that [all] those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him." *Weldon v. Rivera*, 301 A.D.2d 934, 935 (N.Y. 2003). There need not be a formal agreement to commit the battery; "act[ing] tortiously pursuant to a tacit agreement to assault or batter" the victim is enough to create a triable issue of fact. *Scollo*, 60 A.D.3d at 840. Whether multiple wrongdoers "acted in concert is generally a question for the jury." *Herman v. Wesgate*, 94 A.D.2d 938, 939 (N.Y. App. Div. 1983) (participation in concerted activity is equivalent to participation in the activity).

### B. The Amended Complaint States a Claim for Negligent Failure to Exercise Reasonable Care to Prevent Physical Harm (Count II) and for Vicarious Liability (Count III).

ANF gratuitously attempts to conflate Bradberry's negligence and vicarious liability claims in its Motion. [DE 95] at 22. To be clear, Bradberry has brought two distinct and separate claims, each with elements unique to the claim itself, including a claim for negligent failure to exercise reasonable care encompassing direct negligence (Count II) and a separate claim for vicarious liability (Count III). As discussed further herein, Bradberry has properly pled a claim as to both counts.

---

[15] Noting that courts are typically "lenient in allowing scienter issues to withstand [motions to dismiss] based on fairly tenuous inferences, because such issues are appropriate for resolution by the trier of fact." It follows that "[p]laintiffs must simply allege facts that they claim give rise to an inference of knowledge."

1.  <u>Bradberry Has Properly Pled Negligent Failure to Exercise Reasonable Care.</u>

Bradberry has properly pled his negligence count—Count II. To state a claim for negligence under New York law, "a plaintiff must show that the defendant owed the plaintiff a duty and breached that duty, and that the breach proximately caused the plaintiff harm." *Katz v. United Synagogue of Conservative Judaism*, 135 A.D.3d 458, 459 (N.Y. App. Div. 2016). Nearly identical to the Defendants in *Deutsche Bank*, ANF argues that (1) ANF did not have a duty to Plaintiff, and (2) that ANF's conduct was not a proximate cause of Bradberry's injury. *See Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d at 414-15.

First, ANF contends that the Amended Complaint does not identify any facts that would have created a duty to Bradberry. While "[o]rdinarily a person owes no duty to members of the public at large," there is an "except[ion] to avoid injury to them by forces set in motion by such person or those acting as his agents." *Ford v. Grand Union Co.*, 268 NY 243, 269 (1935). All individuals and entities owe the ordinary duty of reasonable care, which can extend to the actions undertaken by third parties insofar as it foreseeably combines with or permits the improper conduct of a third party. *Deutsche Bank*, 671 F.Supp.3d at 414; (citing Restatement (Third) of Torts: Phys. & Emot. Harm § 19); *Ford*, 268 NY at 268-69. In *Deutsche Bank*, the Court held that since plaintiffs alleged that the corporate defendant bank "set in motion Jeffrey Epstein's sex-trafficking venture—by providing the cash that fueled it—they plausibly assert that [the bank] owed a duty to them." *Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d at 414. The fact that the defendants in *Deutsche Bank*—a corporate entity akin to ANF—did not have any pre-existing relationship with the plaintiffs was irrelevant to the Court's analysis. *Id*. at 414; *compare with* [DE 95] at 23 ("The Amended Complaint does not allege that ANF had any pre-existing relationship with Plaintiff…") Similar to the *Deutsche Bank* case, Bradberry alleges that ANF provided the clothing, air travel, hotel accommodations, employees, and cash that fueled the Jeffries sex trafficking operation. *See, e.g.*, Am. Compl. ¶ 164.

ANF, under these facts clearly owed a duty to Bradberry.

Likewise, Bradberry has alleged that ANF's conduct was the proximate cause of his injuries. "When an alleged injury is caused by an intervening criminal act, such as sexual abuse, the defendant's conduct is a proximate cause only when that intervening act is 'a natural and foreseeable consequence of a circumstance created by [the] defendant.'" *Deutsche Bank*, 671 F.Supp.3d at 414-415 (citing *Hain v. Jamison*, 28 N.Y.3d 524 (2016)). "Proximate cause will be found lacking where the original negligent act merely 'furnished the occasion for' … 'an unrelated act to cause injuries not ordinarily anticipated.'" *Id.*

In this count, Bradberry has brought a garden variety, general negligence claim, which merely requires the same sort of knowledge evidence that is often used to find a defendant liable in the context of negligent hiring, retention, and supervision claims. *See, e.g., In re Roman Catholic Diocese of Rockville Centre, New York*, 651 B.R. 146, 164 (S.D.N.Y. 2023). For such a duty to exist, there need only be ""a nexus between the actions or omissions of the employer and the harm the employee was able to inflict." *Moore Charitable Foundation v. PJT Partners, Inc*., 40 N.Y.3d 150, 162 (2023). "[A]n employer cannot avoid liability for negligent supervision and retention by shutting its eyes to the tortious practices and propensities of its employees—that is, by being doubly negligent. An employer 'should know' of an employee's dangerous propensity if it has reason to know of the facts or events evidencing that propensity and may be liable if it nonetheless 'place[s] the employee in a position to cause foreseeable harm.'" *Id*. at 158. (internal citations omitted). Bradberry has sufficiently pled that ANF negligently failed to exercise reasonable care to prevent physical harm by, among other things, retaining Jeffries as CEO and failing to exercise adequate supervision, over his unfettered access to ANF resources and aspiring young models in furtherance of the sex-trafficking operation. *See, e.g.*, Am, Compl. ¶ 2.

ANF contends that Bradberry does not "plausibly identify any known risks or factors that

would have created a duty for ANF to police the private actions of its CEO." [DE 95] at 23. Yet again, the Court need look no further than Bradberry's allegations themselves. Am. Compl. ¶¶ 160-161 (ANF directly paid settlements to individuals related to Jeffries' sexual harassment or abuse before his departure from the company); ¶ 269 (ANF knowingly spent a "copious amount of money on extravagant drug and sex parties" and "ignore[d] multiple red flags of criminality in Jeffries's corporate account activity"—all while employees packed his sex toy bag and ignored sex videos of Jeffries circulating at the ANF office); ¶ 156 (A verified stockholder derivative complaint from 2014 that alleged the board tolerated the creation of a corporate culture that resulted in completely avoidable lawsuits that tarnished the company because of Jeffries's conduct). Nearly all of Jeffries's behavior exhibited known risk and was all ignored so that the company could continue to profit.

ANF attempts to confuse the issues through discussion of certain inapplicable employer-employee cases. Very simply, Bradberry's negligence claim is predicated on what ANF knew or should have known and in turn what actions it had a duty to take to ensure Jeffries was not using his CEO post to sexually harm the young men that were being forced to model ANF's clothing. The allegations supporting Plaintiff's negligence claim relate to facts known to and easily discernable by ANF that placed the company on notice of Jeffries's likelihood of engaging in criminal conduct. By ratifying that conduct (*See e.g.* Am. Compl. ¶¶ 4, 51, 121, 164, 219) as well as taking overt steps it knew or should have known would contribute to Jeffries's criminal conduct (*See e.g.* ¶ 164), ANF is liable for its negligence.

## 2.   Bradberry Has Properly Pled His Vicarious Liability Claim.

Next, ANF argues in one lengthy sentence that Bradberry has failed to properly plead his Count III vicarious liability claim because Jeffries was not acting within the course and scope of his employment. [DE 95] at 22. However, "scope of employment is not the only basis for employer liability under agency principles." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 744 (1998). An

employer is subject to liability for the torts of its employees acting outside the scope of their employment when "the employee purported to act or to speak on behalf of the employer and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relationship." *Id.* (citing Restatement of Torts (Second) of Agency § 219(2)(d)). Here, Bradberry alleges a clear case of vicarious liability in light of multiple allegations regarding Jeffries's use of the Abercrombie name and brand.[16] Indeed, Bradberry specifically delineated in the Amended Complaint specific ways that Jeffries used the Abercrombie brand:

> "Throughout the entirety of the recruiting process, Jeffries and his co-conspirators were purporting to act on behalf of Abercrombie including but not limited to the following ways: a) Offering what the victims believed to be legitimate modeling opportunities; b) Providing victims the opportunity to meet with Abercrombie's professional photographer, Bruce Weber; c) Having modeling scouts recruit and find potential victims with the promise of meeting the CEO of Abercrombie; d) Providing victims Abercrombie clothing; e) Requiring all the victims to wear Abercrombie attire at each of the sexual abuse events; f) Providing victims gift cards to Abercrombie storefront locations; and g) Having staff at the sex-trafficking events dressed in Abercrombie." Am. Compl. ¶ 353.

ANF was in the business of selling clothes, through the use of a sexually exploitive campaign led by its CEO Jeffries, where young male models dressed scantily promoting the brand. *Id.* ¶ 164. Bradberry and the other Class Members were models, provided ANF clothing, taken to events where everyone was adorned in ANF clothing, and given personal interviews with Jeffries—as the CEO of ANF. *Id.* ¶¶ 5-7; 62; 184. How can ANF plausibly argue Jeffries was not acting in the scope of his employment? During the specific interview with Bradberry, as the CEO of ANF, Jeffries directly asked Bradberry "about his aspirations in the modeling industry" to which Bradberry replied "that he would like to be in the Abercrombie catalogue." *Id.* ¶ 232. Obviously, Jeffries was in the course and scope of his employment as CEO for ANF during most of, if not the entirety of, these events.

---

[16] For example, Jeffries "used his role as CEO of Abercrombie to prey upon attractive young men who believed that Jeffries was going to hire them as an Abercrombie model. Am. Compl. ¶¶ 1; 3 ("If the modeling scout saw 'potential' in the young model, he would be invited to attend a casting at the palatial home of Michael Jeffries, the well-known CEO of the Abercrombie brand"); 8; 36; 140-143; 217-218; 241 (the men believed that the castings were arranged by Abercrombie and that they could be cast as models for the brand).

Regardless, if at any point during any of these events that resulted in the sexual abuse of Bradberry and the Class the Court finds Jeffries to have momentarily stepped outside the scope of his employment, Bradberry has clearly alleged both that: (1) Jeffries purported to act or to speak on behalf of ANF and that there was reliance upon this apparent authority, and (2) Jeffries was aided in accomplishing the tort by the existence of the agency relation to ANF. Whether or not Jeffries was acting in the course and scope of his employment, ANF is liable.

Lastly, ANF makes a mumbled argument that the Adult Survivor's Act (ASA) does not apply to Bradberry's negligence claims against ANF because he has failed to demonstrate that ANF's negligence was the proximate cause of his alleged injuries. [DE 95] at 24. As explained in great detail above, Bradberry has alleged that but for ANF's negligence, including in supervising and retaining Jeffries, Jeffries could not have committed the hundreds if not thousands of criminal sex acts that he did. Bradberry has sufficiently and repeatedly pled that: (1) ANF's negligence was the proximate cause of his injuries, and (2) that Jeffries engaged in a violation of Article 130 that would constitute a sexual offense. *See generally* [DE 104] at Section I(A). Accordingly, the ASA does apply.

## C. Bradberry Has Adequately Pled the Required Gender Motivation or Gender Animus Pursuant to Administrative Code § 10-1101—et seq. (Count IV).

To state a claim under the Victims of Gender Motivated Violence Protection Law ("GMVA"), a plaintiff must allege that "(1) the alleged act constitutes a misdemeanor or felony against the plaintiff; (2) presenting a serious risk of physical injury; (3) that was perpetrated because of plaintiff's gender; 4) in part because of animus against plaintiff's gender; and (4) [sic] resulted in injury." *Hughes v Twenty-First Century Fox, Inc.*, 304 F. Supp 3d 429, 455 (S.D.N.Y. 2018). ANF relies on *Hughes* for the position that the egregious nature of the allegations of a rape fails to state any facts showing ANF's alleged acts were caused due to gender. [DE 95] 25. However, ANF entirely disregards the more recent decisions analyzing the GMVA, that have found allegations of rape or sexual assault are sufficient to state a claim under the GMVA because those types of crimes are

24

motivated, at least in part, by animus based on the victim's gender. *Breest v. Haggis*, 180 A.D. 3d 83, 84 (N.Y. 1st Dept. 2019).

While an allegation of rape would alone be enough to show gender motivated violation, Bradberry goes far above this base-line requirement. Bradberry has alleged that the entire scheme, and the crimes it involved, were targeted specifically at men and based on their gender. Am. Compl. ¶¶ 10, 252, 365, 368, 376. Indeed, the Amended Complaint alleges only crime committed against male (not female) models, demonstrating that Jeffries and the venture exclusively targeted men. The specific allegations into the manner in which Abercrombie "committed, directed, enabled, participated, or conspired" in Jeffries's crimes of violence motivated by gender have been emphasized throughout this memorandum and are alleged in Bradberry's Amended Complaint. *See e.g.* Am. Compl. ¶¶ 1-4; 10; 36; 51-54; 58; 118; 121; 160-161 (ANF directly paid settlements to individuals related to Jeffries' sexual harassment or abuse before his departure from the company); 164; 269 (ANF knowingly spent a "copious amount of money on extravagant drug and sex parties" and "ignore[d] multiple red flags of criminality in Jeffries's corporate account activity"—all while employees packed his sex toy bag and ignored sex videos of Jeffries circulating at the ANF office), 219; 365; 372; 373.

## CONCLUSION

The Court should deny ANF's Motion to Dismiss Plaintiff's Amended Complaint in its entirety. Of course, should the Court find that Bradberry has somehow failed to sufficiently pled facts to support his claims, Bradberry seeks leave to amend his complaint to do so. *See, e.g.*, *Wade Park Land Holdings, LLC v. Kalikow*, 21-cv-1657 (LJL), 2022 WL 2479110 at *3 (S.D.N.Y. July 6, 2022) (indicating that the Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)" and that leave should be granted when the court "cannot say that any amendment would be futile.").

Dated: October 18, 2024

Respectfully Submitted,

/s/ *Bradley Edwards*
Bradley Edwards
Brittany Henderson
Dean Kaire

**EDWARDS HENDERSON**
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Telephone: (954) 524-2820
Fax: (954) 524-2822
Email: brad@cvlf.com
        brittany@cvlf.com
        dean@cvlf.com
        ecf@cvlf.com